# UNITED STATES COURT OF INTERNATIONAL TRADE
# BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

<table>
<tr><td>

DITAR, S.A.,<br>
    Plaintiff,<br>
v.<br><br>
UNITED STATES,<br>
    Defendant,<br>
and<br><br>
COALITION FOR FAIR TRADE IN<br>
SHOPPING BAGS,<br>
    Defendant-Intervenor.

</td><td>

Court No. 24-00130

</td></tr>
</table>

## ORDER

Upon consideration of the Rule 56.2 motion of Plaintiff Ditar, S.A., all responses thereto, and all other papers and proceedings herein; it is hereby

**ORDERED** that Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record is granted; and it is further

**ORDERED** that the U.S. Department of Commerce's final determination set forth in *Certain Paper Shopping Bags From Colombia: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 45,843 (Dep't Commerce May 24, 2024), is remanded to the U.S. Department of Commerce for disposition in a

manner consistent with the judgment of this Court; and it is further

**ORDERED** that the U.S. Department of Commerce will reconsider its decision that Ditar, S.A. did not have two levels of trade in the home market; and it is further

**ORDERED** that if the U.S. Department of Commerce concludes that Ditar, S.A. had two levels of trade in the home market, that the U.S. Department of Commerce will re-calculate Ditar, S.A.'s dumping margin and will make a level of trade adjustment to home market selling prices when U.S. sales made at the distributor level of trade are compared to home market sales made at the retail level of trade.

**SO ORDERED**.

Date: _____    By: _____
      New York, New York                M. Miller Baker, Judge

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DITAR, S.A., <br>     Plaintiff, <br><br> v. <br><br> UNITED STATES, <br>     Defendant, <br> and <br><br> COALITION FOR FAIR TRADE IN <br> SHOPPING BAGS, <br>     Defendant-Intervenor. | Court No. 24-00130 |

## PLAINTIFF'S RULE 56.2 MOTION FOR
## JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Plaintiff Ditar, S.A. respectfully moves for judgment on the agency record with respect to its complaint challenging the final determination of the U.S. Department of Commerce in its less-than-fair-value investigation of certain paper shopping bags from Colombia. *See Certain Paper Shopping Bags From Colombia: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 45,843 (Dep't Commerce May 24, 2024), and accompanying Issues and Decision Memorandum (Dep't Commerce May 17, 2024).

**Court No. 24-00130, Motion for Judgment on the Agency Record**

For the reasons explained in the accompanying Memorandum of Law in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, Plaintiff requests that this Court hold that the contested portions of Commerce's *Final Determination* are unsupported by substantial evidence and otherwise are not in accordance with law. Plaintiff Ditar, S.A. therefore moves that the Court remand the Department of Commerce's *Final Determination* to the agency for disposition in a manner consistent with the judgment of the Court.

Respectfully submitted,

/s/ Robert G. Gosselink

Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
Kensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Plaintiff Ditar, S.A.

Dated:  January 22, 2025

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DITAR, S.A.,<br>  Plaintiff,<br>v.<br><br>UNITED STATES,<br>  Defendant,<br>and<br><br>COALITION FOR FAIR TRADE IN<br>SHOPPING BAGS,<br>  Defendant-Intervenor. | Court No. 24-00130 |

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC certifies that the Memorandum of Law in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, dated January 22, 2025, complies with the word-count limitation described in the Standard Chambers Procedures. The memorandum of law contains 11,428 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink

**TRADE PACIFIC PLLC**
700 Pennsylvania Ave., SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Plaintiff Ditar, S.A.

Dated:  January 22, 2025

# UNITED STATES COURT OF INTERNATIONAL TRADE

# BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DITAR, S.A.,<br>        Plaintiff,<br>v.<br><br>UNITED STATES,<br>        Defendant,<br>and<br><br>COALITION FOR FAIR TRADE<br>IN SHOPPING BAGS,<br>        Defendant-Intervenor. | Court No. 24-00130<br><br>**PUBLIC VERSION** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Ditar, S.A.

Dated:  January 22, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES ........................................................... ii

GLOSSARY .................................................................................. v

I.    STATEMENT PURSUANT TO RULE 56.2(c) ............................... 1

    A.    Administrative Determination Under Review ...................... 1

    B.    Issue Presented for Review ...................................................... 2

    C.    Relief Sought ............................................................................... 3

II.    STATEMENT OF FACTS .............................................................. 4

III.    STANDARD OF REVIEW ........................................................... 21

IV.    ARGUMENT ................................................................................. 24

    A.    Commerce's Decision Not to Find Two Levels of Trade In Colombia Was Unlawful ........................................................... 24

    1.    The Legal Framework for Establishing Different Levels of Trade .......................................................................................... 25

    2.    Commerce Ignored Relevant Facts From the Administrative Record and Reached an Inconsistent LOT Determination   31

    3.    Commerce Misunderstood and Ignored Ditar's Quantitative Analyses ...................................................................................... 40

    4.    Commerce Failed to Recognize That the Levels of Trade in the Home Market Affected Price Comparability ................. 46

V.    CONCLUSION .............................................................................. 57

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                    <u>Page</u>

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ..... 22

*Consol. Edison Corp. v. NLRB*, 305 U.S. 197 (1938) ............................ 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983) ...................................................................................................... 22

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ................... 21-22

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006).... 22

*Solar World Americas, Inc. v. United States,* 962 F.3d 1351 (Fed. Cir. 2020) ...................................................................................................... 23

*Star Fruits S.N.C. v. United States*, 393 F.3d 1277 (Fed. Cir. 2005) .... 24

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) ............................................................................... 22

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) . 23

*Appleton Papers Inc. v. United States*, 37 CIT 1034, 929 F.Supp.2d 1329 (2013) .............................................................................................. 24

*Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961 (1986) ............................................................................... 23-24

*Mitsubishi Heavy Indus. v. United States*, 22 CIT 541, 545, 15 F. Supp. 2d 807 (1998) ......................................................................................... 23

*Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320 (2008) ...................................................................................................... 22

ii

*Productos Laminados de Monterrey S.A. de C.V. v. United States*, 581 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ........................................................ 45

Statutes and Regulations

5 U.S.C. § 706(2)(A) ............................................................................. 23

19 U.S.C. § 1516a.......................................................................... 21, 23

19 U.S.C. § 1677b(a)(1) ........................................................... 25-26, 43

19 U.S.C. § 1677b(a)(7) .................................................26, 27, 35, 49

19 C.F.R. § 351.210(b).......................................................................... 56

19 C.F.R. § 351.224(g).......................................................................... 56

19 C.F.R. § 351.404(b).......................................................................... 57

19 C.F.R. § 351.412(a).......................................................................... 27

19 C.F.R. § 351.412(c)(2) ................................................................ 27, 28

Other Authorities

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296 (May 19, 1997) ........................................................................28, 31, 45

*Carbon and Alloy Steel Wire Rod from the Republic of Korea*, 83 Fed. Reg. 13228 (March 28, 2018) ............................................................ 52-53

*Certain Cut-to-Length Carbon Steel Plate Products from the Republic of Korea*, 87 Fed. Reg. 40489 (July 7, 2022) ................................................ 53

*Certain Lined Paper Products from India: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 16054 (April 13, 2018)................................................................................................ 29-30

*Certain Paper Shopping Bags From Colombia: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 45,843 (May 24, 2024) ................................................................... *passim*

*Certain Paper Shopping Bags From Colombia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 319 (January 3, 2024) ............................................................ *passim*

*Certain Tapered Roller Bearings from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 29092) (June 22, 2018) ........................................................ 30

*Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates*, 87 Fed. Reg. 930 (January 7, 2022) ........................................ 51

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico: Final Results of Antidumping duty Administrative Review; 2019-2020*, 87 Fed. Reg. 22186 (April 14, 2022).................................... 29

*Methionine from Spain: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 69616 (October 6, 2023 ................................................................................... 30

*Passenger Vehicle and Light Truck Tires from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 28569 (May 27, 2021) ........................................... 29

*Stainless Steel Bar from Brazil; Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 33,995 (July 14, 2009)................. 30

# **GLOSSARY**

| Acronym | Meaning |
|---------|---------|
| CONNUM | Control number |
| LOT | Level of trade |
| POI | Period of investigation |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RULE
56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff, Ditar, S.A., a foreign producer and exporter of paper

shopping bags from Colombia, submits this memorandum of law in

support of its motion for judgment on the agency record. As set forth

below, Plaintiff urges this Court to determine based on an assessment

of the law and the administrative record in this case that certain

aspects of the U.S. Department of Commerce's (hereinafter,

"Commerce's") final affirmative determination of sales at less-than-fair

value are not supported by substantial evidence and are otherwise not

in accordance with law, and to remand the agency's determination for

further proceedings.

