# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| _____ ) | |
| DITAR, S.A., ) | |
|          Plaintiff, ) | |
| ) | |
|   v. ) | Court No. 24-00130 |
| ) | |
| UNITED STATES, ) | PUBLIC |
|          Defendant, ) | VERSION |
| ) | |
|   and ) | Business Proprietary |
| ) | Information denoted |
| COALITION FOR FAIR TRADE ) | by brackets on pages |
| IN SHOPPING BAGS, ) | 8, 20, 27, 30, 31, 34, |
|          Defendant-Intervenor. ) | 38, 39, 48, 55 |
| _____) | |
| ) | |
| COALITION FOR FAIR TRADE IN ) | |
| SHOPPING BAGS, ) | |
|          Plaintiff, ) | |
| ) | |
|   v. ) | Court No. 24-00157 |
| ) | |
| UNITED STATES, ) | |
|          Defendant, ) | |
| ) | |
|   and ) | |
| ) | |
| DITAR, S.A., ) | |
|          Defendant-Intervenor. ) | |
| _____) | |

## DEFENDANT'S CONSOLIDATED OPPOSITION
## TO PLAINTIFFS' RULE 56.2 MOTIONS
## <u>FOR JUDGMENT ON THE AGENCY RECORD</u>

YAAKOV M. ROTH
Acting Assistant
    Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:

FRANKLIN E. WHITE, JR.
Assistant Director

RUSLAN KLAFEHN
Attorney
Office of the Chief Counsel
    for Trade Enforcement &
    Compliance
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230

DANIEL BERTONI
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 880-0336

April 15, 2025

Attorneys for Defendant

# **TABLE OF CONTENTS**

STATEMENT PURSUANT TO USCIT R. 56.2 ................................... 2

    I.   The Administrative Determination Under Review ............... 2

    II.  Issues Presented For Review .................................................. 2

STATEMENT OF FACTS ..................................................................... 3

    I.   Commerce Determined That Ditar Made Sales In Its Home
        Market At A Single Level Of Trade ........................................ 4

    II.  Commerce Determined That Ditar Reported As A Home-
        Market Sale One Sale That Included "Plate Charges" On
        The Invoice .............................................................................. 7

    III.  Procedural History ................................................................. 9

SUMMARY OF ARGUMENT .............................................................. 10

ARGUMENT .......................................................................................... 11

    I.   Standard Of Review ............................................................... 11

    II.  Commerce's Level-Of-Trade Analysis Is In Accordance With
        Law And Supported By Substantial Evidence ...................... 13

        A. Legal Standard For Adjusting Normal Value Based On
           Differing Levels Of Trade ................................................ 13

        B. Commerce Applied The Correct Legal Standard ............. 16

        C. Substantial Evidence Supports Commerce's Conclusion
           That There Was Only One Level Of Trade In Ditar's
           Home Market .................................................................... 18

1. Ditar's Activities Designing Bags Are Appropriately Captured As Production Costs, Not As Selling Activities ...................................................................... 19

2. Ditar's Reporting Of Warehousing Or Repacking Expenses Does Not Support Its Claim To A Level-Of-Trade Adjustment......................................................... 24

3. Ditar's Quantitative Analysis Does Not Support Its Argument That It Performed Selling Activities At A Greater Level Of Intensity For End Users Than Distributors................................................................. 28

4. Ditar's Arguments Criticizing Commerce's Examination Of Ditar's Price Comparability Analysis Are Meritless ............................................................... 33

III. Substantial Evidence Supports Commerce's Conclusion That Ditar Correctly Reported Home-Market Sales ............ 39

A. Commerce Employs A Knowledge Test To Determine The Market To Which A Sale Belongs............................. 40

B. Commerce Correctly Determined That Ditar Did Not Know At The Time Of Sale That The Disputed Sale Was Not For Consumption In The Home Market .................... 43

1. Ditar's Collection Of Value-Added Tax On The Disputed Sale And Other Evidence Supports Commerce's Acceptance Of Ditar's Home-Market Sales Reporting........................................................... 44

2. The Inclusion Of "Plate Charges" Does Not Support A Finding That Ditar Misclassified The Disputed Sale As A Home-Market Sale Because Plate Charges Are Not Inherent Characteristics Of Export Sales ............ 46

C. Because The Disputed Sale Was Correctly Reported — And Was An Outlier Even If Incorrectly Reported — Commerce Had No Reason To Look To Facts Otherwise Available Or Apply An Adverse Inference ........................................ 50

1. Standard For Application Of Facts Otherwise Available With An Adverse Inference .......................... 50

2. Substantial Evidence Supports Commerce's Decision That It Was Inappropriate To Look To Facts Otherwise Available .................................................................... 53

IV. Substantial Evidence Supports Commerce's Calculation Of The Rate For Companies Not Selected For Individual Review .................................................................................. 57

CONCLUSION ................................................................................ 58

# TABLE OF AUTHORITIES

**Case**                                                                        **Page(s)**

*AIMCOR v. United States,*
141 F.3d 1098 (Fed. Cir. 1998) ............................................................24

*Allegheny Ludlum Corp. v. United States,*
215 F. Supp. 2d 1322 (Ct. Int'l Trade 2000)....................... 40, 41, 44, 47

*Alloy Piping Products, Inc. v. United States,*
33 C.I.T. 349 (2009)..................................................................... 15, 22, 29

*Am. Honey Producers Ass'n v. United States,*
653 F. Supp. 3d 1329 (Ct. Int'l Trade 2023).................................. 52, 57

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States,*
624 F. Supp. 3d 1343 (Ct. Int'l Trade 2023)........................................52

*Atl. Sugar, Ltd. v. United States,*
744 F.2d 1556 (Fed. Cir. 1984) ............................................................12

*BlueScope Steel Ltd. v. United States,*
548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021)........................................51

*Charles G. Williams Construction, Inc. v. White,*
326 F.3d 1376 (Fed Cir. 2003) .............................................................31

*Cleo Inc. v. United States,*
501 F.3d 1291 (Fed. Cir. 2007) ............................................................13

*Coal. of Am. Flange Producers v. United States,*
448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020)....................... 31, 41, 47, 48

*Consolo v. Fed. Mar. Comm'n,*
383 U.S. 607 (1966).........................................................................12, 48

*Diamond Sawblades Manufacturers' Coal. v. United States*,
No. 17-00167, 2018 WL 5281941 (Ct. Int'l Trade Oct. 23, 2018).........56

*Dillinger France S.A. v. United States*,
981 F.3d 1318 (Fed. Cir. 2020) ......................................................22, 24

*Dongtai Peak Honey Indus. v. United States*,
777 F.3d 1343 (Fed. Cir. 2015) ............................................................34

*Dorbest Ltd. v. United States*,
604 F.3d 1363 (Fed. Cir. 2010) ......................................................24, 37

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996) ..............................................................11

*INA Walzlager Schaeffler KG v. United States*,
957 F. Supp. 251 (Ct. Int'l Trade 1997).........................................41, 43

*Jindal Poly Films Ltd. of India v. United States*,
365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019).........................................51

*Ningbo Dafa Chem. Fiber Co. v. United States*,
580 F.3d 1247 (Fed. Cir. 2009) ............................................................12

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) ............................................................52

*NSK Ltd. v. Koyo Seiko Co.*,
190 F.3d 1321 (Fed. Cir. 1999) ............................................................14

*Papierfabrik August Koehler SE v. United States*,
843 F.3d 1373 (Fed. Cir. 2016) ............................................................52

*Pasta Zara SpA v. United States*,
781 F. Supp. 2d 1297 (Ct. Int'l Trade 2011).........................................26

*Pirelli Tyre Co. v. United States*,
128 F.4th 1265 (Fed. Cir. 2025).............................................................31

*Productos Laminados de Monterrey S.A. de C.V. v. United States,*
 581 F. Supp. 3d 1349 (Ct. Int'l Trade 2022)..........................................32

*QVD Food Co., Ltd. v. United States,*
 658 F.3d 1318 (Fed. Cir. 2011) ...........................................................25

*Stupp Corp. v. United States,*
 359 F. Supp. 3d 1293 (Ct. Int'l. Trade 2019)..................................42, 44

*U.S. Steel Corp. v. United States,*
 621 F.3d 1351 (Fed. Cir. 2010) ...........................................................40

*United States v. Eurodif S.A.,*
 555 U.S. 305 (2009).............................................................................12

*Z.A. Sea Foods Priv. Ltd. v. United States,*
 569 F. Supp. 3d 1338 (Ct. Int'l Trade 2022).........................................41

## Statutes

19 U.S.C. § 1516a(b) ...............................................................................12

19 U.S.C. § 1673 .....................................................................................40

19 U.S.C. § 1677(33) ...............................................................................39

19 U.S.C. § 1677(35) ...............................................................................40

19 U.S.C. § 1677a(a) ..........................................................................13, 46

19 U.S.C. § 1677b ...................................................................................41

19 U.S.C. § 1677b(a) ...................................................................... *passim*

19 U.S.C. § 1677e(a) ....................................................................50, 51, 53

19 U.S.C. § 1677e(b) ................................................................... 51

19 U.S.C. § 1677m(d) .................................................................. 51

28 U.S.C. § 2637(d) ............................................................... 24, 37

## Rules

U.S. Ct. Int'l Trade R. 56.2 ................................................... 1, 2, 9

