# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DITAR, S.A., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>COALITION FOR FAIR TRADE IN SHOPPING BAGS, )<br><br>Defendant-Intervenor. ) | Court No. 24-00130<br><br>**NON-CONFIDENTIAL VERSION** |

## RESPONSE BRIEF OF DEFENDANT-INTERVENOR COALITION FOR FAIR TRADE IN SHOPPING BAGS IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD

J. Michael Taylor
Daniel L. Schneiderman

King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706
(202) 737-0500

May 22, 2025                    *Counsel for Defendant-Intervenor*

## TABLE OF CONTENTS

ARGUMENT ...................................................................................2

I.    PLAINTIFF FAILS TO DEMONSTRATE THAT
      DENIAL OF A LEVEL OF TRADE ADJUSTMENT
      WAS UNSUPPORTED BY SUBSTANTIAL
      EVIDENCE OR NOT IN ACCORDANCE WITH LAW ...........2

      A.    Introduction ..............................................................2

      B.    Commerce Did Not Apply An Incorrect Legal
            Standard ....................................................................4

      C.    The Qualitative Evidence Cited By Ditar Did Not
            Require Finding Separate LOTs .........................................5

      D.    The Quantitative Evidence Cited By Ditar Did
            Not Require A Finding Of Separate LOTs. ......................9

      E.    Commerce Appropriately Analyzed Price
            Comparability ........................................................12

      F.    Any Error Committed By Commerce Was
            Harmless...............................................................15

II.   CONCLUSION ...............................................................16

Ditar's business proprietary information relating to the details of its selling functions and customers has been redacted from pages 7-10, 13, and 14.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Daikin Am., Inc. v. United States*,
    Slip Op. 2025-22 (Ct. Int'l Trade Mar. 7, 2025) ................................. 4, 8

*Seneca Foods Corp. v. United States*,
    663 F. Supp. 3d 1325 (Ct. Int'l Trade 2023) ..................................... 4, 8

*Wheatland Tube v. United States*,
    755 F. Supp. 3d 1304 (Ct. Int'l Trade 2025) ............................ 3, 12, 14

**Regulations**

19 C.F.R. § 351.412(b) ................................................................. 15

19 C.F.R. § 351.412(b)(2) ...................................................... 12, 14, 15

19 C.F.R. § 351.412(c)(2) ....................................................... 2, 5

# GLOSSARY

LOT        Level of Trade

**RESPONSE BRIEF OF DEFENDANT-INTERVENOR COALITION FOR
FAIR TRADE IN SHOPPING BAGS IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>**

Coalition For Fair Trade in Shopping Bags ("Defendant-Intervenor" or "the Coalition") submits the following response brief in opposition to the Motion for Judgment on the Agency Record filed by Plaintiff Ditar, S.A. ("Ditar") and Memorandum of Law In Support thereof (ECF No. 23) ("*Pl. Br.*").

Plaintiff contests certain aspects of the final determination issued by the U.S. Department of Commerce ("Commerce") in *Certain Paper Shopping Bags From Colombia: Final Affirmative Determination of Sales at Less Than Fair Value,* 89 Fed. Reg. 45843 (Dep't Commerce May 24, 2024), Appx1556, and accompanying Decision Memorandum, Appx1533, (the "*Final Determination*").

Defendant-Intervenor agrees with Defendant United States' Response to Plaintiff's Motion for Judgment on the Agency Record filed on April 15, 2025 (ECF No. 28) ("*Def. Br.*").  To minimize repetition, Defendant-Intervenor incorporates by reference the issues presented for review, the statement of facts, and the arguments as presented in Defendant's response brief.  For the reasons set forth in Defendant's

response brief and as further demonstrated below, Plaintiff's arguments lack merit, and the *Final Determination* should be affirmed with respect to the LOT issues being appealed by Plaintiff.

