# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DITAR, S.A.,<br>        Plaintiff,<br>v.<br><br>UNITED STATES,<br>        Defendant,<br>and<br><br>COALITION FOR FAIR TRADE<br>IN SHOPPING BAGS,<br>        Defendant-Intervenor. | Court No. 24-00130<br><br>**PUBLIC VERSION** |

## PLAINTIFF'S REPLY BRIEF

Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Ditar, S.A.

Dated:  June 19, 2025

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................i

TABLE OF AUTHORITIES ..........................................................ii

I.    INTRODUCTION..................................................................1

II.   ARGUMENT .......................................................................3

    A.    Ditar's *Pre*-Production Design-Efforts Constitute Selling
           Activities ...............................................................................3

    B.    Defendant's Claims Regarding Ditar's Warehousing and
           Repacking Activities Are Meritless .......................................9

    C.    Ditar's Quantitative Analyses Complemented Its Qualitative
           Analyses to Support a Level of Trade Adjustment  ............15

    D.    Defendant Fails to Justify Commerce's Price Comparability
           Analysis .............................................................................22

III.  CONCLUSION..................................................................28

# TABLE OF AUTHORITIES

Cases                                                                                                    Page

*NSK Ltd. v. Koyo Seiko Co.*, 190 F.3d 1321 (Fed. Cir. 1999) ................21

*Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360 (Ct. Int'l
Trade 2014)...................................................................................11-12

*Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231 (Ct.
Int'l Trade 2009)..............................................................................10, 11

Statutes and Regulations

19 U.S.C. § 1677b(a)(7)(A)(ii) ...........................................................23, 27

19 U.S.C. § 1677f-1 .................................................................................27

Other Authorities

*Certain Paper Shopping Bags From Colombia:* 89 Fed. Reg. 45,843
(May 24, 2024) ............................................................................. *passim*

*Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 82 Fed.
Reg. 46961 (October 10, 2017) ..............................................................26

*Common Alloy Aluminum Sheet from Greece*, 86 Fed. Reg. 13300
(March 8, 2021)......................................................................................27

*Corrosion-Resistant Steel Products from the Republic of Korea: 2017-
2018*, 85 Fed. Reg. 15114 (March 17, 2020)...........................................18

*Magnesium from Israel: Preliminary Affirmative Determination of Sales
at Less Than Fair Value*, 84 Fed. 32712 (July 9, 2019).....................17-18

*Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan*, 67 Fed.
Reg. 35474 (May 20, 2002) ....................................................................26

*Steel Concrete Reinforcing Bar from the Republic of Korea*, 72 Fed. Reg.
18630 (April 13, 2007) ...........................................................................27

## REPLY BRIEF OF PLAINTIFF DITAR, S.A.

## I.    INTRODUCTION

Ditar, S.A. ("Ditar" or "Plaintiff"), submits this reply to the briefs of
Defendant, the United States, and Defendant-Intervenor Coalition for
Fair Trade in Shopping Bags, which responded to the single claim
raised by Ditar in its Rule 56.2 motion for judgment on the agency
record. *See* Def.'s Consol. Opposition to Pls.' Mot. J. Upon Agency
Record, April 15, 2025, ECF No. 29 ("Def. Resp. Br."); Def. Int.'s Resp.
in Opposition to Pl.'s Mot. J. Upon Agency Record, May 22, 2025, ECF
No. 31 (Def. Int. Resp. Br."). In its motion for judgment on the agency
record, Ditar contested one aspect of the U.S. Department of
Commerce's determination in the less-than-fair-value investigation of
certain paper shopping bags from Colombia. *See* Pl.'s Rule 56.2 Mot. J.
Agency R., January 22, 2025, and Mem. Supp. Mot. J. Upon Agency
Record, October 26, 2024, ECF No. 23 ("Ditar's Brief"); *see also Certain
Paper Shopping Bags From Colombia: Final Affirmative Determination
of Sales at Less Than Fair Value*, 89 Fed. Reg. 45,843 (Dep't Commerce
May 24, 2024) ("*Final Determination*"), Appx1556–1558, and Issues and
Decision Memorandum (Dep't Commerce May 17, 2024) ("*Final

*Decision Memorandum*"), Appx1533–1555. Specifically, Ditar

challenged Commerce's comparison of Ditar's selling prices to

*distributor* customers in the United States to Ditar's selling prices to

*end user* customers in Colombia *without making a level-of-trade*

*adjustment* even though record information established that Ditar

engaged in substantially different selling activities to its end user

customers and that these additional selling functions had a significant

impact on price comparability at the different levels of trade.