## I.   STATEMENT PURSUANT TO RULE 56.2(c)

### A.   Administrative Determination Under Review

Plaintiff Ditar moves for judgment on the agency record with respect

to its complaint challenging certain aspects of the final determination of

Commerce's less-than-fair-value investigation of certain paper shopping

bags from Colombia. *See Certain Paper Shopping Bags From Colombia:*

*Final Affirmative Determination of Sales at Less Than Fair Value*, 89

Fed. Reg. 45,843 (Dep't Commerce May 24, 2024) ("*Final*

1

*Determination*"), Appx1556–1558. The challenged determination,

findings, and conclusions are set forth in Commerce's unpublished

Issues and Decision Memorandum (Dep't Commerce May 17, 2024)

("*Final Decision Memorandum*"), Appx1533–1555.

## B.    Issue Presented for Review

Plaintiff seeks judgment on the agency record and a remand of

Commerce's determination with respect to one issue:  whether

Commerce's *Final Determination* was based on substantial evidence

when Commerce declined to make a level-of-trade adjustment when

comparing Ditar's selling prices to *distributor resellers* in the United

States to the prices of merchandise under investigation sold in the home

market to *end users*. In this case, substantial information on the

administrative record established (1) that Ditar made its U.S.

distributor sales and its Colombian home market distributor sales at

the same level of trade; (2) that Ditar made its home market sales to

*end users* at a more remote and significantly different level of trade

than its sales to *distributor* customers; and (3) that the different levels

of trade in Colombia were characterized by substantially different

selling activities, which had an significant impact on price

comparability. Given these facts, it was imperative that Commerce

make a LOT adjustment in those instances when Commerce did not

match the prices of U.S. *distributor* sales to home market *distributor*

sales, and instead matched the prices of U.S. *distributor* sales to the

prices of sales to home market *end users.*

## C.    Relief Sought

Because Commerce failed to consider the record as a whole and to

determine that Ditar's home market sales to distributor and end user

customers were made at different levels of trade, Commerce's *Final*

*Determination* was unsupported by substantial evidence. The Court

should remand to Commerce with instructions to consider further that

Ditar made its home market sales to end user customers at a different

marketing stage than Ditar's sales to distributor customers in Colombia

and the United States; and that the more remote sales to end user

customers were characterized by an additional layer of selling activities

and selling expenses, amounting in the aggregate to a substantially

different selling function. Given that sales to distributors and sales to

end users constituted different levels of trade, Commerce should

recalculate Ditar's dumping margin and allow for level-of-trade

adjustments when comparing sales to distributors in the United States to sales to end user customers in Colombia.

## II.    STATEMENT OF FACTS

On June 20, 2023, Commerce initiated its less-than-fair value investigation of paper shopping bags from Colombia,[1] and on July 27, 2023, Commerce selected Plaintiff Ditar for individual examination as a mandatory respondent in the investigation.[2] From August 29 through September 26, 2023, Ditar submitted timely responses to Sections A through D of Commerce's Initial AD Questionnaire.[3] And in December 2023, Ditar provided timely responses to Commerce's supplemental questionnaires.[4]

---

[1]    *See* Certain Paper Shopping Bags from Cambodia, the People's Republic of China, Colombia, India, Malaysia, Portugal, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam: *Initiation of Less-Than-Fair-Value Investigations*, 88 Fed. Reg. 41589 (Dep't Commerce June 27, 2023), Appx5984.

[2]    *See* Commerce Memorandum Re. "Respondent Selection" (July 27, 2023), Appx3230–3236.

[3]    *See* Ditar's Letters, "Section A Response" (August 31, 2023) ("Ditar AQR"), beginning at Appx3245 and "Sections BCD Responses" (September 26, 2023) (Ditar BQR, Ditar CQR, and Ditar DQR, respectively), beginning at Appx3789.

[4]    *See* Ditar's Letters, "Supplemental ABC Response" (December 4, 2023) (Ditar 1st SQR (ABC)), beginning at Appx4315; "Supplemental D Response" (December 4, 2023) (Ditar Supplemental D Response),

Description and Production of Paper Shopping Bags

The merchandise subject to the investigation includes various sizes and styles of paper shopping bags with handles, "commonly used by commercial establishments as shopping carrier bags or delivery bags by restaurants as take-away bags or delivery bags." Petition for Imposition of Antidumping Duties, Volume 1 at 7, Appx2129. The bags can be brown, white, or made from colored paper; they "can be sold unprinted or printed with a design or logo"; they "can be used as a vehicle to project the brand image of retailers and food service providers"; and the "print quality and color reproduction allow for creativity in advertising and development of brand image." *Id.* Paper shopping bags thus perform both a utilitarian and an advertising function.

Despite the dual purpose, paper shopping bags are not overly complicated products. Typically, artwork, logos, and information to be printed on the bags are designed; and reels of paper printed with the customer-specific designs are loaded into a tubing machine, which folds the paper and glues the edges. Ditar DQR at Exhibit D-2, Appx4126.

---

beginning at Appx4476; and "2nd Supplemental ABC Response" (December 14, 2023) (Ditar 2nd SQR (ABC)), beginning at Appx4674.

The paper tubes are cut to required lengths (i.e., generally slightly longer than the height of the bag); the sides and bottoms of the bags are creased, glued, and folded (typically to give a V-shape to the bags); and paper cord handles are affixed with adhesive glue. *Id.* For the U.S. and Colombian markets, Plaintiff Ditar produces paper shopping bags in a variety of sizes with different widths, heights, and depths (gusset sizes), and the bags can be printed with up to four colors on each bag (or more using a polychrome technique). Ditar AQR, at A-33, Appx3282. One noteworthy distinction is that for paper shopping bags sold to home market end user customers (including retail stores, fast food chains, food service entities, drug stores, and supermarkets), Ditar typically works with the end user customers to help design the artwork, logos, and information to be printed on the bags. Ditar AQR at A-12 to A-14, Exhibit A-4, Appx3261–3263, Appx3297–3303. In contrast, for sales to distributors in the United States and Colombia, the customers either provide the designs and artwork to Ditar, or the bags are not printed at all:  in either scenario, Ditar does not work with distributor customers to design the artwork for the paper shopping bags that it sells. *Id.*

With respect to the product codes assigned in the normal course of

business, Ditar explained that identical products are listed under the

same product codes if they are sold in both the U.S. and home market.

Notably, however, Ditar reported that "the exact same product codes

are almost never sold in both markets. This is because Ditar's

customers often require a significant degree of customization with

respect to the type of paper used, the basis weight of the paper, the

dimensions of the bags to be produced, the color of any ink used, the

number of colors, the printing coverage, whether the inside and outside

of the bag is printed, the types of handles and top edges, and – most

important – the logo, design, or identity of the customer." Ditar AQR at

A-34, Appx3283.

> ### Ditar Reported That Its U.S. Sales Were Made at a Single Level of Trade

Ditar reported to Commerce that it made all U.S. sales during the

POI through a single channel of distribution and to only one category of

customer (*i.e.*, sales to distributor customers). Ditar AQR at A-12,

Appx3261. All of Ditar's U.S. distributor customers are well-established

companies that have a long familiarity with the merchandise under

consideration and that typically import printed paper shopping bags in

standard sizes from multiple vendors in multiple countries for resale to

their own U.S. end user customers. *Id.* Ditar reported to Commerce that for its U.S. distributor customers, it performed minimal selling functions within only three of the five selling function categories that Commerce normally considers in its LOT analyses. Ditar AQR at A-12, Exhibit A-4, Appx3261, Appx3297–3303.[5]

Specifically, in the sales support category, Ditar employed sales personnel, and also conducted sales meetings, forecasting, and market research. For logistical services, Ditar engaged in period fulfillment and, inventory maintenance, and also made packing and delivery arrangements. And for sales-related administrative services, Ditar conducted customer contact/negotiation, processed orders, made billing adjustments, provided quality assurance/warranty services, paid commissions, and collected payments.[6]  Because there were no

---

[5]  In evaluating the existence of different levels of trade, Commerce typically groups selling activities into five broad categories: (1) provision of sales support; (2) provision of training services; (3) provision of technical support; (4) provision of logistical services; and (5) performance of sales-related administrative services. AD Questionnaire at A-15, Appx7125. Within each of these categories, there can be multiple selling sub-functions and activities. *Id.*

[6]  Ditar AQR at A-12 to A-13, Exhibit A-4, Appx3261–3262, Appx3297–3303; *see also* Ditar CQR, at C-16, C-24, Appx3966, Appx3974.

differences in the selling activities that Ditar performed to sell to its

U.S. customers, Commerce determined in the *Preliminary*

*Determination* that there was one LOT in the U.S. market for all sales.

*See Certain Paper Shopping Bags From Colombia: Preliminary*

*Affirmative Determination of Sales at Less Than Fair Value,*

*Postponement of Final Determination, and Extension of Provisional*

*Measures,* , 89 Fed. Reg. 319 (January 3, 2024) ("*Preliminary*

*Determination*"), Appx1018–1020, and accompanying "Decision

Memorandum for the Preliminary Affirmative Determination in the

Less-Than-Fair-Value Investigation of Certain Paper Shopping Bags

from Colombia" (December 27, 2023) ("*Preliminary Decision*

*Memorandum*" or "PDM"), at 15, Appx1014.