## Regulations

19 C.F.R. § 351.210(b) .................................................................. 38

19 C.F.R. § 351.224(g) .................................................................. 38

19 C.F.R. § 351.309(c) ............................................................. 24, 37

19 C.F.R. § 351.401(b) .................................................................. 14

19 C.F.R. § 351.404(b) .................................................................. 39

19 C.F.R. § 351.412(c) .................................................................. 15

## Other Authorities

*Antidumping Duties; Countervailing Duties*,
   62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) ............. *passim*

*Certain Crystalline Silicon Photovoltaic Products from Taiwan: Final
   Determination of Sales at Less Than Fair Value*,
   79 Fed. Reg. 76,966 (Dep't of Commerce Dec. 23, 2014) and
   accompanying Issues and Decision Memorandum (Dec. 15, 2015) ..... 42

*Certain Crystalline Silicon Photovoltaic Products From Taiwan: Final Results of Antidumping Duty Administrative Review; Partial Rescission of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2019-2020*,
86 Fed. Reg. 49,509 (Dep't of Commerce Sept. 3, 2021), and accompanying Issues and Decision Memorandum
(Aug. 27, 2021) ............................................................................... 43, 46

*Certain Paper Shopping Bags From Cambodia, the People's Republic of China, Colombia, India, Malaysia, Portugal, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*,
88 Fed. Reg. 41,589 (Dep't of Commerce June 27, 2023) ....................... 3

*Certain Paper Shopping Bags From Colombia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*,
89 Fed. Reg. 319 (Dep't of Commerce Jan. 3, 2024) ............................... 4

*Certain Paper Shopping Bags From Colombia: Final Affirmative Determination of Sales at Less Than Fair Value*,
89 Fed. Reg. 45,843 (Dep't Commerce May 24, 2024), and accompanying Issues and Decision Memorandum (May 17, 2024) ... 2, 6

*Emulsion Styrene-Butadiene Rubber from Brazil*,
85 Fed. Reg. 38,847 (Dep't of Commerce June 29, 2020), and accompanying Issues and Decision Memorandum
(June 23, 2020) ............................................................................... 15, 25

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade (USCIT R.), defendant, the United States, respectfully opposes the motions for judgment on the agency record filed by Ditar, S.A. (Ditar), plaintiff in Court No. 24-00130, and the Coalition for Fair Trade in Shopping Bags (the Coalition), plaintiff in Court No. 24-00157.

Ditar disputes Commerce's decision not to grant it a level-of-trade adjustment based on Commerce's finding that Ditar's sales to its home-market distributors and end users do not constitute different levels of trade. The Coalition disputes Commerce's determination that Ditar correctly reported a certain sale as a home-market sale, and Commerce's determination not to apply facts available with an adverse inference based on Ditar's reporting of that sale. As explained below, both plaintiffs' motions should be denied because Commerce's final determination is supported by substantial evidence and is otherwise in accordance with law.

## STATEMENT PURSUANT TO USCIT R. 56.2

### I.    The Administrative Determination Under Review

These actions involve challenges to Commerce's final determination in the less-than-fair-value investigation of certain paper shopping bags from Colombia.  *See Certain Paper Shopping Bags From Colombia: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 45,843 (Dep't of Commerce May 24, 2024), Appx1556-1558, and accompanying Issues and Decision Memorandum (May 17, 2024), Appx1533-1555.  The period of investigation is April 1, 2022 through March 31, 2023.

### II.    Issues Presented For Review

1.    Whether substantial evidence supports Commerce's determination that Ditar made home-market sales to unaffiliated distributors and end-user customers at the same level of trade with the result that Commerce properly denied Ditar's request for a level-of-trade adjustment.

2.    Whether substantial evidence supports Commerce's determination that Ditar correctly classified a certain sale as a home-market sale rather than a U.S. sale.

3.      Whether substantial evidence supports Commerce's determination not to apply facts otherwise available with an adverse inference to Ditar's home-market sales reporting.

4.      Whether substantial evidence supports Commerce's determination of the margin assigned to non-selected companies under review.

## STATEMENT OF FACTS

On June 20, 2023, after the Coalition filed a petition, Commerce began a less-than-fair-value investigation of shopping bags from Colombia, among other countries.  *See Certain Paper Shopping Bags From Cambodia, the People's Republic of China, Colombia, India, Malaysia, Portugal, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 88 Fed. Reg. 41,589 (Dep't of Commerce June 27, 2023); Appx5984-5990.  On July 27, 2023, Commerce chose Ditar as a mandatory respondent.  Appx3230.  On July 28, 2023, Commerce issued Ditar the initial questionnaire.  Appx7093.

## I.    Commerce Determined That Ditar Made Sales In Its Home Market At A Single Level Of Trade

Commerce's initial questionnaire instructed Ditar to provide information on its selling activities, including quantitative and qualitative analyses, to permit Commerce to determine whether Ditar's sales in the United States and in its home market were made at different levels of trade.  Appx7117-7118; *see* Appx7230.

Ditar responded to the initial questionnaire with information regarding its distribution process and its claimed levels of trade. Appx3259-3274.  Specifically, Ditar reported one channel of distribution (unaffiliated distributors) for the U.S. market, and two channels of distribution (unaffiliated distributors and end-users) for its home market.  Appx3261; Appx3810; Appx3966.  Ditar argued that its two home-market channels of distribution qualified as two levels of trade and that it was therefore entitled to a level-of-trade adjustment. Appx3261-3274.

In its preliminary determination, Commerce evaluated Ditar's qualitative and quantitative justifications for a level-of-trade adjustment.  Appx1012-1014; *see Certain Paper Shopping Bags From Colombia: Preliminary Affirmative Determination of Sales at Less Than*

*Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 319 (Dep't of Commerce Jan. 3, 2024), Appx1018.  Commerce first determined that the differences in the selling functions Ditar claimed it performed for its distributor customers as opposed to its end-user customers were not meaningful enough to constitute different marketing stages and to merit a finding of separate levels of trade.  Appx1013.  Commerce next found that Ditar's quantitative analysis and comparison of prices did not support finding two levels of trade, and Commerce observed that "Ditar did not include all applicable CONNUMs in its analysis."  *Id.*  In any event, Commerce found that a comparison of prices by product code rather than CONNUM would "provide{ } a more realistic indicator of the differences between the prices offered to distributors and end users for the same . . . product."  *Id.*  Commerce's own, product-code-based analysis found less of a difference in price than Ditar had reported.  *Id.*  Accordingly, Commerce rejected Ditar's request for a level-of-trade adjustment.

In its administrative case brief, Ditar contended that, although it may have performed many of the same selling activities for both

distributor and end-user customers, it did so at a higher intensity and frequency for the latter group. Appx5830-5831. Further, Ditar argued that it performed additional selling activities for end-user customers compared to distributor customers. Appx5831-5832. Finally, Ditar claimed that it had sufficiently supported its qualitative analysis with quantitative evidence. Appx5832.

On May 24, 2024, Commerce published its final affirmative determination and calculated a weighted-average dumping margin of 11.06 percent for Ditar. 89 Fed. Reg. at 45,844; Appx1557. Commerce ultimately determined that the record evidence supported a finding that Ditar made sales to home-market distributors and home-market end users at a single level of trade. Appx1547-1551. Commerce explained that a level-of-trade adjustment is appropriate "{o}nly where the intensity of sales functions and support reflect demonstrable differences out of proportion with their relative difference in volume, and such differences are supported by quantitative and qualitative information on record." Appx1548. Commerce found that the differences in Ditar's selling activities and intensities were better attributed to differences in the product rather than a different level of trade, and that on balance,

Ditar's selling activities and intensity were proportionate to each channel of distribution. Appx1548. Further, Commerce found that Ditar did not support its qualitative analysis with an adequate quantitative analysis, because an analysis of prices by product code showed that there was an insignificant difference between the price to home-market distributor and end-user customers. Appx1550-1551.

## II.    Commerce Determined That Ditar Reported As A Home-Market Sale One Sale That Included "Plate Charges" On The Invoice

To distinguish Ditar's home-market sales from its export sales, Commerce's initial questionnaire also instructed Ditar to report the sales it made in its home market during the period of investigation. Appx7126-7127. In response, Ditar submitted a home-market sales database. Appx3798; *see, e.g.*, Appx3836.

On January 24, 2024, Commerce notified Ditar of its intent to verify Ditar's sales reporting. Appx4734. Commerce pre-selected four of Ditar's reported home-market sales for tracing from the initial inquiry or order through final payment. Appx4742-4745; Appx4751. Commerce conducted an in-person cost and sales verification from

February 5 through February 9, 2024, and issued its report on March 11, 2024.  Appx5573.