## ARGUMENT

### I.    PLAINTIFF FAILS TO DEMONSTRATE THAT DENIAL OF A LEVEL OF TRADE ADJUSTMENT WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE OR NOT IN ACCORDANCE WITH LAW

#### A. Introduction

In the *Final Determination*, Commerce appropriately found that Ditar's home market sales to distributors and end-users were not made at separate LOTs.  Appx1547-1551.  In order for sales to be considered having been made at separate LOTs, they must be "made at different marketing stages (or their equivalent)," and "substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing." 19 C.F.R. § 351.412(c)(2).  In this case, sales to both distributors and end-users were made directly by Ditar (without using, for example, an affiliated reseller transacting with end-users).  Appx1550.  Moreover, Ditar performed the same selling activities when selling to both

customer types.  Appx1547.  Although Ditar claims that some of those
activities were performed at a higher level of intensity when selling to
end-users, Ditar relies on metrics that do not prove those claims.  *See
Pl. Br.* at 15-16.  Commerce cited other metrics showing that Ditar's
sales staff and resources were in proportion to the company's sales to
each customer type.  Appx1548.  Moreover, to the extent that certain
functions were performed at a greater intensity for sales to end-users,
Commerce found those differences insufficient, by themselves, to
warrant finding separate LOTs.  Appx1548-1549.

This Court has found that, "given the minimal statutory and
regulatory guidance" regarding how the LOT analysis should be
performed, "Commerce enjoys discretion in choosing its methodology."
*Wheatland Tube v. United States*, 49 CIT __, __, 755 F. Supp. 3d 1304,
1316 (2025).  While Ditar would have preferred that Commerce viewed
the record differently, it cannot show an abuse of such discretion or any
unlawful decisionmaking.  Commerce's findings are reasonable and
supported by substantial record evidence.  Ditar cites other record
evidence that it believes points toward the opposite conclusion.  *See Pl.
Br.* at 15-16.  Indeed, Ditar argues that "substantial information on the

administrative record" supports finding two LOTs. *Pl. Br.* at 2. But even if a contrary conclusion might also be supported by substantial evidence, affirmance is required where, as here, Commerce's decision is supported by substantial evidence. *See Daikin Am., Inc. v. United States*, Slip Op. 2025-22 (Ct. Int'l Trade March 7, 2025) ("Where two different, inconsistent conclusions may reasonably be drawn from the evidence in the record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence"), *quoting In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013). Ultimately, Plaintiff seeks to have this Court reweigh the evidence, which it must not do. *See, e.g., Seneca Foods Corp. v. United States*, 47 CIT __, __, 663 F. Supp. 3d 1325, 1336 (2023) ("the court may not reweigh evidence or substitute the agency's reasoned decisionmaking with its own reasoning"). Accordingly, the *Final Determination* should be affirmed with respect to the LOT findings challenged by Ditar.

### B. Commerce Did Not Apply An Incorrect Legal Standard

Plaintiff contends Commerce erred as a matter of law in not finding that sales to distributors and end-users comprised separate

4

LOTs.  According to Plaintiff, Commerce erroneously believed that sales to the latter category would have to "change hands twice" (as would occur when a respondent reports downstream sales to end-users through an affiliated reseller) to comprise a separate LOT.  *Pl. Br.* at 25-30.  Plaintiff observes that Commerce has found separate LOTs in other cases even without an affiliated reseller causing merchandise to change hands twice.  *Id.*  But Plaintiff mischaracterizes the *Final Determination*.  Although Commerce cited the fact that Ditar's sales to both distributors and end-users were made directly (without passing through layers of affiliated companies), Appx1550, that was only one piece of evidence weighing against finding separate LOTs.  Appx1547-1551.  Commerce never found that factor, by itself, to be dispositive.  There was no application of an incorrect legal standard or departure from established practice.

### C. The Qualitative Evidence Cited By Ditar Did Not Require Finding Separate LOTs

The regulation provides that sales are at different LOTs when "made at different marketing stages (or their equivalent)." 19 C.F.R. § 351.412(c)(2).  "Substantial differences in selling activities are a

necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing," although "some overlap in selling activities will not preclude a determination that two sales are at different stages of marketing." *Id*. In the *Final Determination*, Commerce found that Ditar performed the same selling activities for sales to both distributors and end-users. Appx1547. Although Ditar contended that it performed those activities at a higher level of intensity when selling to end-users, Commerce found those differences in degree insufficient to warrant finding separate LOTs. *Id*.