In its response brief, Defendant repeats Commerce's incorrect

assumptions and fails to address the substantial record information

that established that Ditar sold to home market end user customers at

a more remote and significantly different level of trade than it did to its

U.S. and Colombian distributor customers. In trying to justify

Commerce's denial of a level-of-trade adjustment, Defendant

misunderstands the significance of *pre-production* design as a selling

activity in the paper bag industry, disregards Commerce's own

instructions to Ditar on how to report indirect selling expenses, and

ignores the rationale and relevance of each quantitative metric that

Ditar presented that established that Ditar engaged in such different

selling activities for different types of customers that each constituted a

2

separate and different market stage. Defendant-Intervenor, for its part,

similarly repeats Commerce's conclusory remarks and ignores vast

portions of the administrative record that undermine Commerce's

determination. In this case, Defendant's and Defendant-Intervenor's

explanations for Commerce's denial of a level-of-trade adjustment

cannot be ascribed to a difference in view or the product of agency

expertise. Rather, they serve to illustrate only further that Commerce's

level-of-trade determination was unsupported by substantial evidence,

and that this case must be remanded for reconsideration.

## II.   ARGUMENT

### A.   Ditar's *Pre*-Production Design-Efforts Constitute Selling Activities

In response to Ditar's argument that "developing and coordinating

the bag designs with end user customers was an integral part of the

selling function at that more remote level of trade," Defendant claims in

its response brief for the first time that "Ditar's work designing bags for

its customers is a production activity, not a sales activity." Def. Resp.

Br. at 21. Defendant argues that "Commerce made clear that it

considered this kind of activity to be a production function," Def. Resp.

Br. at 22, citing Appx1548, but this novel interpretation of the facts is a

position that not even Commerce adopted. Commerce's *Decision Memorandum* never suggests that Commerce considered Ditar's on-site meetings with end user customers to learn more about their needs; its education of customers about the correct sizes and correct paper types of the paper bags to be purchased; its assistance to end user customers in developing sample artwork for the printed bags, its "*pre-production*" mock-up designs for bag development, and its technical assistance and answering of practical questions about bag sizes and specifications constituted "production activities."  Appx1547-1551; *see also* Appx3262, Appx3297–3303. Plaintiff disagrees with Commerce on the degree to which these selling functions supported the existence of a different level of trade, but even Commerce recognized that these activities constituted selling activities. *See* Appx1548 (discussing the "greater level of intensity for sales to end users, such as designers, personnel training, small customer support, customer training, and technical assistance). That Defendant relies on this false assumption to justify Commerce's denial of a level-of-trade adjustment to Ditar invalidates its position at the very outset. *See* Def. Resp. Br. at 20, 22.

To be sure, Ditar did incur additional costs for the printing plates that it used to print designs onto paper once actual production began

and for producing paper bags with more complex designs and graphical
applications. And Ditar identified these costs to Commerce in its
reported costs of production. *See*, *e.g.*, Appx4155-4157 (showing the
inclusion of separate design and printing expenses in Ditar's costs of
manufacture) and Appx5559-5564 (describing the process used to
calculate costs of production and including designing and printing
costs). But Ditar did not include any of these actual production design
activities and costs in its quantitative and qualitative analyses that
established the different levels of trade of its end user and distributor
customers. Equally important, Ditar in the ordinary course of business,
did not include any of its expenses for the pre-production design and
selling activities described above as part of its costs of goods sold;
rather, all such activities were performed by, and the costs attributed
to, Ditar's sales staff and designers, and formed part of Ditar's reported
*indirect selling expenses*. Ditar AQR at A-13 and Exhibit A-4, Appx3262,
Appx3297–3303 (identifying Ditar's large end user direct sales staff –
including [     ] pre-production designers – that interacted with end user
customers on a daily basis).

    As outlined by Petitioner in its antidumping petition, the paper
shopping bags subject to the investigation include various sizes and

styles of paper shopping bags "commonly used by commercial establishments as shopping carrier bags or delivery bags by restaurants as take-away bags or delivery bags," they "can be sold unprinted or printed with a design or logo"; they "can be used as a vehicle to project the brand image of retailers and food service providers"; and the "print quality and color reproduction allow for creativity in advertising and development of brand image." Appx2129. Paper shopping bags thus perform an advertising as well as a utilitarian function, and it was the role of Ditar's sales staff – and not its production department – to ensure that this critical selling function was achieved – a selling activity that Ditar performed in significant measure for its end user customers and *not at all* for its distributor customers. In the *Final Determination*, Commerce never articulated that any of Ditar's pre-production design activities constituted production activity, and the Court may rely on this basis alone to disregard Defendant's *post-hoc* rationalization. The Court also can ignore this line of Defendant's reasoning because it is simply wrong.