<u>Ditar Reported That Its Home Market Sales Were Made at
Two Different Levels of Trade</u>

In the home market, Ditar sold to both distributors and end user

customers, and reported that it did so through two separate channels of

distribution: (1) sales to distributor customers; and (2) sales to end user

customers. For sales to distributors, Ditar performed the exact same

selling functions in Colombia that it did for its sales to distributors in

the United States. Ditar AQR at A-12, Exhibit A-4, Appx3261,

Appx3297–3303. For sales support, Ditar employed sales personnel, and also conducted sales meetings, forecasting, and market research. For logistical services, Ditar engaged in period fulfillment and inventory maintenance, and also made packing and delivery arrangements. And for sales-related administrative services, Ditar conducted customer contact/negotiation, processed orders, made billing adjustments, provided quality assurance/warranty services, paid commissions, and collected payment.[7]

For sales to end users, Ditar reported that it conducted these same selling activities, but did so far more frequently and at a significantly greater degree of intensity. In addition, Ditar performed substantial additional selling functions for end user customers in Colombia that it did not perform at all for sales to distributors. *See id.*

The selling function chart below outlines in a glance the significant differences in selling activities that Ditar performed during the period of investigation (both in terms of the degree of involvement for each selling activity, and how often each performed) for sales of the

---

[7]  Ditar AQR at A-12 to A-13, Exhibit A-4, Appx3261–3262, Appx3297–3303; *see also* Ditar BQR, at B-17, B-25, Appx3810, Appx3818.

Plaintiffs' Rule 56.2 Memorandum                                           *Public Version*
Ct. No. 24-00130

merchandise under investigation to its Colombian distributor and end

user customers.

| Ditar S.A. Selling Activities Chart | | Home Market — Channel 1 Distributor Customers | | | | Home Market - Channel 2 End User Customers: Food Service, Retail, Drug Stores, Institutions | | | | Sale-Specific 1-3 = Low Levels of Intensity 4-6 = Medium 7-10 = High |
|---|---|---|---|---|---|---|---|---|---|---|
| Selling Activity / Function | | Perform | No. | Intensity | Frequency | Perform | No. | Intensity | Frequency | |
| Sales Support | Sales Forecasting | Yes | | 3 | Monthly | Yes | | 9 | Weekly | |
| | Sales Meetings | Yes | | 3 | Monthly | Yes | | 6 | Weekly | |
| | Mkt Research/Econ. Plan. | Yes | | 3 | Monthly | Yes | | 8 | Monthly | |
| | Sales Promotion/Advertising | Yes | | 3 | Monthly | Yes | | 8 | Monthly | |
| | Customer Sales Support | Yes | | 3 | Weekly | Yes | | 9 | Daily | |
| | Direct Sales Persons | Yes | 1 | 7 | Daily | Yes | 8 | 10 | Daily | |
| | Customer Assistant | Yes | 1 | 7 | Daily | Yes | 6 | 10 | Daily | |
| | Designers | No | | | | Yes | 5 | 10 | Daily | |
| Training Services | Personnel Training | No | | | | Yes | | 6 | Quarterly | |
| | Small Customer Support | No | | | | Yes | | 8 | Weekly | |
| | Cust. Personal Training | No | | | | Yes | | 5 | Weekly | |
| Tech. Support | Technical Advice | No | | | | Yes | | 7 | Weekly | |
| Logistical Services | Pre-sale Res/Period Fulfill. | Yes | | 2 | Quarterly | Yes | | 7 | Monthly | |
| | Inventory Maintenance | Yes | | 4 | Quarterly | Yes | | 8 | Monthly | |
| | Packing | Yes | | 3 | Weekly | Yes | | 5 | Daily | |
| | Delivery Arrangements | Yes | | 7 | Weekly | Yes | | 8 | Daily | |
| | Company Delivery | Yes | | 3 | Monthly | Yes | | 5 | Weekly | |
| | Post-Sale Warehousing | No | | | | Yes | | 3 | Monthly | |
| | Repacking Services | No | | | | Yes | | 4 | Monthly | |
| Sales-Related Administration | Cust. Contact/Negotiation | Yes | | 3 | Weekly | Yes | | 8 | Daily | |
| | Order Processing | Yes | | 3 | Weekly | Yes | | 8 | Daily | |
| | Price/Billing Adjustments | Yes | | 2 | Monthly | Yes | | 6 | Weekly | |
| | Quality/Warranty Svcs. | Yes | | 3 | Weekly | Yes | | 5 | Weekly | |
| | After Sales Service | Yes | | 1 | Monthly | Yes | | 6 | Daily | |
| | Commission Payments | Yes | | 3 | Weekly | Yes | | 6 | Daily | |
| | Payment Collection | Yes | | 3 | Weekly | Yes | | 6 | Daily | |
| | Tax/Duty Collection | Yes | | 2 | Weekly | Yes | | 4 | Daily | |

Ditar AQR at Exhibit A-4, Appx3297. As shown in the chart, Ditar

distinguished between degrees of performance by assigning codes for

different levels of activity. Codes "1" through "3" refer to low levels of

intensity, codes "4" through "6" refer to average levels of intensity, and

codes "7" through "10" reflect higher levels of intensity. Ditar reported

these levels of intensity for each distribution channel and customer type

using information from Ditar's accounting records. Ditar AQR at A-12,

Appx3261. The chart shows that Ditar performed 20 different activities at the distributor LOT with an average intensity of 3.40, and performed 27 different activities at the end user LOT with an average intensity level of 6.85 (more than double the intensity level of the distributor LOT). Ditar AQR at Exhibit A-4, Appx3297.

While Ditar performed some of these selling activities for sales in both channels, the sales to end users required undertaking these selling functions at a far more significant degree of intensity, and at a much higher level of frequency. In its Section A response, Ditar provided information to Commerce demonstrating that for end user customers, Ditar (1) maintained a large direct sales staff (of 19 persons, including five pre-production designers) that interacted with end users *on a daily* basis); (2) prepared monthly sales reports and engaged continuously in sales forecasting; (3) provided marketing support for its customers, including assigning account representatives, conducting frequent customer visits, and performing customer service activities; (4) actively negotiated prices with its customers; (5) performed marketing activities, including customer outreach and identifying potential new customers; (6) prepared mock-up designs for future paper shopping bag

development; (7) created sample artwork to encourage bag purchases and to illustrate bag printing, and (8) provided customers with technical assistance by answering practical questions and providing post-sale follow-up. Ditar AQR at A-13 and Exhibit A-4, Appx3262, Appx3297–3303. In contrast, for sales to distributors in Colombia, Ditar had only two sales staff (and no pre-production designers) who conducted primarily order input activities, engaged in sales forecasting only yearly, provided little customer marketing support, negotiated prices only rarely, and handled warranty claims only occasionally. *Id.* To reinforce its selling activity efforts, Ditar also provided Commerce with 300+ pages of internal documentation illustrating the type, intensity, and frequency of its different home market selling activities, as well as a detailed chart enumerating the specific processes that Ditar undertook for each customer category for each selling function/activity. *See* Ditar AQR at Exhibits A-4, A-6, A-7, and A-8, Appx3261–3262, Appx3309–3567, Appx3569–3580, and Appx3582–3603. For example, all of the dozens of sample emails that Ditar provided to Commerce related to the selling activities performed for sales to *end users*. *See* Ditar AQR at Exhibit A-6, Appx3457–3501. In addition, Ditar showed that the

13

selling functions that Ditar performed for home market sales to

distributors – and the frequencies and intensities of the selling

activities – were similar to those that Ditar performed for sales to

distributors in the United States. Ditar AQR at Exhibit A-4, Appx3297–

3303.

In addition to the qualitative analyses reported above, Ditar also

provided to Commerce numerous quantitative analyses demonstrating

how Ditar's selling activities and selling expenses varied in the home

market based on its distributor and end user marketing stages. In

particular, Ditar provided in its Section A and supplemental Section

ABC responses summary tables for sales made to Colombian distributor

and end user customers showing (1) the total number of invoices, (2) the

total number of sales, (3) the sales quantities and values, (4) the

number of sales employees, (5) the total salaries paid to those

employees, (6) the number of customers, (7) the number of products

sold, and (8) a wide variety of additional metrics that establish

quantitatively that the selling activities that Ditar performed for food

service and retail end user customers (and the expenses incurred)

vastly exceeded those performed (and the expenses incurred) for its

distributor customers.[8] The quantitative metrics and analytical

comparisons included demonstrations that:

- Ditar had only two direct salespersons/assistants and no designers with compensation of [         ] during the POI that focused on home market distributor sales; while Ditar had 14 direct salespersons/assistants and five designers with compensation of [              ] during the POI that were dedicated to end user customer sales.

- Ditar issued [     ] distributor invoices in the home market containing [      ] line items and issued [      ] end user invoices in the home market containing [      ] line items. These data signify that Ditar's distributor sales staff (representing [         ] of the home market sales staff) was responsible for [     ] of the total number of invoices and [      ] of the number of line item sales. In contrast, Ditar's end user sales staff (representing [      ] of the home market sales staff) was responsible for [        ] of the total number of invoices and [      ] of the number of line item sales.