During verification, Ditar notified Commerce that it was "not sure whether" to classify one of the pre-selected sales (SEQH [      ]) as a home-market sale or as a U.S. sale.  Appx5787.  Ditar explained that the documentation for this sale included "plate charges," which according to Ditar indicated that the merchandise would ultimately be sold in the United States.  Appx5788.  Ditar informed Commerce that it had asked the customer for information regarding this sale, and the customer reported that it had sold the merchandise to a downstream customer in the United States.  Appx5787.  Ditar offered at verification to provide documentary evidence for the downstream sale of the merchandise to the United States, but Commerce did not accept the evidence, reasoning that "downstream sales made by unaffiliated parties are not currently covered by this investigation."  *Id*. & n.57.

The Coalition argued in its case brief that Ditar should have reported this pre-selected sale as an export sale rather than a home-market sale.  Appx5808-5809.  Based on this allegedly misclassified sale, the Coalition then contended that Commerce should have looked to

facts otherwise available, because Ditar's error made its sales reporting unusable. Appx5810. The Coalition further argued that Commerce should employ an adverse inference on the grounds that Ditar had information regarding the sale in its possession at the outset and but waited until verification to address the issue, at which point there was not sufficient time to develop the record. Appx5811-5812.

In its final affirmative determination, Commerce found that record evidence supported a finding that Ditar had correctly classified the market of sale for its reported home market and U.S. sales. Appx1539-1540. Regarding the particular challenged sale, Commerce explained that the record did not support a finding that Ditar had knowledge at the time of sale that the merchandise was intended to be exported and resold in the United States. *Id.* Accordingly, Commerce found no need to resort to facts otherwise available to determine Ditar's margin or to employ an adverse inference. Appx1542.

## III.   **Procedural History**

Ditar filed its complaint in No. 24-00130 on July 29, 2024, ECF No. 6, and its motion for judgment on the agency record pursuant to USCIT R. 56.2 on January 22, 2025 (Ditar Br.), ECF No. 23 in No. 24-

00130.  The Coalition filed its complaint in No. 24-00157 on September

12, 2024, ECF No. 9, and its motion for judgment on the agency record

on January 22, 2025 (Coalition Br.), ECF No. 22 in No. 25-00157.

## SUMMARY OF ARGUMENT

First, Commerce's finding that Ditar's home-market sales to

unaffiliated distributors and end-user customers were made at the

same level of trade, and that all U.S. sales were made at the same level

of trade as home-market sales is supported by substantial evidence and

otherwise in accordance with law.  Commerce carefully considered the

evidence and analysis Ditar offered and found that it was insufficient to

demonstrate different selling activities or a significant difference in

pricing between the two claimed levels of trade.  Accordingly, Commerce

properly denied Ditar's request for a level-of-trade adjustment.

Second, Commerce's determination that Ditar correctly classified

the market of sale for its home-market sales, including the disputed

pre-selected sale, is supported by substantial evidence and otherwise in

accordance with law.  Ditar paid value-added tax (VAT) on this sale and

there was no evidence suggesting that Ditar knew at the time of sale

that the sale was meant for export.  Indeed, Commerce verified that all

other sales to the specific customer were destined for consumption in Colombia. Additionally, the "plate charges" were charged more generally for plate creation and that fact on its own would not have alerted Ditar that the sale was meant for export to the United States.

Third, Commerce also reasonably determined there was no occasion to resort to facts otherwise available or to use an adverse inference in its analysis of Ditar's home-market sales reporting. Although Commerce identified errors at verification, these errors were minor ones that Commerce was able to easily correct, and which did not indicate fundamental flaws in Ditar's reporting. Additionally, Commerce only scrutinized the pre-selected sale because of certain differences from Ditar's other home-market sales, such that any problems with Ditar's reporting of that sale would not affect Ditar's reporting of other sales.

## ARGUMENT

## I.    Standard Of Review

The Court sustains any determination, finding, or conclusion made by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law. *Fujitsu Gen.*

*Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)). "Substantial evidence" means "more than a mere scintilla" of evidence that "a reasonable mind might accept as adequate to support a conclusion." *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009) (cleaned up).

The Court should sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Even if the Court could draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). An agency decision may not be overturned "simply because the reviewing court would have reached a different conclusion

12

based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291,

1296 (Fed. Cir. 2007) (citations omitted).

## II. Commerce's Level-Of-Trade Analysis Is In Accordance With Law And Supported By Substantial Evidence

As we establish below, Commerce's findings that Ditar did not

provide qualitative or quantitative evidence to support the existence of

different selling activities and that the record did not support a finding

that Ditar sold merchandise at different prices across its home-market

channels are supported by substantial evidence. *See* Appx1547-1551.

Therefore, the Court should sustain Commerce's determination that

Ditar's home-market sales were made at a single level of trade.

### A. Legal Standard For Adjusting Normal Value Based On Differing Levels Of Trade

"{T}o the extent practicable," Commerce must establish normal

value "at the same level of trade" as the export price.[1]  19 U.S.C.

---

[1] Generally, normal value is "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(i).  Export price is "the price at which the subject merchandise is first sold . . . to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States."  *Id.* § 1677a(a).

§ 1677b(a)(1)(B)(i).  Commerce may adjust its normal value calculation

when sales in the exporting country are made at a different level of

trade if two factors are met:  the proposed different levels of trade

involve different selling activities and that difference is reinforced by a

difference in pricing.  19 U.S.C. § 1677b(a)(7)(A)(i)-(ii).

For the first factor, to determine whether different selling

activities exist so as to justify a different level of trade, Commerce

analyzes the exporter's selling functions to determine if levels of trade

identified by the exporter are meaningful.  *Antidumping Duties;*

*Countervailing Duties*, 62 Fed. Reg. 27,296, 27,371 (Dep't of Commerce

May 19, 1997) (*Preamble*).  Accordingly, for an adjustment to be granted

based on different levels of trade, the party seeking the adjustment

must demonstrate that different prices and selling expenses are caused

by differences in level of trade and not by other factors, such as volume

sold or arbitrary pricing.  *See* 19 C.F.R. § 351.401(b)(1); *NSK Ltd. v.*

*Koyo Seiko Co.*, 190 F.3d 1321, 1330 (Fed. Cir. 1999) ("NTN did not

provide evidence to prove that {price} differences were not caused by

other factors, such as volume sold or arbitrary pricing practices. . . .

14

NTN did not present evidence to establish that the difference in the level of trade caused the differences in price and selling expenses.").

Commerce's regulations further specify that sales are made at a different level of trade "if they are made at different marketing stages (or their equivalent)" and that "{s}ubstantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing." 19 C.F.R. § 351.412(c)(2). Thus, "the focal point of Commerce's {level-of-trade} adjustment analysis is on the *selling activities* performed in each market." *Alloy Piping Prods., Inc. v. United States*, 33 CIT 349, 355 (2009).

Commerce requires respondents to support level-of-trade claims with both quantitative and qualitative information. Quantitative information "permits Commerce to examine whether respondent's narrative explanations and qualitative evidence are supported by its books and records maintained in the ordinary course of business." *Emulsion Styrene-Butadiene Rubber from Brazil,* 85 Fed. Reg. 38,847 (Dep't of Commerce June 29, 2020), and accompanying Issues and Decision Memorandum (June 23, 2020) (*ESBR from Brazil IDM*) at 10.

"Additionally, the requirement that respondents provide quantitative support for their claimed {levels of trade} reduces subjectivity and the likelihood of inconsistency in the application of Commerce's analytical framework that results from the analysis of purely qualitative information, which can be, by its nature, subject to different interpretations." *Id.* at 10-11.  If the record lacks sufficient quantitative evidence to support respondent's level of trade claims, Commerce will find that the respondent has not met its burden to merit an adjustment to normal value.  *See, e.g., id.*

## B.  <u>Commerce Applied The Correct Legal Standard</u>

As an initial matter, Ditar takes out of context a statement in Commerce's preliminary determination — a statement that is not present in the final determination — to argue that Commerce applied an incorrect legal standard in its level-of-trade analysis.  *See* Ditar Br. at 27.  Ditar contends that "Commerce contradicted its own regulation, claiming incorrectly that 'different marketing stages occur where merchandise changes hands twice.'"  *See* Ditar Br. at 27 (quoting Appx1013).  Ditar then quotes the *Preamble*, in which Commerce stated that "'it is sufficient that, at the more remote level, the seller takes on a

16

role comparable to that of a reseller' as if the merchandise had changed

hands twice." *Id.* at 28 (citing *Preamble*, 62 Fed. Reg. at 27,371).

Ditar essentially disregards Commerce's entire analysis to focus

on two sentences in the preliminary decision where Commerce made an

observation that, at a basic level, Ditar's level-of-trade claim was

suspect. *See* Appx1013. And Commerce's statement — before Ditar

took it out of context — is true: different marketing stages occur when

merchandise changes hands twice. *See id.* The *Preamble* explains that,

although merchandise does not necessarily have to change hands twice,

> {e}ach more remote level must be characterized
> by an additional layer of selling activities,
> amounting in the aggregate to a substantially
> different selling function. Substantial differences
> in the amount of selling expenses associated with
> two groups of sales also may indicate that the two
> groups are at different levels of trade.