Plaintiff contends that Commerce failed to consider that it performed more extensive work in designing bags for end-users than it does for distributors. *Pl. Br*. at 33, 36-37. But it was appropriate for Commerce to disregard this factor, because the LOT analysis looks to differences in *selling* activities, whereas design functions represent *production* activities. As Commerce found, "the costs associated with the design and production of the paper bags with more complex designs and graphical applications are captured in the cost of production not in selling expenses." Appx1549. This is based on how Ditar itself reported its production costs. As stated in Ditar's initial "Section D" cost

response, "the main variable overhead costs include *product design and review*." Appx4094 (emphasis added). *See also* Appx4126 (showing [          process          ] of the production process). Commerce correctly concluded, therefore, that these design "activities are not subject to LOT considerations." Appx1549. In its opening brief, Ditar simply ignores this fact. Nowhere in its brief does Ditar dispute that design activities were captured as production costs rather than as selling expenses, and nowhere does Ditar explain why Commerce was required to consider such production cost differences for purposes of the LOT analysis.

Even if design activities had been captured as selling expenses (which they were not), Commerce appropriately found that "Ditar faces the same design demands, whether it sells paper bags to end users or to distributors who supply those end users." Appx1549. Ditar contends this "is simply false." *Pl. Br.* at 36. But this finding was based on Ditar's own statements made to Commerce at verification. *See* Appx5779 ("Ditar explained that its home market customers are extremely demanding about sizes and designs, so that, *whether it sells merchandise to distributors or end-users*, it must satisfy the size and

design demands of each specific end-user") (emphasis added).  Indeed,

approximately [

<span style="color:red">percent of sales to customer types and particular customer names</span>

]. Appx4659, Appx5887.  Commerce's

finding is, therefore, supported by substantial record evidence.

Although Ditar points to other portions of its response characterizing

the design activities as being more extensive when selling directly to

end-users, *Pl. Br.* at 36, this does not render Commerce's finding

unlawful.  This Court does not reweigh the evidence and must uphold

Commerce's finding, even if a reasonable factfinder could have reached

a different conclusion.  *See Daikan* and *Seneca, supra*.

Ditar contends that Commerce unfairly found claimed differences

in warehousing expenses were undermined by the lack of any reported

warehousing expenses in the home market sales file.  *Pl. Br.* at 33-36.

According to Ditar, warehousing costs were incurred at the mill rather

than at an outside location, and thus they were reported as indirect

(rather than as direct) selling expenses.  *Id*.  Ditar, however, does not

deny that it performed this selling function for sales to all customer

types, and Ditar failed to provide sufficient information documenting

significant intensity differences by customer type. *See Def. Br.* at 25-27.  Even if such differences had been well-documented, Ditar does not explain how differences in maintaining on-site inventories for distributor and end-user customer alone would be sufficient to *compel* a finding of separate LOTs.  Any differences in the intensity of inventory maintenance functions performed simply would not, by themselves, require finding separate LOTs – particularly in light of Commerce's findings regarding the many other selling activities performed by Ditar similarly for both distributor and end-user customers.  Appx1547-1548.

### D. The Quantitative Evidence Cited By Ditar Did Not Require A Finding Of Separate LOTs.

Plaintiff contends Commerce "misunderstood and ignored Ditar's quantitative analyses" showing how selling activities differed by customer type. *Pl. Br.* at 40.  According to Plaintiff,

> Commerce failed to consider the degree and intensity of the selling functions that Ditar performed. For example, Ditar's [ # ] distributor salespersons (representing [ percent ] of the home market sales staff) were responsible for [ # ] of the total number of invoices and [ # ] of the number of line item sales.  In contrast, Ditar's [ # ] end user salespersons (representing [ # ] of the home market sales staff) were responsible for

[ percent ] of the total number of invoices and
[ percent ] of the number of line item sales.