Like Defendant, Defendant-Intervenor similarly advances the fiction that Ditar treated its production design costs as part of its claimed selling activities. Def. Int. Resp. Br. at 6-7. But Defendant-Intervenor

6

takes Defendant's error one step further, claiming that "Ditar faces the

same design demands, whether it sells to end users or to distributors

who supply those end users. Def. Int. Resp. Br. at 7, citing Appx1549.

But this statement is contradicted by the administrative record. While

Ditar did sell certain printed paper bags to distributor customers as

well as end user customers, Ditar was not involved at all in the design

of the paper bags that it sold to its distributor customers. As explained

in Ditar's memorandum of law, Ditar produces paper shopping bags for

both the U.S. and Colombian markets in a variety of sizes with different

widths, heights, and depths (gusset sizes), and the bags can be printed

with up to four colors on each bag (or more using a polychrome

technique). Ditar's Brief, Appx3282. However,

> one noteworthy distinction is that for paper shopping bags sold to
> home market end user customers (including retail stores, fast food
> chains, food service entities, drug stores, and supermarkets), *Ditar*
> *typically works with the end user customers to help design the*
> *artwork, logos, and information to be printed on the bags.* Ditar
> AQR at A-12 to A-14, Exhibit A-4, Appx3261–3263, Appx3297–
> 3303. In contrast, for sales to distributors in the United States
> and Colombia, the customers either provide the designs and
> artwork to Ditar, or the bags are not printed at all: *in either*
> *scenario, Ditar does not work with distributor customers to design*
> *the artwork for the paper shopping bags that it sells. Id.*
> …
>
> Ditar also reported that the majority of its sales to distributor
> customers in Colombia were of unprinted bags that had no

> designs. Ditar AQR at A-12, Appx3261. Furthermore, Ditar
> reported that it rarely had on-site sales meeting with its home
> market and U.S. distributor customers because they *either
> purchased plain, generic bags in limited size ranges for resale, or
> were familiar with the products and already had established
> designs and artwork that need no further modification.* Ditar AQR
> at A-20, Appx3269.

Ditar's Brief at 6, 36 (emphasis added). Ditar also identified these

distinctions in its administrative case brief. *See*, *e.g.*, Appx5835. But

Commerce ignored them then and Defendant-Intervenor ignores them

now. Even when Ditar sold [


] Def. Int Resp. Br. at 8, Ditar was not involved in the design

of such bags, whatsoever. Thus, Commerce's and Defendant-

Intervenor's claim that Ditar faces the same design demands whether it

sells to end users or to distributors who supply those end users is

contradicted by plain information on the record. That Commerce relied

on this incorrect observation to conclude that Ditar did not sell

shopping bags in Colombia to distributors and end users at two

different levels of trade further establishes that Commerce's level-of-

trade determination was unsupported by substantial evidence on the

record.

### B.   Defendant's Claims Regarding Ditar's Warehousing and Repacking Activities Are Meritless

In addition to the pre-production design efforts for end user customers in which Ditar fully engaged, Ditar's administrative case brief and its brief before this Court described numerous additional selling activities that Ditar performed for its end user customers that it did not perform for its distributor customers. Moreover, where there was overlap in some of the selling functions, Ditar explained – and Commerce agreed – that it engaged in more selling activities for its end user customers than for its distributor customers and that its end user selling activities also were *more intensive* and *more frequent*. Appx1547-1548 (Commerce acknowledging that "the greater level of intensity for sales to end users … indicate that the products require different levels of support" and that Ditar had "more frequent sales meetings, client meetings, personnel training, or more small customer support and customer personnel training for end users").

While Defendant's response brief generally ignores most of Ditar's reported selling functions, Defendant does discuss two of Ditar's reported selling activities – warehousing and repacking – and we address each of Defendant's complaints in turn. First, Defendant

9

alleges that Ditar failed to exhaust its argument that Ditar's provision of warehousing and repacking supported a finding of different levels of trade for its home market distributor and end user customers. Def. Resp. Br. at 24. But the Court should reject the notion that Ditar failed to exhaust its administrative remedies. When considering exhaustion, a preliminary question is whether Commerce neglected to address the issue until Commerce's final decision. *See Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) (noting that the party otherwise would not have had a full and fair opportunity to raise the issue at the administrative level). In this case, in neither the *Preliminary Determination* or at any time prior to the *Final Determination* did Commerce suggest that Ditar should have reported "warehousing or repacking expenses in the home market sales database" and also reported "post-sale warehousing in its sales database," or that such non-reporting could impact Commerce's level-of-trade determination. *See* Appx1548.