- Ditar averaged [         ] invoices and [         ] sale line items per distributor sales staff, whereas Ditar averaged [              ] invoices and [        ] sale line items per end user sales staff.

- Ditar incurred [         ] more sales salary costs per invoice and [        ] more sales salary costs per sale line item for end user sales than for distributor sales.

- Ditar sold [            ] paper shopping bags to home market distributors during the POI constituting [             ], and sold [            ] paper shopping bags to home market end users during the POI constituting

---

8    *See* Ditar AQR Exhibit 5, Appx3306–3307; updated in Ditar 1st SQR (ABC) at Exhibit SQ1-7, Appx4379–4380, to reflect changes made in the revised home market sales listing.

[          ] kilograms; showing that Ditar incurred [      ] more sales salary costs per bag and [      ] more sales salary costs per kilogram for its end user sales than for its distributor sales.

- Ditar had [                    ] in distributor sales and [                    ] in end user sales during the POI, demonstrating that Ditar's end user sales value per sale and sales value per line item exceeded those for distributor sales by [                ], respectively.

- Ditar's total sales value per sales staff was higher for end user sales than it was for distributor sales.

- On a kilogram basis, Ditar incurred [      ] higher indirect selling expenses for end user sales than for distributor sales ([                              ]).

- On a per-bag basis, Ditar incurred [      ] higher indirect selling expenses for end user sales than for distributor sales ([                              ]).

- Ditar incurred average credit expenses for end user sales that were [      ] higher than for distributor sales on a kilogram basis ([                         ]) and [      ] higher on a per-bag basis ([          ]).

- Ditar's inventory carrying days for end user products was [      ] times longer than the inventory carrying days for distributor products ([                    ]).

- The longer inventory carrying period for end user products contributed towards Ditar incurring inventory carrying costs for end user sales that were [      ] higher than for distributor sales on a kilogram basis ([          ]) and [      ] higher on a per-bag basis ([          ]).

- Ditar had more billing adjustments for end user sales than

> for distributor sales; Ditar had significantly more end user
> customers than it did distributor customers; Ditar sold more
> than [    ] times as many product codes to end user
> customers than it did to distributors; and Ditar also sold
> more than [    ] times as many CONNUMs to end user
> customers than it did to distributors.

Ditar 1ˢᵗ SQR (ABC) at Exhibit SQ1-7, Appx4379–4380.

Finally, Ditar also provided to Commerce a price comparability analysis that demonstrated how Ditar's average net prices in the home market differed by CONNUM between Ditar's distributor and end user customers.[9] Using Commerce's own exact level-of-trade adjustment programming, Ditar showed that for the above-cost sales of the [    ] CONNUMs that Ditar sold in Colombia to both distributors and end users, its net prices to end users averaged [    ] percent higher than its distributor prices for [    ] of the CONNUMs, were about the same for [    ] of the CONNUMs, and were lower to end users than to distributor customers for [        ] of the CONNUMs. *See* Ditar 1ˢᵗ SQR (ABC) at Exhibits SQ1-7 and SQ1-8, Appx4383–4408. Overall, for all CONNUMs sold at both levels of trade, Ditar's net prices to end users averaged [    ] percent higher than its distributor prices. *Id.*

---

[9]    Ditar AQR Exhibit 5, Appx3305; updated in Ditar 1ˢᵗ SQR (ABC) at Exhibit SQ1-7, Appx4383, to reflect corrected CONNUM coding.

On January 3, 2024, Commerce published the preliminary

determination in the investigation, assigning Ditar a preliminary

dumping margin of 9.48%. *Preliminary Determination*, Appx1018–1020.

In the *Preliminary Determination*, Commerce concluded that "all of

Ditar's home market sales were made at the same level of trade during

the POI, and that sales to the United States (which were all made to

distributors) and home market sales during the POI were made at the

same LOT." PDM at 15, Appx1014. As a result, Commerce preliminarily

determined that no LOT adjustment was warranted, explaining (1) that

"Ditar failed to identify that {its} selling activities … differed by type of

customer"; (2) that "Commerce's rulemaking" established that "different

marketing stages occur where merchandise changes hands twice" and

that Ditar thus did not qualify because Ditar was the "same home-

market entity {that} made all home market sales"; and (3) that

Commerce's own analysis on the differences between prices offered to

distributors and end users on a product code-basis (i.e., not based on

CONNUMs) resulted in a difference that was "less than the difference

found in Ditar's analysis." PDM at 13-15, Appx1012–1014. Notably,

with respect to the latter finding, Commerce initially calculated a

[        ] price premium for sales to distributor customers. *See*
"Memorandum Re. Analysis of the Preliminary Determination Margin
Calculation for Ditar S.A. (December 27, 2023) ("*Preliminary Analysis
Memorandum*") at 3, Appx1023. But after eliminating from its analysis
one product code that Commerce thought aberrational, Commerce
determined that "Ditar's prices to end users are on average only [      ]
percent [       ] than its prices to distributors. *Id*.

On April 1, 2024, Ditar submitted a substantive case brief to
Commerce, specifically challenging Commerce's conclusion that Ditar
did not make sales at two different levels of trade in Colombia and its
consequent decision not to make a level of trade adjustment. *See* Ditar
Case Brief (April 1, 2024), Appx5816–5848. Ditar's brief emphasized (1)
the record contained numerous quantitative analyses, mathematical
metrics, and substantial source documentation demonstrating that the
selling activities that Ditar performed in making sales to distributors
and end users differed by customer type and that these differences were
significant and meaningful; (2) quantitative analyses tied back to the
intensity and frequency levels reported in Ditar's selling function chart
and selling activity descriptions; (3) that Ditar had qualitatively and

quantitatively supported its claim that Ditar sold paper bags to distributors and end users in Colombia at two different levels of trade; and (4) that Commerce should make a level of trade adjustment in the final determination whenever normal value was based on Ditar's home market sales to end user customers. Id., Appx5824–5846.

On May 17, 2024, Commerce issued its final determination in the less-than-fair-value investigation, calculating a final dumping margin for Ditar of 11.06%. *See Final Determination*, Appx1556–1558. In the *Final Determination*, Commerce continued to find that Ditar's sales to distributors and end users did not constitute different LOTs. In its *Final Decision Memorandum*, Commerce disagreed "that having more frequent sales meetings, client meetings, personnel training, or more small customer support and customer personnel training for end users indicates that sales were made at different LOTs." Appx1547. Commerce also disagreed that "end users requir{ing} more technical support and/or technical advice services than distributors, indicate differences in levels of trade." *Id.* Commerce further concluded that "the greater level of intensity for sales to end users, such as designers, personnel training, small customer support, customer personnel

training, and technical assistance, indicate that the products require

different levels of support because the products are different, not

because the LOTs differ." Appx1548. For the first time, Commerce also

stated that Ditar claimed that it had incurred certain selling expenses

for sales to end users (that were not provide to distributors), but that

Ditar did not report these expenses in its sales database. *Id.*

Additionally, Commerce agreed with the petitioner's contention that

Ditar faced "the same design demands, whether its sells paper bags to

end users or two distributors who supply those end users." Appx1549.

Finally, Commerce continued to conclude that any price comparisons of

sales to distributors and end users were "appropriately conducted at the

product code level rather than the home market CONNUM level"

because CONNUMs do not reflect design differences. Appx1551.

 This appealed ensued.

## III.   <u>STANDARD OF REVIEW</u>

 In reviewing a challenge to a final determination by Commerce,

this Court deems the determination unlawful when it is "unsupported

by substantial evidence on the record, or otherwise not in accordance

with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence "is more

than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951) (*quoting Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)). Moreover, substantial evidence is measured by the entire record, and when reviewing an agency determination, this Court evaluates whether the agency action is reasonable given the record as a whole and whether Commerce considered "whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994); *see also Universal Camera Corp.*, 340 U.S. at 488; *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). In so doing, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (*quoting Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *see also Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008).