*Preamble*, 62 Fed. Reg. at 27,371. Accordingly, Commerce did not say

in the preliminary determination that two changes of hands was the

sole way for different marketing stages to be found. It merely said that

Ditar's situation was not one in which merchandise changed hands

twice. *See id.* Thus, Commerce's level-of-trade analysis, which

examines the details of Ditar's failure to show different marketing

stages and a difference in pricing — and not merely on merchandise changing hands twice — is consistent with its regulation and the *Preamble*.

Commerce has also explained that differences in customer type are insufficient to establish a different level of trade. *Preamble*, 62 Fed. Reg. at 27,371 ("Although the type of customer will be an important indicator in identifying differences in levels of trade, the existence of different classes of customers is not sufficient to establish a difference in the levels of trade."). Therefore, in the final determination, Commerce analyzed the selling functions Ditar reported, as we discuss further below, and did not rest its decision solely on different customer types. Appx1547-1551. As a result, Ditar misdirects the Court by pointing to other decisions in which Commerce found different levels of trade even when merchandise had not changed hands twice. *See* Ditar Br. at 28-30.

### C.    Substantial Evidence Supports Commerce's Conclusion That There Was Only One Level Of Trade In Ditar's Home Market

Ditar argues that Commerce erred in finding a single level of trade for its home-market sales. Because Commerce analyzed the

evidence Ditar put on the record and explained why Ditar's analysis

was inadequate, the Court should sustain Commerce's determination.

> **1.    Ditar's Activities Designing Bags Are Appropriately Captured As Production Costs, Not As Selling Activities**

Ditar first argues that its sales to end users were made at a

different level of trade because "Ditar engaged in more selling

activities . . . and that these selling activities were more intensive and

more frequent." Ditar Br. at 33. Specifically, Ditar argues that

"developing and coordinating the bag designs with end user customers

was an integral part of the selling function at that more remote level of

trade." *Id.* at 33, 36-39.

Ditar conceded before Commerce that it performs many of the

same selling activities for both end-user customers and distributor

customers. Appx3262; Appx1012. For the two channels of distribution

it identified in its home market, Ditar reported selling activities in five

categories: (1) sales support; (2) training services; (3) technical support;

(4) logistical services; and (5) sales-related administration. Appx3297-

3303. Ditar reported performing six of seven sales support functions

and seven of eight sales-related administration functions for both

distributor and end-user customers.  Appx3298-3299; Appx3302-3303.
And for any supposed differences in selling activities, such as in
technical support and technical advice services, the record evidence
shows that these expenses were an insignificant component of Ditar's
reported total indirect selling expenses.  Appx1547; Appx5152-5153
(showing Ditar's reporting that technical services amounted to only
[          ] of indirect selling expenses).[2]  Therefore, Commerce concluded
that Ditar performed essentially the same selling activities for both
distributor and end-user customers, though perhaps at a different
frequency.  Appx1547.

Commerce then determined that the differences Ditar reported in
the nature of activities it performed and their frequency were best
explained as deriving from differences in the products Ditar was selling.
Appx1548.  That is, what Ditar claimed were different selling activities
were actually different production activities.

---

[2]  For the period of investigation, Ditar reported a total of
[                    ] COP in indirect selling expenses.  Appx5152-5153.
Ditar's reported "thecnical {sic} services" expenses amount to
[                ] COP.  *Id.*

Commerce observed that Ditar reported performing the following activities for end-user customers:

> (1) maintains a larger direct sales staff that interacts with the end user customers on a daily basis; (2) prepares monthly sales reports and continuously engages in sales forecasting; (3) provides sales and marketing support for its customers, including assigning customer account representatives, conducting frequent customer visits, and performing customer service activities; (4) actively negotiates prices with its customers; (5) performs marketing activities, including customer outreach to potential new customers; (6) performs most of the mock-up for bag development; (7) creates most of the artwork for bag printing, and (8) provides customers with technical assistance by answering practical questions and providing post-sale follow-up.

Appx1012.  Commerce then noted that for home-market distributor customers, "Ditar has a smaller staff that primarily conducts order input activities, provides limited sales forecasting to yearly meetings, provides little marketing support for customers that are seeking mostly generic bags, negotiates prices and handles warranty claims only on occasion."  *Id.*

After considering all of Ditar's submissions, Commerce concluded that the differences in activities were best ascribed to differences in the products Ditar was selling to home-market distributors and end users:

unprinted bags in a small range of sizes to the former and printed bags of varying sizes to the latter.[3]  Appx1548.

Ditar's work designing bags for its customers is a production activity, not a selling activity.  "The focal point of Commerce's {level-of-trade} adjustment analysis is on the *selling activities* performed in each market."  *Alloy Piping Prods.*, 33 CIT at 355.  Activities related to the processing of merchandise are not selling activities.  *See Dillinger France S.A. v. United States*, 981 F.3d 1318, 1327 (Fed. Cir. 2020).

Based on Ditar's submissions, Commerce found that Ditar's production process involved designing and printing paper, then cutting the paper, gluing the bag, and attaching handles.  Appx1549; Appx4072; Appx4125-4126; *see also* Appx5778 ("{T}he sales and production process is far more difficult for home market customers.").  Ditar's own characterization of its production process confirms that designing bags is a production activity.  Appx4126; *cf.* Ditar Br. at 37 ("Ditar undertook substantial efforts to help "build" the bag to its end

---

[3]  Thus, Ditar is incorrect in stating that Commerce "conceded" that "developing and coordinating the bag designs with end user customers" was a selling function.  *See* Ditar Br. at 33.  Rather, Commerce made clear that it considered this kind of activity to be a production function.  Appx1548.

user customer's specifications.  In this regard, Ditar not only helped

design the artwork to be printed on the bag, but also produced the

printing plates.") (citing Appx3268-3269).  Ditar even explained to

Commerce at verification that "its home market customers are

extremely demanding about sizes and designs, so that, whether it sells

merchandise to distributors or end-users, it must satisfy the size and

design demands of each specific end-user."  Appx5779.  Thus,

Commerce's conclusion that designing bags forms a part of Ditar's

production process is consistent with Ditar's own account.  *See*

Appx1549 ("Some paper bags have more complex designs, graphical

applications or are printed in more colors, or covering a greater

percentage of the bag than others.").

Accordingly, Commerce reasoned that Ditar's claimed differences

in selling expenses "associated with the design and production of the

paper bags with more complex designs and graphical applications are

captured in the cost of production{,} not in selling expenses" and were

inapplicable to a level-of-trade analysis.  Appx1549.  Therefore,

Commerce concluded that these activities were processing activities

already captured in the cost of production rather than selling activities

that could signify a separate level of trade.  *See Dillinger France*, 981

F.3d at 1327 ("We see no error in Commerce's refusal to consider these

processing activities to be selling functions.").

### 2. Ditar's Reporting Of Warehousing Or Repacking Expenses Does Not Support Its Claim To A Level-Of-Trade Adjustment

Ditar next argues that Commerce should have found different

levels of trade for its home market because Ditar provides warehousing

to both distributor and end-user customers and occasionally some

repacking services to end-user customers.  *See* Ditar Br. at 33-36.  As an

initial matter, Ditar has failed to exhaust this argument by raising it in

its administrative case brief, and the Court should therefore not

consider it.  *See* 28 U.S.C. § 2637(d).  Commerce's regulations require

that an administrative case brief "must present all arguments" relevant

to the final determination or final results, 19 C.F.R. § 351.309(c)(2), and

a party fails to exhaust arguments that are not raised in an

administrative case brief, *Dorbest*, 604 F.3d at 1375.  A party that fails

to exhaust administrative remedies may not raise the issue *de novo*

before the Court.  *AIMCOR v. United States*, 141 F.3d 1098, 1111-12

(Fed. Cir. 1998).  In any event, Ditar did not report these expenses in its

home-market sales database and instead reported them as indirect

selling expenses.  Ditar Br. at 35.  Ditar contends, without support, that

its classification of its own expenses supports a finding of different

levels of trade.

Ditar is responsible for building the record to support its claimed

level-of-trade adjustment.  *See QVD Food Co., Ltd. v. United States,* 658

F.3d 1318, 1324 (Fed. Cir. 2011) (holding that parties, not Commerce,

have the burden of building the record); *see also ESBR from Brazil IDM*

at 10 (explaining that Commerce will look to books and records to

determine whether the record supports a claim to a level-of-trade

adjustment).  Commerce's level-of-trade analysis is holistic and

evaluates the seller's overall marketing scheme.  *See Preamble*, 62 Fed.