*Id.* at 40-41.

Commerce did not "misunderstand" or "ignore" this analysis. It simply found that the analysis is more appropriately performed on a volume basis rather than on the basis of "number or invoices" or "line items." Appx1549. By both volume and value, Ditar's sales to distributors comprised roughly [#] percent of total home market listing and its sales to end-users comprised roughly [ # ] percent of the home market listing. Appx4379. If sales to distributor customers and end-user customers required *exactly the same* amount of effort and attention from Ditar's [ # ] person sales staff, one would expect that [#] salespersons, *i.e.*, roughly [#] percent, would be assigned to distributor customers, and that [ # ] salespersons, *i.e.*, roughly [ # ] percent, would be assigned to end-user customers. And that is precisely what the record shows. Appx4379. Viewed from another perspective, every kilogram of merchandise sold, whether to distributors or end-users, requires [ comparing amounts ] of attention and coverage from Ditar's sales staff. This quantitative analysis does not support finding separate LOTs. As explained in the *Final Determination*,

10

the fact that it devotes the vast majority of its
staff and resources to end users rather than
distributors is not so much a result of any
differences in the LOT, as an alignment of its
resources with requirements of making and
servicing the vast majority of its sales.  Put
simply, where sales to one type of customer
type/channel are, for example, nine times the
level of sales to another customer type/channel, a
ninefold increase in the expense and effort the
company applies in supporting the larger
customer type/channel is not reflective of a
different intensity of selling functions, but rather,
the proportional increase which would be
expected for sales of the much greater volume.
Only where the intensity of sales functions and
support reflect demonstrable differences out of
proportion with their relative difference in
volume, and such differences are supported by
quantitative and qualitative information on
record, might they support a difference in the
LOT.  As discussed below, the information
provided by Ditar in support of its requested LOT
adjustment simply does not substantiate that
sales to end users reflect substantial differences
in selling functions which are disproportionally
higher than that of sales to distributors.

Appx1548.  As Commerce further explained, "the percentage values for

the total sales value, the total sales volume, the number of sales staff,

and the number of sales with price or billing adjustments are in

alignment," and "they reflect the fact that Ditar makes the vast

majority of sales to end users and, therefore, allocates company

11

personnel to support the value of its sales." Appx1550. Commerce reasonably concluded, therefore, that "Ditar's quantitative analysis does not support its claims that sales to end users and distributors were made at different LOTs." *Id.*

Ditar contends that various other metrics, such as salesperson salary costs per invoice, or credit expenses and inventory carrying costs per kilogram, tend to show great disparities by customer type. *Pl. Br.* at 41-44, citing Appx4379-4380. But Ditar does not explain why Commerce's analysis was unreasonable, or why Commerce was compelled to view the data in Ditar's preferred way. Ditar cites no law or practice requiring Commerce to adopt its particular preferred metrics as part of the quantitative analysis. *Id.* Its arguments, therefore, must fail. *See Wheatland Tube*, 755 F. Supp. 3d at 1316.

### E. Commerce Appropriately Analyzed Price Comparability

Even assuming there were two separate LOTs (which there were not), the adjustment sought by Ditar could be made only when "the difference in level of trade has an effect on price comparability." 19 C.F.R. § 351.412(b)(2). In particular, there must exist "a pattern of consistent price differences" by LOT. 19 C.F.R. § 351.412(b)(2).

Commerce conducted its own analysis of price differences between home market sales to distributors and end users, because the analysis that had been offered by Ditar omitted certain CONNUMs and thus was incomplete. Appx1551. Ditar contends that it is unfairly hampered in its ability to evaluate Commerce's claims in this regard, because Commerce never placed its underlying quantitative analysis on the record, and "this fact alone requires remand for further explanation." *Pl. Br.* at 49-50. But Ditar is mistaken. The relevant Excel file was placed on the record as Attachment 5 of the December 27, 2023 preliminary analysis memorandum. It appears at C.R. 70 of the administrative record (Barcode 4484535-06). From the Excel file, Ditar can easily replicate Commerce's analysis and confirm that it encompasses the complete home market sales listing. Moreover, a printout of the complete Excel file is included in the Joint Appendix. Appx1474-1502. Ditar was not unfairly hampered, and there is no cause for a remand.