Under these circumstances, Ditar was not required to exhaust its administrative remedies because at the time Ditar filed its administrative brief, there was nothing to exhaust. *See Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231, 1236-37 (Ct. Int'l

Trade 2009) (stating that "{a} party … may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such a circumstance, the party would not have had a full and fair opportunity to raise the issue at the administrative level") (citation omitted). In this case, Commerce's erroneous claim that Ditar should have reported warehousing and repacking costs as direct selling expenses did not arise until the *Final Determination* when Commerce indicated that such expenses were missing and that Ditar's home market sales database therefore did not support its selling function chart. Appx1548.

Because Commerce gave no indication prior to the *Final Determination* that it would incorrectly (as fully described in Ditar's brief) rely on Ditar's non-reporting of these expenses as direct selling expenses to justify not finding different levels of trade, Ditar's first meaningful opportunity to challenge Commerce's decision is in this judicial review proceeding. *See Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1367 (Ct. Int'l Trade 2014) (noting that "while plaintiffs argued for the use of {certain} data in their administrative briefs filed with Commerce}, they could hardly foresee {at that time} what use {Commerce} would make of that data," and reasoning that "{i}t

is simply too much to ask of the parties to anticipate" the position that
Commerce would take and the rationale that the agency would give in
the Final Results, and holding that, "because plaintiffs had no realistic
opportunity to present their arguments before {Commerce}, ... plaintiffs
did not fail to exhaust their administrative remedies"). Because
Commerce addressed the issues of warehousing expenses and repacking
expenses – albeit incorrectly – only in its final decision, the exhaustion
doctrine does not preclude the Court's consideration of Ditar's
explanations that Commerce specifically instructed Ditar to report as
direct selling expenses *only expenses incurred at a distribution
warehouse not located at the factory* and that its only repacking
expenses already were included in its reported indirect selling expenses.
Ditar's Brief at 34-35. In sum, the doctrine of exhaustion of
administrative remedies has no application here.

    Separately, both Defendant and Defendant-Intervenor allege that
Ditar did not provide quantitative support that it "dedicated
significantly different areas of its warehouse space for sales in the
different distribution channels." Def. Resp. Br. at 26, *citing* Ditar's
Brief at 34; Def. Int. Resp. Br. at 8-9. But Ditar's administrative case
brief specifically cited to its Section B home market sales response and

an inventory worksheet showing that Ditar (1) warehoused significantly more merchandise during the first quarter of 2023 for its end user customers than it did for its distributor customers (averaging more than *twice* as much per month by value for end users than for distributors; and (2) turned over its *end user* inventory at only *one-fifth* of the number of days that it turned over its *distributor* inventory. *See* Appx3819, Appx3918. It is axiomatic that increased end user inventory means that Ditar incurred more time and effort to maintain and manage such inventory. Moving end user merchandise in and out of the warehouse and turning over such inventory at five times the rate of distributor inventory means that Ditar decisively performed this selling function more intensely for its end user customers.

Moreover, when Ditar updated its inventory turnover worksheet to include *all the months* of the period of investigation, the data showed that Ditar's average inventory for end users was *three* times greater than for its distributor customers and that Ditar turned over its end user inventory at a rate *one-sixth* of the rate of its distributor inventory. *See* Appx4381. Defendant's and Defendant-Intervenor's argument that Ditar did not quantitatively support that it dedicated significantly more warehouse space to end user merchandise than to distributor

merchandise thus is without merit.

With respect to repacking, Ditar fully explained to Commerce that it performed this selling activity only for home market end user customers, and that – like other after-sales services such as arranging for post-sale warehousing, coordination, and provision of additional documentation – Ditar included the costs for such services in its reported indirect selling expenses. *See* Appx3273, Appx3937-3939. Ditar also explained that because such repacking costs are not deducted from home market prices as direct selling expenses, it is even more appropriate that Commerce make a level-of-trade adjustment to reflect this additional cost and end user customer selling function to ensure that normal value is compared fairly to U.S. prices that do not reflect such selling activity.