In cases brought pursuant to 19 U.S.C. § 1516a, Commerce determinations also are subject to the default standard of the Administrative Procedure Act, which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also Solar World Americas, Inc. v. United States,* 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020). "Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States,* 161 F.3d 1365, 1369 (Fed. Cir. 1998). In determining whether a statutory interpretation is reasonable, the Court considers "the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole." *See Mitsubishi Heavy Indus. v. United States,* 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998). The Court "will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F. Supp. 961,

966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987). Finally, Commerce

abuses its discretion when its decision is "based on an erroneous

interpretation of the law, on factual findings that are not supported by

substantial evidence, or an unreasonable judgment in weighing relevant

factors." *Appleton Papers Inc. v. United States*, 37 CIT 1034, 1037, 929

F.Supp.2d 1329, 1334 (2013) (*citing Star Fruits S.N.C. v. United States*,

393 F.3d 1277, 1281 (Fed. Cir. 2005)).

## IV.   ARGUMENT

### A.   Commerce's Decision Not to Find Two Levels of Trade In Colombia Was Unlawful

Commerce's decision in this investigation not to make an LOT

adjustment when it compared Ditar's sales to *distributors* in the United

States to Ditar's sales to *end users* in Colombia was unsupported by

substantial evidence. Commerce claimed that Ditar did not sufficiently

explain how it sold the foreign like product in the home market at two

different levels of trade. PDM at 14, Appx1013; *Final Decision*

*Memorandum*, at 15, Appx1547. But the administrative record contains

numerous quantitative analyses, mathematical metrics, and substantial

source documentation demonstrating that the selling activities that

Ditar performed in making sales to distributors and end users differed

24

by customer type and that these differences were significant and meaningful. Moreover, Ditar linked its quantitative analyses to the intensity and frequency levels that Ditar reported in its selling function chart and selling activity descriptions. The record evidence in this case therefore qualitatively and quantitatively establishes that Ditar sold paper bags to distributors and end users in Colombia at two different levels of trade. Because Ditar sold paper bags in the United States only to distributors, and sold paper bags in Colombia at both the distributor marketing stage and the more remote end user marketing stage, Commerce should have made an LOT adjustment whenever normal value was based on Ditar's home market sales to the more remote end user customers. Because Commerce failed to recognize that Ditar's selling activities differed by customer type and that such differences were meaningful and substantial, Commerce did not consider the record as a whole, and Commerce's *Final Determination* therefore was unsupported by substantial evidence.

1.    The Legal Framework for Establishing Different
      Levels of Trade

In calculating dumping margins, Commerce establishes normal value "to the extent practicable, at the same level of trade as the export price."

19 U.S.C. § 1677b(a)(1)(B)(i). When Commerce determines that sales in the foreign market are not at the same level of trade as sales to the United States, Commerce increases or decreases normal value to make due allowance for any difference between the export price and normal value that is shown to be wholly or partly due to a difference in level of trade. Commerce makes such an LOT adjustment if two conditions are met. *Id.* § 1677b(a)(7)(A). First, the difference in the level of trade for the U.S. sale and the comparison home market sale must involve "the performance of different selling activities." *Id.* § 1677b(a)(7)(A)(i). Second, the difference in the level of trade between the U.S. sale and the comparison home market sale the export price and normal value is "demonstrated to affect price comparability" and that the difference is "based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined." *Id.* § 1677b(a)(7)(A)(ii). Essentially, it must be demonstrated that the respondent engages in different selling activities for its U.S. and comparison home market sales (at the different levels of trade), and that there also is an overall difference in the price of similar merchandise sold in the home market at the different levels of trade. If

both conditions are met, then Commerce makes a prices adjustment to normal value based on the average price difference between the two levels of trade in the comparison market. *Id.* § 1677b(a)(7)(A).

Commerce's regulations support the statutory directive, and reiterate that when comparing U.S. sales with foreign market sales, Commerce "may determine that sales in the two markets were not made at the same level of trade, and that the difference has an effect on comparability of the prices." In such instances, Commerce "adjust{s} normal value to account for such a difference." 19 C.F.R. § 351.412(a). The regulations state further that to determine whether different levels of trade exist, Commerce examines whether sales "are made at different marketing stages (*or their equivalent*)." *Id.* § 351.412(c)(2).

In the *Preliminary Determination*, Commerce contradicted its own regulation, claiming incorrectly that "different marketing stages occur where merchandise changes hands twice." PDM at 14, Appx1013.[10] Commerce's basis for this claim is not clear. Perhaps the existence of

---

[10] Commerce suggested that "{e}ven at this basic level, this scenario does not apply to Ditar because the same home-market entity made all home market sales directly to its customers, either distributors or end users." *Id.*

different marketing stages is more apparent when merchandise is sold

first by one party and then re-sold by another. Regardless, Commerce

did not articulate the correct test. As Commerce established in the

preamble to the promulgation of the regulations in 1997, the phrase "or

the equivalent" in 19 C.F.R. § 351.412(c)(2) "means that the

merchandise *does not necessarily have to change hands twice* in order to

reach the more remote LOT." *Antidumping Duties; Countervailing

Duties*, 62 Fed. Reg. 27296, 27371 (May 19, 1997) (emphasis added).

According to Commerce, "it is sufficient that, at the more remote level,

the seller takes on a role comparable to that of a reseller," as if the

merchandise had changed hands twice. *Id.*

In the *Final Determination*, Commerce maintained this rationale

for not finding two levels of trade in the home market, claiming that

"none of {Ditar's} sales passed either through layers of multiple

companies or layers of affiliated parties. Rather, Ditar's employees all

work together at the same location and make sales to the first

unaffiliated party in the home market, whether the unaffiliated party

was an end user or distributor." *Final Decision Memorandum*, at 18,

Appx1550. But this justification for not finding different levels of trade

does not reflect the law or agency practice. In fact, Commerce

frequently has found different levels of trade in the home market when

the merchandise did not change hands twice. In *Passenger Vehicle and*

*Light Truck Tires from the Republic of Korea*, Commerce found that

respondent Nexen had two levels of trade in the home market:  one LOT

for OEMs/large distributors and a second LOT for small resellers. *See*

*Final Affirmative Determination of Sales at Less Than Fair Value*, 86

Fed. Reg. 28569 (May 27, 2021), Issues and Decision Memorandum at

Comment 6. In *Heavy Walled Rectangular Welded Carbon Steel Pipes*

*and Tubes from* Mexico, Commerce found that respondent Prolamsa

made sales at two levels of trade in the home market: one LOT for sales

to OEMs and another LOT for all other commercial sales. *See Final*

*Results of Antidumping duty Administrative Review; 2019-2020*, 87 Fed.

Reg. 22186 (April 14, 2022), Issues and Decision Memorandum at

Comment 9. In *Certain Lined Paper Products from India*, Commerce

found that respondent Navneet had two levels of trade in the home

market: one LOT for sales to distributors and another LOT for sales to

retail chains, institutional end users, and schools for end-use. *See Final*

*Results of Antidumping Duty Administrative Review; 2015-2016*, 83

*Public Version*

Fed. Reg. 16054 (April 13, 2018), Issues and Decision Memorandum at

Comment 1.[11]  In all of these proceedings, the merchandise did not

change hands twice for Commerce to find a second, more remote, LOT.

Rather, in each case, the respondent (like Ditar) engaged in sufficiently

different selling activities to different customer types in the home

market such that sales to each customer type constituted a different

marketing stage and a different level of trade. In this case, Commerce's

reliance on the fact that Ditar *itself* made sales to both distributors and

end users thus was not a permissible basis for concluding that two

levels of trade did not exist in the home market.

---

[11] These cases represent just a few examples; there are many more.
*See, e.g., Methionine from Spain: Preliminary Results of
Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg.
69616 (October 6, 2023), Preliminary Decision Memorandum
(Commerce found that respondent Adisseo Espana sold in the home
market at two different LOTs based on substantial differences in the
home market channels); *Certain Tapered Roller Bearings from the
Republic of Korea: Final Determination of Sales at Less Than Fair
Value*, 83 Fed. Reg. 29092) (June 22, 2018), Issues and Decision
Memorandum at Comment 6 (Commerce found that respondent Iljin
Group's sales in the home market of prototype and non-prototype
models constituted sales at different LOTs); *Stainless Steel Bar from
Brazil; Final Results of Antidumping Duty Administrative Review*, 74
Fed. Reg. 33,995 (July 14, 2009), Issues and Decision Memorandum
at Comment 1 (Commerce found that the respondent's two reported
channels of distribution constituted two levels of trade).

Finally, it is relevant with respect to determining the existence of a more remote LOT that the preamble to Commerce's regulations instructs that "{s}ubstantial differences in the amount of selling expenses associated with two groups of sales may indicate that the two groups are at different levels of trade," and that "{s}ome overlap in selling activities will not preclude a determination that two sales are at different stages of marketing." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27371 (May 19, 1997). Therefore, even if Ditar did engage in some of the same selling functions to both distributors and end users (at different degrees of intensity and frequency), that does not bar a finding that sales to distributors and end users were made at different LOTs.

> 2.    Commerce Ignored Relevant Facts From the Administrative Record and Reached an Inconsistent LOT Determination

In the *Preliminary Determination*, Commerce claimed that:

> despite the fact that Ditar attempted to define and redefine the selling activities performed in making sales to end users and distributors, Ditar failed to identify that these selling activities (such as sales forecasting, sales meetings, market research/ economic planning, sales promotion/advertising and/or sales personnel), differed by type of customers, that any such differences were meaningful and substantial, and how or whether the claimed differences constituted "different marketing stages."