Reg. at 27,371 ("{A}n analysis of selling activities alone is insufficient to

establish the {level of trade}. . . . In situations where some differences in

selling activities are associated with different sales, whether that

difference amounts to a difference in the levels of trade will have to be

evaluated in the context of the seller's whole scheme of marketing.").

Therefore, Commerce requires there to be substantial differences in

selling functions to support a finding that sales are made at different

levels of trade. *See Pasta Zara SpA v. United States*, 781 F. Supp. 2d 1297, 1302 (Ct. Int'l Trade 2011) ("Commerce permissibly determined on the record *as a whole* that Zara's selling activities directed to its traditional local customers were not so separate from Zara's other selling activities{.}") (emphasis added).

Ditar did not report warehousing or repacking expenses in either the home-market sales database or in its questionnaire response. Appx1548; Appx3820; Appx3834 (lacking a field for warehousing expenses). Rather, Ditar told Commerce that it provides warehousing at its own factory for both distributor and end-user customers, Appx3820, and that repacking occurs only "{o}ccasionally," Appx3273.

Ditar now points to its statement that it "dedicated significantly different areas of its warehouse space for sales in the different distribution channels." Appx3819 (cited at Ditar Br. at 34). But the exhibits Ditar cites offer no quantitative support for this statement or for a difference in repacking expenses. *See* Appx3917-3919 (dividing inventory, cost of goods sold, and sales staff according to sales channel); Appx3936-3939 (listing some indirect selling expenses as "building-warehouses" without a breakdown by sales channel and lacking a line

item for repacking).  Furthermore, Ditar's average per-unit packing

expenses are higher for distributors than end-user customers, even

when the average per-unit cost of manufacturing merchandise sold to

distributors is lower than the manufacturing cost of merchandise sold to

end users.  Appx1548; Appx1472; Appx1474.[4]

But even if the Court looks past the lack of quantitative support,

Ditar's limited narrative does not support a substantial difference in

selling functions such that Commerce could appropriately grant a level-

of-trade adjustment based on Ditar's warehousing and repacking

expenses.

---

[4]  In a spreadsheet attached to Commerce's preliminary analysis
of the margin calculation, Commerce found that, despite Ditar's average
per-unit cost of manufacturing being higher for sales made to end-users,
Ditar's average packing expenses were higher for distributor customers.
Tab PACKH of the spreadsheet shows that the sum of packing expenses
for distributor customers is [          ] COP as compared to
[          ] COP for end-user customers.  Tab TOTCOM shows the
total cost of manufacturing for distributor customers as [          ]
COP and [          ] COP for end-user customers.  Tab QTYUNIT2H
shows the total quantity sold be [       ] kg for distributor customers
and [       ] kg for end-user customers.  Thus, Ditar's average per-unit
total cost of manufacturing for merchandise sold to distributor
customers is [       ] COP and its average per-unit total cost of
manufacturing for merchandise sold to end-user customers is [       ]
COP.  But its average per-unit packing expenses are [       ] COP for
sales to distributor customers and [       ] COP for sales to end-user
customers.

### 3. Ditar's Quantitative Analysis Does Not Support Its Argument That It Performed Selling Activities At A Greater Level Of Intensity For End Users Than Distributors

Ditar's next argument is that Commerce "failed to consider the degree and intensity of the selling functions that Ditar performed," when it concentrated on Ditar's allocation of sales staff to volume and price sold. Ditar Br. at 40-46. Ditar contends that its quantitative analysis supports its argument that its sales to end users were made at a higher level of trade than its sales to distributors. *Id.* at 40-44. Contrary to Ditar's contentions, Commerce properly considered Ditar's quantitative analysis and other evidence on the record when concluding that Ditar had not demonstrated two levels of trade in its home market.

Ditar presented Commerce with a quantitative analysis that consisted of various calculations based on its two claimed sales channels in its home market:

> Ditar reports the number of sales staff for distributors and end users, and then, the number of invoices, sales observations, and sales value for end users and distributors. Then based on these figures, Ditar calculates the number of sales staff per invoice, and per line item, then reverses the figures and calculates the number of invoices per sales staff and the number of line items per sales staff. It makes similar calculations for sales staff

compensation, showing the total compensation for
distributors and end users, and then, separately
calculates the compensation per invoice, per line
item, per kilogram sold, per bag sold for end users
and distributors.

Appx1550.  Ditar presents the Court with similar catalogs of

calculations.  Ditar Br. at 15-17; 40-44.  But Ditar does not explain why

these individual line items — which mostly compare Ditar's selling

expenses and rely on the numbers of invoices and line items and salary

costs rather than the actual values or quantities of shopping bags sold

— are a meaningful, let alone relevant, metric to determine the

intensity of selling activities.  Commerce's level-of-trade analysis

focuses on selling *activities* rather than on individual selling *expenses*

taken in isolation, as the statute requires.  *See* 19 U.S.C.

§ 1677b(a)(7)(A)(i) (requiring analysis of "the performance of different

selling activities"); *Alloy Piping Prods.*, 33 CIT at 355 ("The focal point

of Commerce's {level-of-trade} adjustment analysis is on the *selling*

*activities* performed in each market.").

Indeed, Commerce observed that some of Ditar's metrics run

counter to its argument that sales to home-market distributors and

home-market end users were made at separate levels of trade because

29

"the percentage values for the total sales value, the total sales volume, the number of sales staff, and the number of sales with price or billing adjustments are in alignment." Appx1550.  For example, distributor sales and end-user sales comprised approximately [     ] percent and [     ] percent, respectively, of Ditar's home-market sales by weight. Appx4379.  Ditar employed [     ] sales personnel for distributor customers ([     ] percent of its home-market sales staff) and [     ] sales personnel for end-user customers ([     ] percent of its home-market sales staff), a close correspondence that supports Commerce's conclusion that Ditar's sales staffing levels were "in alignment" with its home-market sales volume.  *Id*; Appx1550.  Commerce found a similar proportionality regarding the value of shopping bags sold in each home-market channel, where Ditar had [                 ] COP in distributor sales and [                 ] COP in end-user sales.  Appx4379; *cf.* Ditar Br. at 41-42 n.12.  Thus, because each salesperson made a similar value of sales,[5] Commerce reasonably concluded that Ditar's quantitative analysis did not demonstrate separate levels of trade.  Appx1550.

---

[5] Ditar's salespeople for distributor sales averaged sales of [                 ] COP per salesperson and its salespeople for end-user

Ditar also argues that Commerce did not address individual pieces of data that Ditar presented:  the amounts of credit expenses and inventory carrying costs, the numbers of end-user and distributor customers, and the numbers of different product codes and CONNUMs sold.  Ditar Br. at 43-45.  Ditar mistakes what is required of Commerce's written decision.  Commerce's analysis of the record "does not necessitate explicit mention and discussion of each piece of evidence." *Pirelli Tyre Co. v. United States*, 128 F.4th 1265, 1271 (Fed. Cir. 2025) (citing *Charles G. Williams Constr., Inc. v. White*, 326 F.3d 1376, 1380 (Fed Cir. 2003)); *see also Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1351 (Ct. Int'l Trade 2020) ("{T}he agency is not required to address every piece of evidence submitted by the parties{.}").  In determining that Ditar's proposed quantitative analysis "does not support its claims," Commerce referred specifically to the table that presented Ditar's credit expense and carrying costs, and determined that the data presented there was insufficient.  *See* Appx1550 & n.56 (citing Appx4379-4380).

---

sales averaged sales of [                    COP ] per salesperson.  *See* Appx4379.

Further, Ditar's reliance on *Productos Laminados* is misplaced. Ditar Br. at 45-46 (citing *Productos Laminados de Monterrey S.A. de C.V. v. United States*, 581 F. Supp. 3d 1349 (Ct. Int'l Trade 2022)). First, in *Productos Laminados*, Commerce had identified two levels of trade, the opposite of the situation here. 581 F. Supp. 3d at 1358. Therefore, the Court's holding in that case that certain record evidence was sufficient to support Commerce's finding does not logically lead to the conclusion that the presence of similar evidence in this record requires Commerce to find that Ditar engaged in two levels of trade. Further, the *Productos Laminados* Court described the additional selling *expenses* that supported a finding of different selling *activities* — and therefore a different level of trade — as "substantially higher as a proportion of revenue earned." *Id.* at 1357. Ditar has presented no similar evidence here, but rather offers non-comparable calculations of indirect selling expenses per kilogram and per bag. Ditar Br. at 42-43; *see* Appx4380.

In short, after examining Ditar's quantitative analysis and the data that underlay that analysis, Commerce found that Ditar failed to demonstrate that it made home-market sales at two levels of trade.

32

Appx1550.  Because Ditar concedes that it made sales to U.S. distributors at the same level of trade as home-market distributors, Ditar Br. at 24-25, Commerce properly denied a level-of-trade adjustment.

### 4. Ditar's Arguments Criticizing Commerce's Examination Of Ditar's Price Comparability Analysis Are Meritless

Ditar also challenges Commerce's evaluation of a separate quantitative analysis Ditar prepared, in which Commerce concluded that Ditar failed to support the existence of price difference between its sales to end users and distributors as would be necessary to support a finding of two levels of trade.  Ditar Br. at 46-56.