Commerce found that, based on its own analysis, the [ # ] percent average price difference between sales to distributor and end-used customers is insufficiently significant to warrant a LOT adjustment.

NON-CONFIDENTIAL VERSION

Appx1023, Appx1502, Appx1551.  Ditar contends that Commerce's

analysis is erroneous, because (1) it fails to exclude sales below cost,

which would not be used for normal value in the margin calculations,

(2) it compares sales at the product code level rather than at the

CONNUM level used in the margin calculations, and (3) a difference of

[ # ] percent would be considered significant in other contexts of the

dumping calculations.  *Pl. Br.* at 48-56.  These arguments lack merit.

There is no requirement that Commerce identify "pattern{s} of

consistent price differences" between home market sales to different

customer types (for LOT purposes) the same way that it identifies

"dumping" when comparing export price with normal value.  *See* 19

C.F.R. § 351.412(b)(2).  Again, as this Court recently explained, "given

the minimal statutory and regulatory guidance" regarding how to

perform the LOT analysis, "Commerce enjoys discretion in choosing its

methodology."  *Wheatland Tube,* 755 F. Supp. 3d at 1316.  Plaintiff cites

no law or established practice compelling Commerce to perform the

analysis in its preferred way.

Commerce's methodology was entirely reasonable.  There was no

reason why Commerce could not examine price differences across all

home market sales, even if some of those sales ultimately would not be used in the normal value calculations. Moreover, Commerce explained that it was appropriate to compare prices by product code (rather than CONNUM) to control for design differences (which are not captured at the CONNUM level). Appx1551. Nothing compelled Commerce to measure "price differences" for LOT purposes in exactly the same way that it measures "dumping." Because Ditar cannot show that Commerce's methodology was unreasonable or otherwise unlawful, its appeal must fail. Commerce's finding that any LOT difference did not have an effect on "price comparability" under 19 C.F.R. § 351.412(b)(2) is supported by substantial evidence in is in accordance with law.

### F. Any Error Committed By Commerce Was Harmless

Under the regulations, a LOT adjustment is appropriate only when there are different LOTs and the difference has an effect on price comparability. 19 C.F.R. § 351.412(b). Accordingly, if this Court finds that Commerce erred in concluding there was only one LOT, such error would be harmless if the Court affirms Commerce's findings regarding the effect on price comparability. Conversely, if this Court finds that Commerce erred regarding the effect on price comparability, such error

would be harmless if the Court affirms Commerce's finding of a single LOT. A remand would be appropriate only of Commerce erred in both aspects of its analysis. In this case, however, Commerce committed no error in either aspect of the LOT analysis.

## II.    CONCLUSION

For the reasons set forth above, Plaintiff's arguments lack merit, and the *Final Determination* should be affirmed with respect to the LOT issues raised.

Respectfully submitted,

May 22, 2025                    */s/ J. Michael Taylor*
Date                           J. Michael Taylor
                               JMTaylor@KSLAW.com

                               Daniel L. Schneiderman
                               DSchneiderman@KSLAW.com

                               King & Spalding LLP
                               1700 Pennsylvania Avenue, NW
                               Washington, DC  20006-4706
                               (202) 737-0500

                               *Counsel for Defendant-Intervenor*

16

CERTIFICATE OF COMPLIANCE
WITH WORD COUNT LIMITATIONS

Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's *Standard Chambers Procedures*, the undersigned certifies that this brief complies with applicable word count limitations.  Exclusive of the exempted portions, as provided in paragraph 2(B)(1), this brief includes 2,934 words.  In preparing this certificate, the undersigned has relied upon the word count feature of the word-processing system used to prepare the submission.

*/s/ Daniel Schneiderman*
Daniel L. Schneiderman

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500

*Counsel for Plaintiff*

May 22, 2025