Furthermore, Defendant's mathematical analysis of Ditar's reported packing expenses makes no sense whatsoever. In footnote 4 of its response brief, Defendant attempts a breakdown of Ditar's packing expenses, but does not explain what it is trying to accomplish. Def. Resp. Br. at 27 n.4. Moreover, what Defendant claims in Commerce's preliminary analysis attachment to be the "total quantity" in kilograms that Ditar sold to end user and distributor customers is not the

cumulated QTYUNIT2H, but instead is the number of line item sales (SEQH) that Ditar made to each customer category. *Id.*, *citing* Appx1472, Appx1474. Furthermore, what Defendant calculates to be the "sum of packing expenses for distributor customers" and end user customers actually is the sum of the *per-kilogram* packing costs (PACKH) that Ditar reported for each line item sold by customer category. Finally, what Defendant claims to be the "total cost of manufacturing for distributor customers" and end user customers is the sum of the *per-kilogram* costs of manufacture (TOTCOM) reported for each line item. *Id.* It makes no sense to add the *per-kilogram* costs from multiple line items and consider the results to be total costs. It is even less rational to divide these cumulated per-kilograms totals by the number of line items sold and claim the result has any meaning at all. Defendant's claims regarding Ditar's packing expenses – notably ignored and not repeated by Defendant-Intervenor – should be disregarded in their entirety.

### C. Ditar's Quantitative Analyses Complemented Its Qualitative Analyses to Support a Level of Trade Adjustment

The next section of Defendant's response brief is even less convincing. While Defendant's recitation of the legal standard for

adjusting normal value for differing levels of trade is correct, *see* Def. Resp. Br. at 13-16, Defendant's arguments suggest that Defendant does not understand what the level-of-trade analysis is intended to accomplish. For example, Defendant at the outset takes aim at the quantitative analyses that Ditar proffered to Commerce, and questions why Ditar presented Commerce with an array of quantitative metrics and analytical comparisons when "Commerce's level-of-trade analysis focuses on selling *activities* rather than on individual selling *expenses* taken in isolation." Def. Resp. Br. at 29 (emphasis in original).

By discounting the importance of how different selling expenses support the existence of different levels of selling activities, Defendant fails to recognize that the *quantitative* data provided by a respondent must work in conjunction with *qualitative* data to support a level-of-trade adjustment. In this case, to support a level of trade adjustment qualitatively, Ditar provided Commerce with narrative explanations, descriptive observations, email correspondence, and other information establishing that Ditar engaged in more frequent selling activities at a greater degree of intensity for end user customers. Ditar then demonstrated the veracity of its more frequent and more intensive selling activities for end user customers with quantitative metrics that

used actual selling expenses to illustrate empirically the reliability of such qualitative support. The two analyses do not operate independently, but must function in concert to demonstrate that a company's selling functions are sufficiently different at different marketing stages to establish that there are different levels of trade. Any focus on the concept of different "selling activities" alone without also considering the commensurate selling expenses that frame such selling activities thus paints only half the picture.

In the initial questionnaire sent to Ditar, Commerce directed Ditar to:

> Provide a quantitative analysis showing how the expenses assigned to POI/POR sales made at different claimed levels of trade impact price comparability. Your analysis should not include direct expenses reported to Commerce in your comparison market and U.S. market sales databases.

Ditar's Section A Response, at A-11, Appx3260. Commerce's requirement that respondents support level-of-trade claims with quantitative evidence in all proceedings was implemented in 2018 to enhance Commerce's ability to determine whether reported differences in selling functions are substantial enough to warrant a finding that sales were made at different levels of trade. *See, e.g.*, *Magnesium from Israel: Preliminary Affirmative Determination of Sales at Less Than*

*Fair Value*, 84 Fed. 32712 (July 9, 2019), Preliminary Decision

Memorandum at 13. For example, in *Corrosion Resistant Steel from*

*Korea*, Commerce considered, *inter alia*, the following quantitative

information in its level of trade analysis: (1) a demonstration of how

indirect selling expenses varied by the different levels of trade claimed;

(2) an explanation of how the quantitative analysis supported its

claimed levels of intensity for the reported selling activities; and (3) an

analysis of how expenses assigned to period of review sales made at

different claimed levels of trade impacted price comparability functions.

*See Corrosion-Resistant Steel Products from the Republic of Korea:*

*Final Results of Antidumping Duty Administrative Review; 2017-2018*,

85 Fed. Reg. 15114 (March 17, 2020), Issues and Decision Memorandum

at Comment 4 (finding that the quantitative analysis submitted by the

respondent corroborated its reported level of intensity information).