PDM at 14, Appx1013. But contrary to Commerce's claims, the record was replete with evidence that the selling activities that Ditar performed differed by customer category. After receiving Ditar's case brief, which emphasized the substantial record documentation demonstrating that the selling activities that Ditar performed in making sales to distributors and end users differed by customer type and that these differences were significant and meaningful, Commerce changed its position in the *Final Determination*, concluding instead that

> {w}e disagree, however, *that having more frequent sales meetings, client meetings, personnel training, or more small customer support and customer personnel training for end users indicates that sales were made at different LOTs.* Nor do Ditar's claims that end users require more technical support and/or technical advice services than distributors indicate differences in levels of trade, especially given the fact that the level of Ditar's technical service expense represents an insignificant component of the total value of Ditar's reported indirect selling expenses. Rather, it indicates that *Ditar sells products in each market with different design requirements.*

*Final Decision Memorandum*, at 15, Appx1547. Commerce explained further that Ditar "sold *printed* bags of varying sizes to end users, and *unprinted* bags of more similar sizes to distributors. Thus, the greater level of intensity for sales to end users ... indicate that the products require different levels of support because the products are different,

not because the LOTs differ." *Final Decision Memorandum*, at 16,

Appx1548. In sum, Commerce thus conceded in the *Final Determination*

the points that Ditar had been advocating: *i.e.*, (1) that Ditar engaged in

more selling activities for sales to its end user customers than to its

distributor customers and that these selling activities were *more*

*intensive* and *more frequent*; and (2) that developing and coordinating

the bag designs with end user customers was an integral part of the

selling function at that more remote level of trade. But having

acknowledged these facts, Commerce nonetheless decided that these

substantial differences in selling activities were not relevant to finding

different stages of marketing and that there was only a single LOT in

the home market. It is hard to imagine a more constrained logical

progression or one based less on substantial evidence.

Commerce also argued in the *Final Determination* that Ditar's home

market sales database did not support its explanations that it provided

certain selling activities for end users that it did not provide for

distributors. In particular, Commerce claimed that Ditar "did not report

warehousing or repacking expenses in the home market sales database"

and also "did not report any post-sale warehousing expenses in its sales

database." *Final Decision Memorandum*, at 16, Appx1548. But these

claims illustrate Commerce's misunderstanding of its own data

reporting requirements and margin calculation methodologies. With

regard to the warehousing expense field in the home market sales

database, Commerce's antidumping questionnaire specifically

instructed Ditar that "the cost of warehousing reported in this field

should include *only expenses incurred at a distribution warehouse not

located at the factory that produced the merchandise*, less any

reimbursement received from the customer, Ditar BQR at B-27,

Appx3820 (emphasis added); and Ditar reported that "did not use any

distribution warehouse other than that located at its factory where the

merchandise was produced." *Id.* Instead, Ditar explained that it

dedicated significantly different areas of its own warehouse space for

sales to its different customer types, and reported that it included

warehouse costs in its indirect selling expenses – *i.e.*, not as a direct

selling expense. Ditar BQR at B-26, Exhibits B-9 and B-16, Appx3819,

Appx3918–3919, Appx3937–3939. With respect to repacking expenses,

Ditar reported that "{o}ccasionally, for home market end user customers,

Ditar [

] Ditar AQR at A-24, Appx3273. Like the other after-sales services that Commerce identified, such as arranging for post-sale warehousing, coordination, and providing additional documents to customers, *see Final Decision Memorandum*, at 17, Appx1549, these sales staff costs are part of indirect selling expenses. Ditar BQR at Exhibit B-16, Appx3937–3939. Therefore, contrary to Commerce's claims, Ditar correctly did not report these non-distributor customer expenses as direct selling expenses in its home market sales database. Because Commerce typically does not deduct indirect selling expenses from home market gross unit prices when calculating net selling prices for dumping comparison purposes, and because LOT-specific selling expenses usually – as in this case – are reflected in non-deducted indirect selling expenses, a level-of-trade adjustment is especially important to ensure that Commerce makes fair comparisons with export prices. *See* 19 U.S.C. § 1677b(a)(1)(B)(i). Contrary to Commerce's position, Ditar's non-reporting of the expenses for its warehousing, repacking, and other after-sales services as direct expenses in its home market sales database thus supports, rather than detracts from, a finding of different levels of trade. On these points,

Commerce's confusion regarding its own data reporting requirements and margin calculation methodologies further undermines Commerce's refusal to find different levels of trade.

Finally, Commerce's argument that "Ditar faces the same design demands, whether it sells paper bags to end users or to distributors who supply those end users" not only conflicts with Commerce's statements above with respect to end user design requirements, but is simply false. *Final Decision Memorandum*, at 17, Appx1549. In its selling function chart, Ditar reported that it employed no designers for its distributor customers, Ditar AQR at Exhibit A-4, Appx3297–3303; and Ditar also reported that the majority of its sales to distributor customers in Colombia were of unprinted bags that had no designs. Ditar AQR at A-12, Appx3261. Furthermore, Ditar reported that it rarely had on-site sales meeting with its home market and U.S. distributor customers because they either purchased plain, generic bags in limited size ranges for resale, or were familiar with the products and already had established designs and artwork that need no further modification. Ditar AQR at A-20, Appx3269.

In contrast, Ditar reported that for end user customer it performed

most of the mock-up for bag development; created most of the artwork for bag printing, and provided customers with technical assistance by answering practical questions and providing post-sale follow-up. Ditar AQR at A-13, Appx3262. Ditar explained that a key aspect of the shopping bags sold to food service and retail store end user customers was the brand and/or logo printed on the bag, and that Ditar undertook substantial efforts to help "build" the bag to its end user customer's specifications. In this regard, Ditar not only helped design the artwork to be printed on the bag, but also produced the printing plates. Ditar AQR at A-19 to A-20, Appx3268–3269. Ditar also undertook substantial efforts to work with its end user customers to create design samples and physical prototypes for the customer's approval. *Id.* Furthermore, Ditar frequently conducted on-site meetings with end user customers to learn more about their needs; to educate them about the correct sizes correct paper types of the paper bags to be purchased; to develop and review the artwork for the printed bags; and to instruct them on the use of paper bags and to convince them to shift from plastic to paper for their shopping bag needs. *Id.* That Ditar routinely conducted such visits for end user customers illustrates Ditar's strong efforts and involvement in

sales preparation and research for design, marketing, and sales support purposes, and demonstrates that Ditar performed these activities on a daily and weekly basis with a very high degree of intensity.

To support the more substantial selling activities that it provided to end user customers, Ditar provided Commerce with numerous emails documenting the efforts undertaken by Ditar to hold in-person meetings with its Colombian end-user customers to review pricing, merchandise technical specifications, and product differences, all of which are an essential part of the small-customer support and customer training activities that Ditar conducts to instruct its customers on the products that it sells and to develop customer relationships. Ditar AQR at Exhibit A-6, Appx3472–3483. Ditar also provided Commerce with additional examples of the technical assistance that Ditar provides for its home market end user customers. Ditar AQR at Exhibit A-6, Appx3507–3520. Such assistance included developing the bags style and design for the customer, correcting its customers as to the size and measurements of the bags to be purchased, and educating its customers on the types of printing and colors and types of available inks. Ditar AQR at A-22, Appx3271. As shown by the detailed nature of the product

drawings and technical specification sheets that Ditar provided to

Commerce, *see, e.g.*, Ditar Sales Verification Exhibit 30, Appx5118,

Appx5467, Appx5473, 5480, Ditar devoted a substantial amount of time

at a high level of intensity to these direct sales personnel design

activities for end user customers, and they were a critical component of

Ditar's home market sales to end users.

    In light of all the available evidence, Commerce's conclusion that

Ditar faced the same design demands whether it sold paper bags to end

users or to distributors that supplied those end users therefore is simply

untrue. As such, Commerce's conclusion that the information provided

by Ditar in support of its requested LOT adjustment did not

substantiate that sales to end users reflected substantial differences in

selling functions higher than those of sales to distributors is not

supported by substantial evidence.

    If Commerce had found two levels of trade in Colombia, it would

have made the necessary level of trade adjustments, when necessary,

and a determination of dumping would have been supported by record

evidence. But Commerce's failure to find different levels of trade in

Ditar's home market undermined the agency's dumping analysis and

resulted in a determination where sales were compared at different

levels of trade.

       3.      Commerce Misunderstood and Ignored Ditar's
               Quantitative Analyses

In rejecting Ditar's claim for a level-of-trade adjustment, Commerce

also concluded that Ditar's quantitative analysis did not support its

claims that sales to distributors and end users were made at different

LOTs. But, as outlined in the Statement of Facts above, the substantial

information and numerous quantitative analyses that Ditar presented

to Commerce demonstrated fully how Ditar's selling activities and

selling expenses varied in the home market based on distributor and

end user marketing stages. But Commerce ignored most of these

analyses, and instead focused on its observation that "Ditar makes the

vast majority of its sales {in Colombia} to end users," and that Ditar

"allocate{d} company personnel to support the value of its sales." *Final*

*Decision Memorandum*, at 18, Appx1550.