Commerce found Ditar's analysis inadequate because it "omitted two CONNUMs that had sales to distributors and to end users." Appx1550-1551 (citing Appx4378).  Commerce's own analysis of the full dataset, based on product codes, "revealed that very few sales had a significant impact on the overall comparison of the prices between end users and distributors."  *Id.*  Specifically, Commerce found that Ditar's sales data, which included a product code with negligible sales but an outlier price, indicated that "Ditar's average prices to end users appear

to be [      ] percent [        ] than the prices to distributors."
Appx1023.  But when Commerce corrected for the aberrational data
point, Commerce found that "Ditar's prices to end users are on average
only [    ] percent [        ] than its prices to distributors."  *Id.*  In the
context of its price comparability analysis, Commerce did not find the
[    ] percent price difference to be significant under 19 U.S.C.
§ 1677b(a)(7)(A)(ii) to support a level-of-trade adjustment.  Appx1551.

Ditar argues that Commerce failed to explain why relying on
product codes is more accurate than CONNUMs and contends that its
own CONNUM-based methodology is reasonable.  Ditar Br. at 46-54.
But Ditar does not identify any requirement that Commerce limit itself
to analyzing price comparability on a CONNUM basis only.  Here,
Commerce found that there was more specific information on the record
that would enable it to calculate the margin more accurately and used
this information.  *See Dongtai Peak Honey Indus. v. United States*, 777
F.3d 1343, 1351 (Fed. Cir. 2015) (explaining that Commerce has a duty
to calculate accurate dumping margins).

First, in its preliminary determination, Commerce described its
reasoning for preferring to calculate pricing differences on a product-

code basis rather than a CONNUM basis.  Appx1014.  Commerce stated

that its methodology would allow for a price comparison of the "same

(*i.e.*, identical) products."  *Id.*[6]  Commerce elaborated on its reasoning in

its final determination, explaining that conducting the price

comparability analysis on a product-code basis rather than a CONNUM

basis "permits us . . . to control for product mix differences within

CONNUMs (which are not intended to capture specific design

differences)."  Appx1551.

Second, Ditar does not identify any error with Commerce's

product-code basis for analyzing price comparability.  Ditar argues that

using a CONNUM-only basis to analyze price is reasonable because

CONNUM characteristics incorporate many design characteristics.

Ditar Br. at 51-52.  But Ditar's argument leads to the opposite result to

what Commerce wanted:  to use product codes to investigate within

CONNUMs because CONNUMs covered merchandise with different

design characteristics.  *Cf.* Appx5781 ("{W}e requested Ditar to

demonstrate the CONNUM characteristics of three CONNUMs in the

---

[6] Contrary to Ditar's assertion, Ditar Br. at 49, Commerce did place its examination on the record.  *See* Appx1023 (citing the relevant portions of the Excel spreadsheet).

home market, where the product descriptions indicate bags of differing sizes, but where the CONNUMs were reported as the same{.}").

Ditar also argues that Commerce's "product-code price comparison approach ignored why Commerce uses a CONNUM-based methodology for calculating dumping in the first place," and that a CONNUM methodology should be used because different product codes can reflect identical products. Ditar Br. at 52-53. Again, Ditar's contention points in the opposite direction of what Commerce found when investigating Ditar's sales — that the same CONNUM represented different product descriptions, *see* Appx1551; Appx5781 — and therefore offers no basis to undermine Commerce's decision to employ a more precise and accurate analysis.

Ditar further contends that Commerce's product-code methodology runs against Commerce's practice of treating products as identical based on CONNUM characteristics. Ditar Br. at 53-54. But on the record before it, Commerce found that a CONNUM-based methodology failed "to capture specific design differences." Appx1551. Indeed, Ditar emphasizes at great length that it undertakes significant effort to customize its bags to its customer's exact specifications. *See, e.g.*,

Appx5779 ("Ditar explained that its home market customers are extremely demanding about sizes and designs, so that, whether it sells merchandise to distributors or end-users, it must satisfy the size and design demands of each specific end-user."). Given the varying design demands within CONNUMs, Commerce reasonably concluded that an analysis of price comparability by product code better captured Ditar's specific situation. *See* Appx1551 ("CONNUMs . . . are not intended to capture specific design differences{.}").

Ditar's final argument against Commerce's use of a product-code methodology is that "Commerce ignored that Ditar reported that the exact same product codes were almost never sold in both markets." Ditar Br. at 54. Ditar, however, has failed to exhaust this argument. *See Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (holding that a party that fails to raise an issue in its administrative case brief before Commerce has failed to exhaust its administrative remedies); 28 U.S.C. § 2637(d); 19 C.F.R. § 351.309(c)(2). In its case brief, Ditar made no argument based on the fact that it almost never sold the same product codes in both markets. *See* Appx5840-5845. The Court should not consider Ditar's argument now.

37

In any event, Ditar's argument amounts to misdirection, because the relevant question is how to compare the prices of sales across two channels in the same market, not across markets. *See* 19 U.S.C. § 1677b(a)(7)(A)(ii) (requiring a showing of "a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined."). Here, Commerce found that an analysis based on product codes better accounted for the individual characteristics of the shopping bags Ditar sold in its home market and therefore produced a more reliable analysis of price differences across home-market sales channels. Appx1551; Appx1014.

Finally, Ditar contends that Commerce should not be permitted to determine that a [    ] percent difference in prices is insignificant because in other contexts a five percent difference may be considered significant. Ditar Br. at 55-56.

- Ditar asserts that Commerce uses a five percent threshold when deciding whether exporters or producers "account for a significant proportion of exports" when granting a request to postpone a final determination. *See* 19 C.F.R. § 351.210(b)(2)(ii).

- A ministerial error is definitionally "significant" when a correction of the error would alter the final margin by at least five *percentage points* (not five percent) but not less than twenty-five percent. *Id.* § 351.224(g).

- Commerce considers a market to be viable for the purposes of calculating normal value when sales are made in five percent or more of the amount of sales in the United States 19 U.S.C. § 1677b(a)(1)(B)(ii)(II); 19 C.F.R. § 351.404(b)(2).

- A person is considered affiliated with an organization by owning five percent or more of the organization's stock. 19 U.S.C. § 1677(33)(E).

Beyond the appearance of the number five, Ditar does not explain why these disparate thresholds have any bearing on a comparison of average pricing across market channels. And Ditar cites no authority that would limit Commerce's discretion in determining whether a [      ] percent difference in average pricing is significant for this purpose.

## III.  Substantial Evidence Supports Commerce's Conclusion That Ditar Correctly Reported Home-Market Sales

The Coalition contends that Commerce erred in determining that Ditar did not know at the time of sale that one of its home-market sales (the "disputed sale") would eventually be exported to the United States. Coalition Br. at 9-14. Because Commerce relied on record evidence that was generated at the time of the sale rather than *post hoc* statements made at the time of verification, substantial evidence supports Commerce's decision that Ditar correctly reported the disputed sale as a home-market sale.

39

## A.    Commerce Employs A Knowledge Test To Determine The Market To Which A Sale Belongs

The antidumping duty statute provides for the application of remedial duties to foreign goods sold, or likely to be sold, in the United States "at less than its fair value."  19 U.S.C. § 1673.  A dumping margin is the amount by which the "'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.'"  *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)) (cleaned up).

When calculating a respondent's weighted-average dumping margin, Commerce must determine the universe and classification of the respondent's sales.  A respondent should report a sale in the home-market sales database if the respondent had actual or constructive knowledge that a sale was for home consumption.  *See Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1330-31 (Ct. Int'l Trade 2000).  Conversely, a sale should be reported as an export sale if the respondent had actual or constructive knowledge that the sale was destined for export.  *Id.* at 1331.

Commerce will not classify sales as home-market sales if the producer "knew or should have known that the merchandise was not for home consumption based upon the particular facts and circumstances surrounding the sales." *INA Walzlager Schaeffler KG v. United States*, 957 F. Supp. 251, 264-65 (Ct. Int'l Trade 1997) (footnotes omitted). Thus, Commerce employs a knowledge test under 19 U.S.C. § 1677b to determine whether the respondent knew or should have known that its merchandise was for home consumption or for export. *See Z.A. Sea Foods Priv. Ltd. v. United States*, 569 F. Supp. 3d 1338, 1352-53 (Ct. Int'l Trade 2022) (quoting *Allegheny Ludlum*, 215 F. Supp. 2d at 1330-31). Rather than *post hoc* positions developed during Commerce's review, the knowledge test seeks to determine a party's knowledge "at the time of a sale." *See Allegheny Ludlum*, 215 F. Supp. 2d at 1331; *Coal. of Am. Flange Producers*, 448 F. Supp. 3d at 1346.