    Ditar provided all of these factors in its quantitative analyses. Ditar

first provided to Commerce numerous quantitative analyses

demonstrating how Ditar's selling activities and selling expenses varied

in the home market based on its distributor and end user marketing

stages. *See* Appx4379–4380; *see also* Ditar's Brief at 14-17. Ditar also

provided numerous explanations of how its quantitative metrics and

analytical comparisons supported its claimed levels of intensity for the

reported selling activities. *See* Appx5836-5838. In addition, Ditar

provided Commerce a price comparability analysis that demonstrated

how Ditar's average net prices in the home market differed by

CONNUM consistently between Ditar's distributor and end user

customers. Ditar AQR Exhibit 5, Appx3305; updated at Appx4383.

Defendant claims that "Ditar does not explain" why its quantitative

analyses "are a meaningful, let alone relevant, metric to determine the

intensity of selling activities." Def. Resp. Br. at 29. But Defendant

simply ignores the numerous, detailed explanations that Ditar provided

of how its analytical comparisons demonstrated the intensities of its

reported selling activities.

For example, Ditar explained to Commerce that the fact that its "end

user sales staff (representing [     ] of the home market sales staff) was

responsible for [          ] of the total number of invoices and [     ] of

the number of line item sales" qualified the intensity of the salesperson

selling activities because it evidenced the "much greater level of

intensity of effort for each sale made at the end user level."  Appx5837.

Ditar also explained to Commerce that the fact that "Ditar averaged

[     ] invoices and [          ] sale line items per distributor sales

staff, whereas Ditar averaged [          ] invoices and [        ] sale

line items per end user sales staff" was "significant because when more

end user sales staff issue fewer invoices, that means Ditar's end user

sales staff is engaged in a much higher level of intensity to issue <u>each</u>

invoice." *Id.* Ditar further explained that when it "incurred [        ]

more sales salary costs per invoice and [        ] more sales salary costs

per sale line item for end user sales than for distributor sales," these

differences "demonstrate an overwhelmingly greater amount of selling

activities at the more remote end user marketing stage." *Id.*

Similarly, Ditar argued to Commerce that when it "incurred [        ]

more sales salary costs per bag and [      ] more sales salary costs per

kilogram for its end user sales than for its distributor sales," these facts

demonstrated again "the substantial difference in salesperson selling

activities at the end user marketing stage. *Id.* Moreover, as discussed

above, Ditar's inventory carrying days for distributor products "was

[    ] times longer than the inventory carrying days for end user

products," and led to "inventory carrying costs for end user sales that

were [      ] higher than for distributor sales on a kilogram basis … and

[      ] higher on a per-bag basis."  Appx5838. Ditar also explained that

it had "more billing adjustments for end user sales than for distributor

sales; … had significantly more end user customers than it did

distributor customers; … sold more than [      ] times as many product

codes to end user customers than it did to distributors … sold more than

[      ] times as many CONNUMs to end user customers than it did to

distributors … {and that} these metrics further establish that Ditar's

had to engage in a far greater number of product-related technical

specifications issues and client-coordination issues for sales to end users

than it did for sales to distributors." *Id.* Finally, for the CONNUMs

included in Ditar's comparative pricing analysis, the average sales

quantities to distributors of [                    ] and to end users of [

      ] were virtually identical, thus proving that the price

differences at the different levels of trade were caused by the selling

activities performed and not by other factors, such as the volumes sold.

*See NSK Ltd. v. Koyo Seiko Co.*, 190 F.3d 1321, 1330 (Fed. Cir. 1999).

Re-reading these explanations, it is impossible to accept Defendant's

assertion that Ditar did not explain *why* its quantitative analyses were

"a meaningful, let alone relevant, metric to determine the intensity of

selling activities."  Def. Resp. Br. at 29. Rather, as explained in Ditar's

brief, Ditar's quantitative analyses fully established that when Ditar

sold to end user customers, it assumed both the selling functions and

the costs that ordinarily would have been performed and incurred by distributors if distributors had made the sales to the end user customers instead. In comparison to Ditar's sales to distributors, Ditar's sales to end user customers thus involved a significant additional level of sales activities amounting in the aggregate to a substantially difference selling function, demonstrating that they were made at a different, and more remote, marketing stage.[1]

## D. Defendant Fails to Justify Commerce's Price Comparability Analysis

In this case, substantial information on the administrative record established not only that Ditar made its home market sales to *end users*