But in concentrating only on the number of Ditar's sales staff and the

volumes sold, Commerce failed to consider the degree and intensity of

the selling functions that Ditar performed. For example, Ditar's [     ]

distributor salespersons (representing [        ] of the home market

sales staff) were responsible for [      ] of the total number of invoices and [      ] of the number of line item sales. In contrast, Ditar's [   ] end user salespersons (representing [      ] of the home market sales staff) were responsible for [          ] of the total number of invoices and [          ] of the number of line item sales. Ditar 1st SQR (ABC) at Exhibit SQ1-7, Appx4379–4380. Ditar also averaged [       ] invoices and [         ] sale line items per distributor sales staff, whereas Ditar averaged [          ] invoices and [       ] sale line items per end user sales staff. *Id.* These numbers and percentages signify that the selling activities of Ditar's distributor sales staff were far less intensive. That Ditar's [   ] home market distributor sales staff could sell close to the same number of invoices and almost an equivalent number of line items as the [   ] home market end user salespersons demonstrates that Ditar's end user salespersons had to work far harder and engage in greater selling activities at a considerably higher level of intensity to make each sale. Ditar thus undertook significantly more work to sell to its end user customers.[12]

---

[12]  Ditar's overall sales values also reflected these additional degrees and intensities of sales efforts. Ditar had [                ] in distributor sales and [               ] in end user sales during

In addition, Ditar incurred [                    ] in salary costs for its

distributor sales staff during the POI while giving its end user sales

staff [                    ], thus illustrating that Ditar incurred

[          ] more sales salary costs per invoice and [          ] more sales

salary costs per sale line item for its end user sales than for its

distributor sales. *Id.* But Commerce ignored this metric in its entirety.

Commerce also ignored that whereas Ditar sold [              ] paper

shopping bags to home market distributors during the POI constituting

[                      ], Ditar sold [              ] paper shopping bags to

home market end users during the POI constituting [              ]

kilograms. *Id.* Ditar therefore incurred [          ] more sales salary costs

per bag and [          ] more sales salary costs per kilogram for its end user

sales than for its distributor sales, thus demonstrating that the

substantial difference in salesperson selling activities at the end user

marketing stage also had a significant impact on selling expenses.

That Ditar incurred additional costs for its end user sales also was

---

the POI, thus demonstrating that Ditar's end user sales value per
sale and sales value per line item exceeded those for distributor sales
by [                    ], respectively. *Id.*

reflected in Ditar's indirect selling expenses. On a kilogram basis, Ditar

incurred [      ] higher indirect selling expenses for end user sales than

for distributor sales ([                                    ]). On a per-bag

basis, Ditar incurred [      ] higher indirect selling expenses for end user

sales than for distributor sales ([                              ]). *Id.*

That these percentages are especially high is relevant because when

Commerce makes level-of-trade adjustments to the home market price

to ensure a fair comparison with the export price, LOT-specific selling

expenses most commonly are reflected in non-deducted indirect selling

expenses. *See* 19 U.S.C. § 1677b(a)(1)(B)(i). In its *Final Determination*,

however, Commerce again overlooked these analyses in their entirety.

Commerce also did not address at all the differences between the

distributor and end user levels of trade that Ditar highlighted with

respect to credit expenses and inventory carrying costs. In particular,

Ditar incurred average credit expenses for end user sales that were

[      ] higher than for distributor sales on a kilogram basis ([

]) and [      ] higher on a per-bag basis

([                              ]). *Id.* Ditar's inventory carrying days

for distributor products was [      ] times longer than the inventory

carrying days for end user products ([                                    ]). The

longer inventory carry period for end user products contributed towards

Ditar incurring inventory carrying costs for end user sales that were

[        ] higher than for distributor sales on a kilogram basis ([

                        ]) and [        ] higher on a per-bag basis ([

                        ]). *Id.* These analyses also formed no part of

Commerce's *Final Determination*.

Finally, Commerce ignored that Ditar had significantly more end

user customers than it did distributor customers; that Ditar sold more

than [        ] times as many product codes to end user customers than it

did to distributors, and that Ditar sold more than [        ] times as many

CONNUMs to end user customers than it did to distributors. *Id.* These

metrics established that Ditar engaged in a far greater number of

product-related technical specifications issues and client-coordination

issues for sales to end users than it did for sales to distributors.

Essentially, these quantitative analyses – most of Commerce did not

address – established that when Ditar sold to end user customers, Ditar

assumed the selling functions (and costs) that ordinarily would have

been performed (and incurred) by distributors if distributors had made

these sales to the end user customers instead. In comparison to Ditar's sales to distributor customers, Ditar's end user sales thus involved a significant additional level of sales activities amounting in the aggregate to a substantially difference selling function, indicating that they were made at different marketing stages. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27371 (May 19, 1997). The record thus supported a determination that Ditar sold to distributors and end users in the home market at different LOTs.

In *Productos Laminados de Monterrey S.A. de C.V. v. United States*, 581 F. Supp. 3d 1349 (Ct. Int'l Trade 2022), the Court concluded that it was sufficient that there were differences in indirect selling expenses and inventory carrying costs to support a claimed level-of-trade adjustment. In this case, Ditar demonstrated that its different home market levels of trade had these same indirect selling expense and inventory carrying cost differences. In addition, Ditar presented Commerce with all the numerous additional quantitative analyses described above that illustrated not only that there were significant differences between the selling activities that Ditar performed at its distributor and end user marketing stages, but that also corroborated

the levels of intensities and frequencies of Ditar's selling activities.

Altogether, the comparisons of Ditar's sales staff, volumes sold,

inventory turnover, selling expense ratios, actual selling expenses, and

other data regarding Ditar's distributor and end user marketing stages

overwhelmingly support a conclusion that Ditar made sales in the home

market to its distributor and end user customers at two different levels

of trade. Commerce's failure to consider the importance of these

analyses and to ignore many of them altogether resulted in a final

determination that was unsupported by substantial evidence.

> 4.    Commerce Failed to Recognize That the Levels of
>        Trade in the Home Market Affected Price
>        Comparability

In the *Final Determination*, Commerce concluded that the price

differences between Ditar's sales to distributors and end users were not

sufficiently large to demonstrate the existence of two LOTs in the home

market. *Final Decision Memorandum*, at 19, Appx1551. But in reaching

this conclusion, Commerce not only incorrectly evaluated the LOT price

comparison analysis that Ditar prepared, but also relied on a separate

price comparison analysis that is not supported by substantial evidence

and that conflicts with long-established Commerce practice.

In this investigation, Ditar provided Commerce with a precise

quantitative analysis showing how the expenses assigned to POI home

market sales at the different levels of trade affected price comparability,

based on a pattern of consistent price differences between sales at the

different levels of trade in Colombia. Specifically, in order to

demonstrate how the different selling functions affected price

comparability at the distributor and end user levels of trade, Ditar

submitted to Commerce a worksheet showing the average net prices of

CONNUMs that Ditar sold in the home market at *both* levels of trade.

Ditar 1st SQR (ABC) at Exhibit SQ1-7, Appx4378. Ditar reported that

its analysis mirrored *identically* the approach used in the SAS margin

program that Commerce normally used to calculate differences in levels

of trade and – in accordance with Commerce's LOT programming –

included only sales of CONNUMs that passed the cost test (i.e., sales

that were made at prices above the cost of production). Ditar 1st SQR

(ABC) at SQ-9, Exhibit SQ1-7, Appx4328, Appx4378. Ditar's analysis

demonstrated that its sales to end user customers (including retail

stores, drug stores, restaurants, and food service entities) overall were

made at net selling prices that were [          ] higher than sales of

identical CONNUM to home market distributors. *Id.*[13] In particular, for

the [   ] CONNUMs that Ditar sold above cost to both distributors and

end users, the net prices to end users were *at least* [ ] percent higher

and *averaged* [   ] percent higher for [   ] of the CONNUMs. For [    ] of

the CONNUMs, the net prices were basically the same, and the average

net price was lower to end users than to distributors for [        ] of the

CONNUMs. *Id.* Importantly, the volume of sales for [

                                    ] when sold to distributors versus end

users represented [                                                    ] of

the total volume of all distributor sales where the same CONNUM was

sold to both distributors and end users – a truly negligible quantity. *Id.*

In the *Preliminary Determination*, Commerce concluded that Ditar's

quantitative analysis did not support a finding of separate levels of

trade in the home market. PDM at 15, Appx1014. But Ditar's

CONNUM-based price comparison methodology demonstrated that the

---

[13] Together with its price comparability analysis, Ditar provided
Commerce with the output from Commerce's standard SAS level of
trade programming, which showed the exact same pricing difference
of [                   ] between the distributor and end user levels of
trade. Ditar 1st SQR (ABC) at Exhibit SQ1-8, Appx4383–4408.

prices that Ditar charged for the foreign like product in the home market followed a consistent and particular pattern depending on the customer category to which the merchandise was sold. *See* 19 U.S.C. § 1677b(a)(7)(A)(ii) (the LOT difference is "based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.").

In the *Final Determination*, Commerce claimed that "a careful examination of Ditar's chart reveals that it omitted two CONNUMs that had sales to distributors and to end users" and that "Ditar's price analysis, *based on incomplete data*, fails to demonstrate that the differences in net prices to its distributors and end users demonstrates the existence of two LOTs in the home market." *Final Decision Memorandum*, at 19, Appx1551 (emphasis added). But Commerce did not put any of its "careful examination" on the record, and thus there is no basis for Commerce's claim of incompleteness. As reiterated in its case brief, when Commerce calculates the applicable LOT adjustment, its standard margin calculation program uses only sales that are made at prices above the cost of production to calculate the difference in average pricing between levels of trade. Ditar Case Brief at 22-23,

Appx5844–5845. In its quantitative analysis comparing selling prices to
distributors and end users, Ditar followed Commerce's standard
programming methodology and did not include sales that were made at
below-cost prices. Ditar suspects that Commerce might not have
excluded such below-cost home market sales in accordance with its
practice, but without the basis for Commerce's own explanation, it is
impossible to determine why Commerce believed Ditar's analysis was
not complete. This fact alone requires remand for further explanation.