Actual knowledge requires "an admission of the respondent" that the company knew the actual destination of the merchandise being sold. *INA Walzlager Schaeffler*, 957 F. Supp. at 265. Constructive knowledge, however, requires that Commerce must "diligently inquire into allegations of knowledge and render its conclusion based on all

relevant facts and circumstances," not just on respondent admissions. *Stupp Corp. v. United States*, 359 F. Supp. 3d 1293, 1310 (Ct. Int'l. Trade 2019), *aff'd in part, vacated in part, and remanded on other grounds*, 5 F.4th 1341 (Fed. Cir. 2021) (citation omitted).

When evaluating knowledge, Commerce considers documentary or physical evidence that the producer knew or should have known its goods were destined for the United States. *See Certain Crystalline Silicon Photovoltaic Products from Taiwan: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 76,966 (Dep't of Commerce Dec. 23, 2014) and accompanying Issues and Decision Memorandum (Dec. 15, 2015) at 33 ("{T}he standard for making a knowledge determination is that the producer must have reason to know *at the time of the sale* that the *specific sale* of subject merchandise was destined for the United States{.}" (emphasis in original)). Commerce has clarified that "{s}worn statements made well after the time of the specific sales at issue {are} not relevant to the analysis of whether {the producer} had reason to know at the time of sale that specific sales of subject merchandise were destined for the U.S." *Certain Crystalline Silicon Photovoltaic Products From Taiwan: Final Results of*

42

*Antidumping Duty Administrative Review; Partial Rescission of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2019-2020*, 86 Fed. Reg. 49,509 (Dep't of Commerce Sept. 3, 2021) (*Solar Products from Taiwan*), and accompanying Issues and Decision Memorandum (Aug. 27, 2021) at 10. Further, a general knowledge or belief on the part of one party in the sales chain that the next party generally sells some products to the United States does not satisfy the knowledge test. *Id*.

### B. Commerce Correctly Determined That Ditar Did Not Know At The Time Of Sale That The Disputed Sale Was Not For Consumption In The Home Market

Commerce reasonably determined that Ditar correctly classified the market of sale for its home-market sales, including the disputed sale considered at verification, because the record evidence supported that Ditar neither knew nor should have known at the time of sale that the disputed sale was not for home consumption. *See INA Walzlager*, 957 F. Supp. at 263-64. The Coalition builds its argument to the contrary on Ditar's *post hoc* statements rather than evidence from the time of the sale. *See* Coalition Br. at 10, 13 (discussing statements made by Ditar during verification). Additionally, the Coalition argues

that Commerce's reliance on the non-collection of value-added tax (VAT) and "negative evidence" was misplaced because that evidence only relates to whether Ditar had sold the bags directly to a domestic customer but has no bearing on whether Ditar had knowledge that the disputed sale was intended for eventual export. *Id.* at 11-12. Both of the Coalition's arguments lack merit.

> **1.    Ditar's Collection Of Value-Added Tax On The Disputed Sale And Other Evidence Supports Commerce's Acceptance Of Ditar's Home-Market Sales Reporting**

The constructive knowledge standard means that the information regarding a party's knowledge must be derived from extrinsic sources, such as documentation relevant to the shipping, handling, and packing of merchandise. *See Stupp,* 359 F. Supp. 3d at 1310; *see also Allegheny Ludlum*, 251 F. Supp. 2d at 1336 (finding the knowledge test was satisfied where an employee had discussed the export destination of merchandise with the customer at the time of sale). Commerce explained in its final determination that extrinsic evidence on the record did not support a finding that Ditar had actual or constructive knowledge at the time of the disputed sale that its merchandise was destined for export and resale in the United States. Appx1539-1540.

In particular, Commerce found that "Ditar did not prepare any export documentation for sale to the United States" with respect to the disputed sale. Appx1539; Appx5192-5199. Moreover, Commerce examined the record and found no evidence that Ditar used special labeling or packaging indicating that the merchandise in the disputed sale was destined for the United States. Appx1539-1540

Additionally, Ditar reported to Commerce that VAT is collected on all home-market sales with limited exceptions, but not on U.S. sales. Appx4093; Appx3992-3993. Because Ditar collected VAT on the disputed sale, Commerce identified support for the conclusion that Ditar thought at the time of sale that the disputed sale was intended for home-market consumption rather than export to the United States. Appx1540; Appx5192. Furthermore, Commerce verified that, except for one additional sale, all of Ditar's other sales to the customer of the disputed sale were destined for the Colombian market. Appx5787. Thus, record evidence supports Commerce's determination that Ditar neither knew nor should have known at the time of sale that the disputed sale was not meant for home consumption.

### 2. The Inclusion Of "Plate Charges" Does Not Support A Finding That Ditar Misclassified The Disputed Sale As A Home-Market Sale Because Plate Charges Are Not Inherent Characteristics Of Export Sales

The Coalition argues that Commerce's analysis relates only to Ditar's knowledge regarding direct export of the disputed sale and not to Ditar's knowledge regarding eventual export by an unaffiliated domestic purchaser.  Coalition Br. at 11-12; *see* 19 U.S.C. § 1677a(a).  In particular, citing Commerce's verification report, the Coalition argues that Ditar "admitted" that it knew that the disputed sale would subsequently be exported to the United States based on (1) the fact that Ditar charged a separate "plate charge" on its U.S. sales for the cost of the design plate used to print a design onto a shopping bag; and (2) features of the bag design.  Coalition Br. at 13.

However, when determining the proper classification of a sale, Commerce gives "greater consideration to physical evidence and documentation prepared at the time of a transaction than to unsubstantiated statements or declarations" made by company officials. *See Solar Products from Taiwan,* 86 Fed. Reg. 49,509 (Dep't of Commerce Sept. 3, 2021), and accompanying Issues and Decision

Memorandum at Comment 2; *Allegheny Ludlum*, 215 F. Supp. 2d at 1331 (explaining that Commerce determines knowledge as of the time of a sale); *Coal. of Am. Flange Producers*, 448 F. Supp. 3d at 1346 (same). Therefore, Ditar's statement at verification of its confusion as to the correct market for the disputed sale does not negate or outweigh the separate evidence that supports Commerce's determination. *See* Appx1539.

In its statement at verification, Ditar referred to the separately invoiced plate charges (which were actually just separate line items on the same invoice, Appx5192) and the specific design of the bags as indicative of eventual export to the United States. Appx5776. But Ditar may impose plate charges whenever Ditar is engaged to design and build a plate, which is used to imprint artwork on a paper bag. *See* Appx5776 n.22 ("Plate charges are additional costs that Ditar assesses . . . to cover the cost of designing the 'plates' that are used to imprint the ink for artwork on a paper bag."). Because plate charges are not specific to any particular market, there is nothing inherent in the charge that demonstrates a particular destination market. Thus, the Coalition's argument that Ditar must have known the sale was destined for the

47

U.S. based on the existence of a "plate charge" stretches the limits of what Ditar could have known at the time it made the disputed sale.

Additionally, the design of the bag does not — on its own — indicate that the sales were destined for exportation to the United States.  To the extent that Ditar's alleged knowledge is based on the fact that the bags were [                                    ], *see* Appx5214, Commerce explained that any inferences that may be drawn from a bag's design are "speculative and, even if accurate, would still fall short of any threshold to substantiate that Ditar maintained knowledge at the time of sale." Appx1540.  Therefore, notwithstanding Ditar's statements at the time of verification about its knowledge, Commerce reasonably concluded that the record did not support reclassifying the disputed sale as a home-market sale.

Further, in any event, when evidence of a party's knowledge may point in different directions, all that Commerce is required to do is to "explain its choice between these two reasonable inferences."  *Coal. of Am. Flange Producers*, 448 F. Supp. 3d at 1354; *see Consolo*, 383 U.S. at 620.  Commerce did so here by explaining why it determined the plate charge and the design of the bags were insufficient to support a finding

that Ditar had knowledge at the time of the disputed sale of the sale's eventual export.  Appx1539-1540; Appx5787.

Finally, the Coalition is incorrect that any issue with Ditar's reporting of the disputed sale impugns the accuracy of other reported home-market sales.  *See* Coalition Br. at 9 (referring to misclassification of "certain of Ditar's transactions").  Ditar explained that sales in its home market and the U.S. market typically do not require Ditar to build a printing plate, although Ditar does assist end-user customers in designing and printing their bags.  Appx3268-3269.  Therefore, any concern regarding plate charges would be limited to the sales that incur plate charges.  And even within that subset of sales, Ditar described the disputed sale at verification as "unique" in that it was "the only home market sale made to an unaffiliated party during the {period of investigation} for which it had knowledge that the merchandise would subsequently be exported to the United States."  Appx5776; *see* Appx5787 ("However, we did verify that Ditar's other sales to {the customer} were destined for the Colombian market.").

### C.   Because The Disputed Sale Was Correctly Reported — And Was An Outlier Even If Incorrectly Reported — Commerce Had No Reason To Look To Facts Otherwise Available Or Apply An Adverse Inference

The Coalition next requests that the Court order Commerce to reconsider its decision that there existed no grounds to apply an adverse inference to facts otherwise available when determining Ditar's rate.  Coalition Br. at 14-19.  But because the single sale on which the Coalition builds its argument was correctly reported, and because that sale was an outlier in any event, Commerce reasonably decided that the record did not support looking to facts otherwise available.