---

[1] After asserting that Ditar did not explain the relevance of its quantitative analyses, Defendant argues that Commerce was not required to address "every piece of evidence" submitted by the parties). Def. Resp. Br. at 31. The Court should reject this tortile reasoning as inconsistent and self-serving. Also incorrect is Defendant's argument that "because Ditar concedes that it made sales to U.S. *distributors* at the same level of trade as home-market *distributors*, Commerce properly denied a level-of-trade adjustment. Def. Resp. Br. at 33 (emphasis added). But Ditar has never argued that Commerce should have made a level-of-trade adjustment when it compared Ditar's prices to distributors in the United States to Ditar's prices to distributors in Colombia (which are at the same level of trade). Rather, Commerce erred by not making a level-of-trade adjustment when it compared Ditar's prices to distributors in the United States to Ditar's prices to Colombian end users.

at a more remote and significantly different level of trade than its sales

to *distributor* customers; but also that Ditar's different levels of trade in

Colombia were characterized by substantially different selling activities

that had a significant impact on price comparability. Ditar explained in

its opening brief that the price comparability analysis that it presented

to Commerce was consistent with longstanding Commerce precedent

and demonstrated how Ditar's average net prices in the home market

differed by CONNUM between distributor and end user customers. In

its response, Defendant fails to justify the novel and unsupported

product code-based price comparison approach that Commerce relied on

instead, and in so doing, also fails to explain how the results Commerce

reached actually supported Commerce's conclusion.

We address the latter issue first. Under 19 U.S.C. §

1677b(a)(7)(A)(ii), Commerce "shall" make a level-of-trade adjustment

for any difference between U.S. price and normal value that is shown to

be due to a difference in level of trade if the difference in level of trade

involves the performance of different selling activities and "is

demonstrated to affect price comparability, based on a pattern of

consistent price differences between sales at different levels of trade in

the country in which normal value is determined." In this case, all

23

parties agree that Commerce – using its own product-code based price comparability analysis – found Ditar's prices to end users on average to be consistently [     ] percent higher than its prices to distributors. Appx1023. In its response, Defendant notes that Commerce "did not find the [     ] percent price difference to be significant," Def. Resp. Br. at 34, but fails to explain why the consistent [     ] percent difference between Ditar's distributor and end user pricing did not constitute a "significant" percentage. Equally important, Defendant does not explain why the percentage difference needs to be any particular level at all. The statute does not prescribe a particular percentage difference; it requires only that there be "a pattern of consistent price differences," which Commerce found. Here, Defendant fails to justify Commerce's reliance on a "significance" test when the statute does not require one, and also fails to explain why Commerce's own finding of a consistent price difference at the different levels of trade did not meet the statutory requirement.

Separately, Defendant also fails to justify Commerce's departure from practice and reliance on a product code-based pricing analysis instead of a CONNUM-based pricing comparison. Defendant repeats Commerce's explanation that a CONNUM-based methodology did not

"capture specific design differences" and that conducting the price comparability analysis on a product-code basis rather than a CONNUM basis permitted Commerce to "control for product mix differences with CONNUMs (which are not intended to capture specific design differences)" Ditar's Brief at 51-52. But Ditar explained in its brief that the premise of Commerce's argument is wrong: the CONNUM characteristics of paper type, printing, ink coverage, hot stamping, bag width, bag depth, and bag height used in this investigation *all* reflect and incorporate design characteristics. And in its response brief, Defendant did not answer any of these observations.

Just as important, Defendant also failed to explain or demonstrate how potential "product mix differences within CONNUMs" might impact price comparability. Def. Resp. Br. at 35. Defendant merely quoted Commerce's conclusory and unsupported remarks without any reference to evidence in the administrative record. Defendant therefore offered only speculation to support its claim that Commerce's product code-based approach achieved more precise and accurate pricing comparison results. But Commerce may not rely on conjecture to reach its final determination, and any such determination necessarily is unsupported by substantial evidence.

Finally, with respect to the CONNUM-based price comparison approach that Ditar proffered, Defendant offers only an inconsistent rationale for Commerce's failure to accept it. First, Commerce's position for decades has been that the specific physical characteristics that make up a CONNUM and that define a product for purposes of an antidumping proceeding "are those physical characteristics determined to be the most significant in differentiating between products," and that products falling within the same CONNUM are "identical" products. *See Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan*, 67 Fed. Reg. 35474 (May 20, 2002), Issues and Decision Memorandum, Comment 3; *see also Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 82 Fed. Reg. 46961 (October 10, 2017), Issues and Decision Memorandum, Comment 2 (where Commerce described the CONNUM characteristics as the "physical characteristics that *define unique products*."). As routinely described by Commerce,

> At the outset of a case, Commerce identifies the physical characteristics that are the most significant in differentiating products for price comparison purposes. These are the physical characteristics that define identical or similar products (*i.e.*, the CONNUMs) for sales comparison purposes. The level of detail within each physical characteristic (*e.g.*, the multiple different grades or sizes of a product) reflects the importance, in making price-to-price comparisons, that we place on establishing NV based on comparison market sales of the identical, or the most

similar, foreign like product. Thus, under section 773(a)(6)(C)(ii) and (iii) of the Act, an adjustment is made to NV to account for the fact that similar products, as defined by the CONNUMs, are being matched *instead of identical products as defined by the CONNUMs*.