But remand also is necessary because Commerce's own pricing
analysis contradicts longstanding Commerce practice. In the
*Preliminary Determination*, Commerce acknowledged that it was
reasonable for Ditar "to calculate the differences in prices on a
CONNUM-specific basis." PDM at 15, Appx1014. Nonetheless,
Commerce indicated that "a *product code-specific* analysis provides a
more realistic indicator of the difference between the prices offered to
distributors an end users for the same (i.e., identical) product." *Id.*
Commerce thus re-calculated the price difference to Ditar's distributor
and end user customers on a product code-specific basis, and
determined that Ditar's prices to end users were on average [      ]

percent [      ] than its prices to distributors. *Preliminary Analysis Memorandum*") at 3, Appx1023. At the preliminary stage, Commerce did not explain why its approach was "more realistic" and provided no further rationale for departing from its normal practice of calculating level-of-trade price differences on a CONNUM-specific basis. *See, e.g., Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates*, 87 Fed. Reg. 930 (January 7, 2022), Preliminary Decision Memorandum, at 20 (relying on a price comparability analysis "demonstrating how net price differed by control number (CONNUM)"). In the *Final Determination*, however, Commerce explained that its product-code comparison approach was appropriate because it permitted Commerce "to control for product mix differences within CONNUMs (which are not intended to capture specific design differences. *Final Decision Memorandum*, at 19, Appx1551.

But Commerce's product-code price comparison is unsupported by substantial evidence for several reasons. First, contrary to Commerce's claim, the CONNUM characteristics in this investigation incorporate many design characteristics. For example, the Paper Type characteristic of the CONNUM reflects the type of paper used to

51

construct the bag (*e.g.*, brown Kraft, white Kraft, linerboard, *etc.*), thus

impacting the possible designs. The Printing characteristic of the

CONNUM specifies whether there is printing on the bag; and the Ink

Coverage characteristic specifies the percentage of the bag covered by

ink; both of which substantially affect the possible design types. The

Hot Stamping characteristic of the CONNUM specifically identifies

whether the bag design incorporates hot foil stamping. And the Bag

Width, Bag Depth, and Bag Height characteristics all define the bag's

size specifications, all of which impact the design, if any, on the bag.

*See*, *e.g.*, Ditar BQR at B-9 to B-15, Appx3802–3808.

Second, Commerce's product-code price comparison approach ignored

why Commerce uses a CONNUM-based methodology for calculating

dumping in the first place: *i.e.*, that *identical* products often are sold in

different markets and within the same market with *different* product

codes. In fact, it is precisely because different product codes can reflect

identical products that Commerce treats products with the same

identical CONNUM physical characteristics (and thus sharing the same

CONNUM) as identical products. *See*, e.g., *Carbon and Alloy Steel Wire

Rod from the Republic of Korea*, 83 Fed. Reg. 13228 (March 28, 2018)

(I&D Memorandum at Comment 1) ("At the outset of this case, Commerce identified the CONNUM physical characteristics that are most significant in differentiating the significant price differences between products. These are the physical characteristics that define unique products (i.e., the CONNUMs) for sales comparison purposes."); *Certain Cut-to-Length Carbon Steel Plate Products from the Republic of Korea*, 87 Fed. Reg. 40489 (July 7, 2022) (I&D Memorandum at Comment 1); Antidumping Manual (October 13, 2009), at Chapter 4, page 10 ("Identical products are assigned the same CONNUM in both the comparison market sales database and U.S. sales database").

Third, it is Commerce's long-standing practice to treat products as "identical" based on the CONNUM characteristics regardless of whether a respondent considers them to be "identical or unique" based on the product code. In fact, the antidumping questionnaire in this case specifically defined "identical merchandise" as merchandise that is produced by the same manufacturer in the same country as the subject merchandise, and which Commerce determines is identical or virtually identical in all physical characteristics." Antidumping Questionnaire, at Appendix I (Glossary of Terms), Appx7385. Thus, Commerce's claim

that its product code-based price comparison method was appropriate because it allowed Commerce to consider the difference between the prices offered to distributors an end users for "the same (i.e., identical) product" has no basis whatsoever.

Fourth, Commerce's product code-based price comparison analysis had only limited applicability. Specifically, Commerce ignored that Ditar reported that the exact same product codes were almost never sold in both markets and that "Ditar's customers often require a significant degree of customization with respect to the type of paper used, the basis weight of the paper, the dimensions of the bags to be produced, the color of any ink used, the number of colors, the printing coverage, whether the inside and outside of the bag is printed, the types of handles and top edges, and – most important – the logo, design, or identity of the customer." Ditar AQR at A-34, Appx3283.

When Commerce claimed that identical CONNUMs were not "identical" in the context of its LOT analysis, Commerce contradicted decades of administrative practice in which Commerce has established that products sharing the same physical CONNUM characteristics should be considered identical. Considering that Commerce

acknowledged in the *Preliminary Determination* that "Ditar's revised

quantitative analysis *does show* a CONNUM-specific difference in

prices for sales to distributors and end users," PDM at 15, Appx1014,

Commerce's *Final Determination* was not based on substantial evidence

when Commerce did not analyze the differences in prices between

distributors and end users on a CONNUM-specific basis.

But even if Commerce's product code-based price comparison

approach is permissible, Commerce nonetheless erred in finding that

there was no pattern of consistent price differences between Ditar's

sales at the distributor and end user levels of trade. As discussed in the

Statement of Facts, using a product code-specific approach in the

*Preliminary Determination*, Commerce found that Ditar's prices to end

users were on average [      ] percent [        ] than its prices to

distributors. *Preliminary Analysis Memorandum*") at 3, Appx1023.

Based on this finding, Commerce concluded that Ditar's prices did not

differ significantly between the channels of distribution. *Id.* But nothing

in the statute, regulations or Commerce practice mandates that the

difference in pricing between levels of trade reach a minimum

threshold. Moreover, Commerce never explained why the [      ] percent

difference between distributor and end user pricing that Commerce

found did not itself constitute a "significant" percentage. Commerce's

failure to explain its rationale is important because Commerce's

regulations and practice include numerous situations where even a 5

percent amount is consider "significant." For example, Commerce uses 5

percent in determining whether an exporter accounts for a significant

percentage of exports of the subject merchandise in requesting

postponement of a final determination under 19 C.F.R. 351.210(b).

Commerce uses 5 absolute percentage points in determining whether

correction of a ministerial error in a preliminary determination is

significant under 19 C.F.R. 351.224(g). Commerce uses 5 percent in

determining whether a person owning shares in an entity and that

entity are affiliated under 19 U.S.C. § 1677(33). Commerce also uses 5

percent in determining whether the aggregate quantity of foreign like

product sold by an exporter in a country as a percentage of U.S. sales is

sufficient for viability purposes. 19 C.F.R. 351.404(b). Therefore, even

under Commerce's product code-specific pricing comparison analysis in

this case, Commerce erred in concluding that a [      ] percent difference

in pricing did not constitute a significant average pricing difference.

## V.    **CONCLUSION**

For the reasons stated above, it was unlawful for Commerce to
compare Ditar's U.S. sales to distributor customers to home market
sales to end user customers without making a level of trade adjustment
to the home market selling prices. As established in the administrative
record, the selling activities – and the intensity and frequency of such
activities – that Ditar performed for its distributor and end user
customers established that there was a significant difference between
Ditar's distributor and end user marketing stages in Colombia. Ditar
also quantitatively demonstrated that the differences in selling
activities between the home market channels of distributions affected
price comparability. Thus, the administrative record established that
Ditar's home market sales were made at two different levels of trade.
Because Commerce (1) disregarded the evidence on the administrative
record that established two separate levels of trade, (2) ignored how
Ditar's quantitative analyses linked to the intensity levels reported in
Ditar's selling functions chart, (3) misunderstood the importance of the
design work that Ditar engaged in with its end user customers and
failed to recognize that Ditar did *not* perform such activities for its

distributor customers, (4) failed to recognize that the different types and levels of intensity of selling activities for different customer types had an impact on price, (5) ignored the CONNUM-based price comparability analysis that Ditar provided that was based on Commerce's own dumping margin SAS programming, and (6) relied instead on a product code comparison analysis (for different customer categories) that conflicted with Commerce's definition of "identical" products and that failed to recognize that the same product codes are hardly ever sold to different customers, Commerce's level of trade analysis was unreasonable and unsupported by substantial evidence, and the Court should remand to Commerce for further consideration.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated:  January 22, 2025         Counsel to Ditar, S.A.