### 1.   Standard For Application Of Facts Otherwise Available With An Adverse Inference

A two-step analytical framework governs Commerce's ability to apply facts otherwise available with an adverse inference.  First, Commerce may look to "facts otherwise available" when "necessary information is not available on the record," or when a party (1) withholds requested information, (2) fails to provide information by established deadlines or in the form or manner requested, (3) significantly impedes the review, or (4) provides information that cannot be verified.  19 U.S.C. § 1677e(a).  If Commerce finds that a

party meets any of these conditions, it may use facts otherwise available, subject to 19 U.S.C. § 1677m(d), to reach the applicable determination. 19 U.S.C. § 1677e(a). Commerce, however, is required "to provide a respondent with notice of deficient responses, and an opportunity to remediate, before deciding to rely on facts available." *BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351, 1359 (Ct. Int'l Trade 2021) (citing 19 U.S.C. § 1677m(d)). In addition, "Commerce may not decline to consider information that is necessary to the determination but does not meet all the applicable requirements when the information is timely submitted; the information can be verified; the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination." *Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1386 (Ct. Int'l Trade 2019) (cleaned up).

In the second step of the analysis, if Commerce finds that a respondent failed to cooperate by not acting "to the best of its ability to comply with a request for information," it "may" apply an adverse inference in its selection of facts otherwise available. 19 U.S.C. § 1677e(b). A respondent's failure to cooperate to the "best of its ability"

is "determined by assessing whether {a} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (emphasis added).  The standard requires that respondents "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question." *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed. Cir. 2016) (quoting *Nippon Steel*, 337 F.3d at 1382).  Therefore, Commerce may employ an adverse inference in selecting among the facts available after it examines "respondent's actions and assess{es} the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information." *Nippon Steel*, 337 F.3d at 1382.

"{W}hether to apply adverse inferences is a matter within Commerce's discretion." *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343, 1377 (Ct. Int'l Trade 2023).  The Court should sustain Commerce's decision not to employ an adverse inference when the decision is supported by substantial evidence. *Am.*

*Honey Producers Ass'n v. United States*, 653 F. Supp. 3d 1329, 1335-37

(Ct. Int'l Trade 2023).

> ## 2. Substantial Evidence Supports Commerce's Decision That It Was Inappropriate To Look To Facts Otherwise Available

Commerce reasonably found that no gap in the record required

that it resort to facts otherwise available — let alone employ an adverse

inference — with respect to Ditar's home-market sales reporting.

Appx1539-1540.  Thus, the Coalition's argument fails at the first step of

the analysis.  *See* 19 U.S.C. § 1677e(a).

Although Commerce acknowledged that Ditar's initial reporting

contained errors which were addressed at verification, Appx1539-1540,

Commerce found no evidence of "systematic reporting which calls into

question the accuracy of the universe of sales reported in either

market," Appx1542.  Regarding Ditar's home-market sales, the disputed

sale had been selected for scrutiny during verification because it was

"an outlier in terms of quantity and product characteristics," and

Commerce verified that Ditar's other sales to the same customer were

definitively destined for home-market consumption.  Appx1540;

Appx5787.  In sum, Commerce found that Ditar cooperated fully and

provided timely and complete answers, with the consequence that
Commerce had no need to look to other facts on the record.  Appx1537;
Appx1542.

Before the Court, the Coalition contends that Commerce's record-
based decision not to resort to other facts available must be remanded
because it was based on an "incorrect factual finding" that the disputed
sale was properly classified as a home-market sale and because the
Coalition speculates that Ditar's other sales may have been
misclassified.  Coalition Br. at 16-18.  Conjuring the possibility of broad-
based deception of the sort that Commerce explicitly rejected, Appx1542
("The errors observed, though numerous, are all minor{.}"), the Coalition
urges that Commerce should be required to "reconsider how widespread
the misreporting may have been," Coalition Br. at 17.

This argument fails at the outset because, as demonstrated above,
substantial evidence supports Commerce's finding that Ditar correctly
classified the disputed sale.  Moreover, from a single allegedly
misclassified sale, the Coalition conjures a universe of "widespread"
errors.  *See* Coalition Br. at 17.  But any alleged deficiencies with the
reporting of the disputed sale were not present for the other sales to

that specific customer.  At verification Commerce demonstrated that the disputed sale was an outlier, and indeed, was selected for verification on that basis.  Appx1540.  Ditar also described the disputed sale as "unique."  Appx5776.

Further, Commerce confirmed that Ditar's other sales to the same customer were destined for consumption in the Colombian market. Appx1540 ("At verification, we confirmed that Ditar's other sales to this customer were in fact destined for customers in Colombia."); Appx5787 ("{W}e did verify that Ditar's other sales to {the customer} were destined for the Colombian market.").  And, to support its conclusion, Commerce observed that Ditar's other sales were either "too small" for export or were made by one of Ditar's sales representatives who handled domestic sales.  *Id.*  Finally, Commerce examined the product descriptions of these other sales and found that they did not include plate charges and were for [            ] bags that Ditar sells in its home market.  *Id.* Thus, these other sales lack the two characteristics, plate charges and design, that the Coalition believes would evince an export sale and, by the Coalition's inference, possible misreporting by Ditar.  *See* Coalition Br. at 15.

The Coalition then infers from the designs printed on certain shopping bags that Ditar reported home-market sales incorrectly. Coalition Br. at 18.  The Coalition muddies the facts, combining Ditar's comments about the design of the shopping bags in the disputed sale and the various designs of shopping bags in Ditar's overall sales in its home market.  *See id.*  Commerce addressed this speculative argument, observing that the Coalition's examples of potentially misclassified sales represented "global brand names sold in many markets." Appx1540.  Therefore, Commerce found no need to employ facts available.

Citing *Diamond Sawblades*, the Coalition argues that Commerce's determination must be remanded because Commerce allegedly failed to explain "why errors discovered at verification would not have been widespread."  Coalition Br. at 18-19 (citing *Diamond Sawblades Manufacturers' Coal. v. United States*, No. 17-00167, 2018 WL 5281941, at *8 (Ct. Int'l Trade Oct. 23, 2018).  This case is inapposite because the Court's holding relied on the fact that Commerce "ha{d} not pointed to anything unique about the reviewed samples."  *Diamond Sawblades*, 2018 WL 5281941 at *8.  Here, Commerce pointed out that the disputed

sale was anomalous and an "outlier" among Ditar's home-market sales and further found that any reporting errors were not widespread or indicative of systematic misreporting.  Appx1540.  Indeed, Commerce successfully verified other sales to the same customer and found them to be correctly reported.  *Id.*

Ultimately, the only evidence that the Coalition can offer for its inference of "widespread" errors is a statement Ditar made in relation to a single sale at verification, a sale that Commerce determined was both an outlier and was correctly reported as a home-market sale. Therefore, substantial evidence supports Commerce's decision not to look to facts otherwise available or to employ an adverse inference.  *See Am. Honey Producers*, 653 F. Supp. 3d at 1335-37.

## IV.  Substantial Evidence Supports Commerce's Calculation Of The Rate For Companies Not Selected For Individual Review

Finally, the Coalition argues that "if at the conclusion of this litigation Ditar's margin is revised, the 'all others' rate should be recalculated in accordance with law."  Coalition Br. at 19.  Because, as we explained, Commerce did not err in determining Ditar's weighted-average dumping margin, the margin assigned to non-selected

companies under review does not require any revision and should be sustained. *See id.* Nevertheless, to the extent that Commerce recalculates Ditar's margin, we agree that the all-others rate should be adjusted as well.

## CONCLUSION

For these reasons, we respectfully request that the Court deny both plaintiffs' motions for judgment on the agency record, sustain Commerce's final determination, and enter judgment in both cases for the United States.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant
    Attorney General

PATRICIA M. McCARTHY
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

|  |  |
|---|---|
| | /s/ Daniel Bertoni |
| RUSLAN KLAFEHN | DANIEL BERTONI |
| Attorney | Trial Attorney |
| Office of the Chief Counsel | Commercial Litigation Branch |
|    for Trade Enforcement & | Civil Division |
|    Compliance | U.S. Department of Justice |
| U.S. Department of Commerce | P.O. Box 480 |
| 1401 Constitution Avenue, NW | Ben Franklin Station |
| Washington, DC 20230 | Washington, DC 20044 |
| | (202) 880-0336 |

April 15, 2025                                Attorneys for Defendant

## **<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that the foregoing response complies with the

Rules of the United States Court of International Trade, the Court's

Standard Chambers Procedures, and the Court's scheduling orders of

November 26, 2024, March 11, 2025, and April 4, 2025 because it

contains 10,895 words, including text, footnotes, and headings.

<u>      /s/ Daniel Bertoni      </u>