*Common Alloy Aluminum Sheet from Greece*, 86 Fed. Reg. 13300 (March 8, 2021), Issues and Decision Memorandum, Comment 1. That Commerce relies on physical characteristics to identify "identical" products rather than design characteristics also is a long-standing Commerce position. *See Steel Concrete Reinforcing Bar from the Republic of Korea*, 72 Fed. Reg. 18630 (April 13, 2007), Issues and Decision Memorandum, Comment 1 (identifying Commerce's practice that the CONNUMs used for comparison purposes "should be based on physical characteristics, rather than specification-based characteristics").

But, as noted above, Defendant presents no explanation in its response why product codes sharing identical CONNUMs should not be treated as comparable when making level-of-trade pricing comparisons under 19 U.S.C. § 1677b(a)(7)(A)(ii) when Commerce relies on their exact comparability when making all other dumping margin calculation comparisons under 19 U.S.C. § 1677f-1. In this case, an explanation for Commerce's inconsistent approach is especially necessary because

Defendant offers no support for its incorrect position that CONNUMs do not "capture specific design differences." Def. Resp. Br. Furthermore, Defendant does not explain the unavoidable inconsistency that would result if Commerce in fact (A) found a consistent percentage price difference at the different levels of trade based on product codes, but then (B) made a *different* CONNUM-based percentage level-of trade adjustment to normal value based on its long-standing practice and standard margin calculation programs. Such an inconsistent pricing adjustment could never be sustained as supported by substantial evidence. In sum, Commerce's misapplication of the law, adoption of an inconsistent and arbitrary product-code approach to comparing prices, and failure to find a pattern of consistent price differences between Ditar's sales at its distributor and end user levels of trade constituted both legal and factual errors that Commerce now must correct.

## III.   <u>CONCLUSION</u>

For the reasons stated above, it was unlawful for Commerce to compare Ditar's U.S. sales to distributor customers to home market sales to end user customers without making a level of trade adjustment to the home market selling prices. As established in the administrative record, the selling activities – and the intensity and frequency of such

activities – that Ditar performed for its distributor and end user customers established that there was a significant difference between Ditar's distributor and end user marketing stages in Colombia. Ditar also quantitatively demonstrated that the differences in selling activities between the home market channels of distributions affected price comparability. Thus, the administrative record established that Ditar's home market sales were made at two different levels of trade.

Because Commerce (1) disregarded the evidence on the administrative record that established two separate levels of trade, (2) ignored how Ditar's quantitative analyses linked to the intensity levels reported in Ditar's selling functions chart, (3) misunderstood the importance of the design work that Ditar engaged in as a selling activity with its end user customers and failed to recognize that Ditar did *not* perform such activities for its distributor customers, (4) failed to recognize that the different types and levels of intensity of selling activities for different customer types had an impact on price, (5) ignored the CONNUM-based price comparability analysis that Ditar provided that was based on Commerce's own dumping margin SAS programming, and (6) relied instead on a product code comparison analysis (for different customer categories) that conflicted with

29

Commerce's definition of "identical" products, Commerce's level of trade

analysis was unreasonable and unsupported by substantial evidence,

and the Court should remand to Commerce for further consideration.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated:  June 19, 2025                    Counsel to Ditar, S.A.

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DITAR, S.A.,<br>    Plaintiff,<br>v.<br><br>UNITED STATES,<br>    Defendant,<br>and<br><br>COALITION FOR FAIR TRADE IN SHOPPING BAGS,<br>    Defendant-Intervenor. | Court No. 24-00130 |

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC certifies that Plaintiff's Reply Brief, dated June 19, 2025, complies with the word-count limitation described in the Standard Chambers Procedures. The memorandum of law contains 6,005 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink

**TRADE PACIFIC PLLC**
700 Pennsylvania Ave., SE, Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel to Plaintiff Ditar, S.A.

Dated: June 19, 2025