Slip Op. 25-128

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

**Court No. 24-00130**

DITAR, S.A.,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

COALITION FOR FAIR TRADE
IN SHOPPING BAGS,

*Defendant-Intervenor.*

Before: M. Miller Baker, Judge

**OPINION**

[Remanding for the Department of Commerce to re-
consider its denial of a level-of-trade adjustment.]

Dated: October 1, 2025

*Robert G. Gosselink*, *Jonathan M. Freed*, *Kenneth N.
Hammer*, and *MacKensie R. Sugama*, Trade Pacific
PLLC, Washington, DC, on the briefs for Plaintiff.

*Yaakov M. Roth*, Acting Assistant Attorney General;
*Patricia M. McCarthy*, Director; *Franklin E. White,
Jr.*, Assistant Director; and *Daniel Bertoni*, Trial

Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the brief for Defendant. Of counsel for Defendant was *Ruslan Klafehn*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*J. Michael Taylor* and *Daniel L. Schneiderman*, King & Spalding LLP, Washington, DC, on the brief for Defendant-Intervenor.

*Baker*, Judge: In this case involving an antidumping investigation of paper bags exported from Colombia, a producer from that country challenges the Department of Commerce's denial of a level-of-trade adjustment to the company's home-market pricing. For the reasons stated below, the court remands for reconsideration.

## I

Under the Tariff Act of 1930, as amended, antidumping duties must be "equal to the amount by which the normal value exceeds the export price . . . for the merchandise." 19 U.S.C. § 1673. "Normal value" means "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, *at the same level of trade* as the export price." *Id.* § 1677b(a)(1)(B)(i) (emphasis added). Essentially, determining "normal value" requires Commerce to calculate the sales price to consumers in the producer's home market. *Giorgio Foods, Inc. v. United States*, Slip

Op. 24-79, at 3, 2024 WL 3534491, at *1 (CIT 2024) (citing *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1573 (Fed. Cir. 1983)), *appeal pending*, No. 25-2090 (Fed. Cir.). But sometimes, the level-of-trade question can make that a fraught exercise.

As relevant here, the Department must adjust the home-market sales price "to make allowance for any difference" between export price and normal value "that is . . . due to a difference in level of trade." 19 U.S.C. § 1677b(a)(7)(A). Such a "difference in level of trade" must both involve the performance of "different selling activities" *and* "affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade" in the producer's home market. *Id.* § 1677b(a)(7)(A)(i), (ii).

A Commerce regulation implements this mandate. *See* 19 C.F.R. § 351.412. It says the agency will find different levels of trade if the sales "are *made at different marketing stages (or their equivalent)*. Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing." *Id.* § 351.412(c)(2) (emphasis added).

When the Department promulgated the regulation in 1997, it observed that "the statute uses the term 'level of trade' as a concept distinct from selling activities." 62 Fed. Reg. 27,296, 27,371 (citing *Statement of Administrative Action (SAA) accompanying the 1994*

*Uruguay Round Agreements Act*,[1] H.R. Doc. 103–316, vol. 1, at 829, 1994 U.S.C.C.A.N. 4040, 4168, as "reinforcing" the point). The statute allows a finding of one such level even if two sales have substantial differences in selling activities. *Id.* On the other hand, some common selling activities will not preclude a finding of different levels of trade. *Id.* "Taken together, the two points establish that an analysis of selling activities alone is insufficient to establish the [level of trade]." *Id.* A level of trade, therefore, "is a marketing stage 'or the equivalent' (which means that the merchandise does not necessarily have to change hands twice in order to reach the more remote [level of trade]). It is sufficient that, at the more remote level, the seller takes on a role comparable to that of a reseller if the merchandise had changed hands twice." *Id.*

By negative implication, then, "different marketing stages" exist when merchandise changes hands twice. *Pasta Zara SpA v. United States*, 703 F. Supp. 2d 1317, 1324–25 (CIT 2010) (*Zara I*). Thus, a company seeking an adjustment has two options to show different levels of trade—it can show that its products changed hands twice *or* it can show that in making sales, it took over the role normally performed by a reseller.[2] *Pasta Zara*

---

[1] The SAA is an "authoritative expression" of the statute's meaning. 19 U.S.C. § 3512(d).

[2] The Federal Register notice provides two ways a producer can attempt to show that it assumed the role of reseller. First, it can provide evidence that it performed "an additional layer of selling activities, amounting in the aggregate to a substantially different selling function." 62 Fed. Reg. at 27,371. That is, because demonstrating different

(footnote continues on next page)

*SpA v. United States*, 781 F. Supp. 2d 1297, 1301 (CIT 2011) (*Zara II*) ("[T]he Department considers a different marketing stage to occur where merchandise changes hands twice to reach a more remote level of trade. . . . In identifying the possibility of the 'equivalent' of a separate marketing stage, [it] recognizes that a determination of multiple [levels] is not precluded solely by the fact that the merchandise did not change hands twice.") (citing 62 Fed. Reg. at 27,371).

Although showing a difference in the level of trade is necessary to warrant an adjustment to the home-market sales price, it is not sufficient. An interested party seeking such a tweak must also demonstrate that the "difference has an effect on the comparability of prices." 19 C.F.R. § 351.412(a); *see also* SAA at 829, 1994 U.S.C.C.A.N. at 4168. Commerce will find such an effect when "there is a pattern of consistent price differences between sales in the market in which normal value is determined" both at the export price's level of trade and at the level at which normal value is determined. 19 C.F.R. § 351.412(d)(1).

---

selling activities alone is "necessary, but not sufficient," under 19 C.F.R. § 351.412(c)(2), the producer must show those activities' cumulative effect. Second, it can point to "[s]ubstantial differences in the amount of selling expenses associated with two groups of sales," which "also may indicate that the two groups are at different levels of trade." 62 Fed. Reg. at 27,371.

## II

In 2023, the Coalition for Fair Trade in Shopping Bags[3] petitioned Commerce to impose antidumping duties on imports of paper sacks from Colombia. Appx1000. The Department opened an investigation and, as relevant here, selected producer Ditar, S.A., as a mandatory respondent. Appx1000–1001.

Commerce preliminarily found that Ditar was dumping bags in this country. 89 Fed. Reg. 319, 320. In so doing, the agency considered the company's request for a level-of-trade adjustment to its home-market pricing. *See* Appx1011–1014. The Department explained that in such an exercise, it "examine[s] the distribution system in each market (i.e., the chain of distribution), including selling functions, class of customer . . . , and the level of selling expenses for each type of sale." Appx1011.

Ditar reported that all its U.S. sales were to unaffiliated distributors, while its Colombian sales were to both distributors and end-user customers. Appx1012. The home-market distributors purchased unprinted bags in a limited range of sizes at preset prices, while the end users bought printed ones in a wider range of sizes and styles at negotiated prices. *Id.* The upshot, according to the company, was that its sales to the latter group entailed much higher costs and greater effort—a claim that it attempted to substantiate with a detailed quantitative analysis. Appx1012–1013. Because of this difference, it asserted that it performed

---

[3] A domestic producer and a trade union. *See* ECF 11.

significantly different selling functions for each type of home-market customer and that the variances resulted in disparate levels of trade. *Id*. For this reason, it asked Commerce to adjust pricing of Colombian end-user sales whenever it compared them to distributor sales in this country. *Id*.

The agency preliminarily denied the adjustment, concluding that Ditar failed to show that its home-market sales to distributors and end users involved "different marketing stages (or their equivalent)." Appx1013 (citing 19 C.F.R. § 351.412(c)). It found that the selling activities involved were largely the same for both types of customers, there was no evidence of any "meaningful and substantial" differences, and it was reasonable to conclude that the company assigned the "vast majority of its sales staff" to end users because they constituted almost all of its customer base. *Id*. It further observed that "different marketing stages occur where merchandise changes hands twice," *id*. (citing 62 Fed. Reg. at 27,371), and that "this scenario does not apply to Ditar because [it] made all home market sales directly to its customers," *id*.

In any event, the Department also found that even if there were differences in levels of trade, the company's pricing did not "differ[] significantly between the channels of distribution." Appx1023. It deemed that an independent reason to deny a level-of-trade adjustment. *Id*.

In its final determination, Commerce confirmed its denial of the requested adjustment. *See* Appx1547–1551. It characterized Ditar as arguing that, while it

performed the same selling functions for both types of Colombian customers, it undertook those efforts "to a greater level of intensity" for the end users—"for example, on a daily basis, compared to a monthly or quarterly basis." Appx1547. The Department disagreed that merely conducting the same activities on a more frequent basis constitutes a different level of trade. *Id.* It observed that when a particular type of clientele dominates a customer base, a "proportional increase" in "expense and effort" devoted to that class "would be expected." Appx1548. The agency observed that a *disproportionate* allocation of personnel and resources would more reasonably support finding a difference in level of trade. *Id.* And it again noted that the company's merchandise did not change hands twice, Appx1550, which by itself would have established different levels of trade.

The Department also addressed the level-of-trade test's price comparability prong. Although the agency found "overall price differences" in the home-market channels of trade, they were not "sufficient . . . to justify" a level-of-trade adjustment. Appx1551.

In short, Commerce again concluded that Ditar failed to demonstrate a substantial difference in selling activities between its two groups of home-market customers. In addition, the company failed to show any significant effect on price comparability stemming from the asserted disparity. As neither of the statutory requirements—at least as read by the agency—were satisfied, the agency denied a level-of-trade adjustment to the home-market price. *Id.*

### III

Invoking jurisdiction conferred by 28 U.S.C. § 1581(c), Ditar sued under 19 U.S.C. § 1516a(a)(2)(A)(i)(II) to challenge the denial of the level-of-trade adjustment. ECF 6, ¶ 1. The Coalition intervened as a defendant supporting the government. Ditar filed a motion for judgment on the agency record, which is fully briefed and ripe for disposition.

In § 1516a(a)(2) actions, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The question is not whether the court would have reached the same decision on the same record. Rather, it is whether the administrative record as a whole permits Commerce's conclusion:

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if Commerce makes a choice between "two fairly conflicting views," the court may not

substitute its judgment even if its view would have been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

The court also reviews determinations to ensure the agency engaged in "reasoned decisionmaking," meaning its result must be "within the scope" of its authority and "the process" it uses to reach that outcome "must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). Reasoned decisionmaking requires the agency to "examine the relevant data and articulate a satisfactory explanation . . . including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). But courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

## IV

Ditar challenges Commerce's findings that the company failed to demonstrate either a difference in the level of trade in its home-market sales or any significant effect on price comparability stemming from the asserted disparity. As explained below, the court remands both questions.

## A

Commerce found Ditar did not show that its Colombian-market end-user and distributor sales were "at different marketing stages (or their equivalent) as described in" 19 C.F.R. § 351.412(c)(2). Appx1013

(preliminary decision). In reaching this conclusion, it relied in part on the undisputed fact that the company "made all of its home-market sales to unaffiliated parties," either distributors or end users, and none of its merchandise "change[d] hands twice." *Id.*

The company faults that analysis, saying that "Commerce contradicted its own regulation." ECF 24, at 27. It argues that the agency's "basis for this claim is not clear" and that the Department "did not articulate the correct test" because the Federal Register notice says the regulation's phrase "or the equivalent" means that merchandise need not change hands twice. *Id.* at 27–28.

Ditar conflates the regulation's terms "different marketing stages" and "the equivalent" rather than considering them separately. *See* 19 C.F.R. § 351.412(c)(2). Contrary to the company's assertion, the foundation for the agency's statement is clear and correct: It comes from the Federal Register notice, which declares precisely what the agency said here. *See* 62 Fed. Reg. at 27,371 ("Section 351.412(c)(2) states that [a level of trade] is a marketing stage 'or the equivalent' (which means that the merchandise does not necessarily have to change hands twice in order to reach the more remote [level])."); *see also Zara I*, 703 F. Supp. 2d at 1324 ("[T]he sales to the second group of customers plaintiff identifies would appear not to constitute a different marketing stage *per se* because these customers purchased directly from the producer, with no intermediate distributor.").

Ditar does not dispute that its Colombian sales did not change hands twice. If anything, it emphasizes that they did not. *See* ECF 24, at 30 (referring to "Commerce's reliance on the fact that Ditar *itself* made sales to both distributors and end users") (emphasis in original); *id.* at 29–30 (citing various proceedings in which it says the agency "found different levels of trade in the home market when the merchandise did not change hands twice"). Therefore, the Department's finding that the sales did not involve different marketing stages is supported by substantial evidence. *See* Appx1550.

But that's not the end of the matter because the regulation provides an alternative: "the equivalent" of different marketing stages. 19 C.F.R. § 351.412(c)(2). Under that option, the company may show it took on a role comparable to that of a reseller by engaging in "an additional layer of selling activities, amounting in the aggregate to a substantially different selling function." 62 Fed. Reg. at 27,371.

Ditar argues at length that its selling activities did amount to such a function. ECF 24, at 31–40. It first expresses incredulity at Commerce's findings that:

- "[H]aving more frequent [sales activities]" does not "indicate[] that sales were made at different [levels of trade]." Appx1547.

- Providing more "technical support and/or technical advice services" to end users than distributors does not "indicate differences in level of trade, especially given the fact that the level of

Ditar's technical services expense represents an insignificant component of the total value of [its] reported indirect selling expenses. Rather, it indicates that [the company] sells products in each market with different design requirements." *Id.*

- Ditar "sold printed bags of varying sizes to end users, and unprinted bags of more similar sizes to distributors. Thus, the greater level of intensity for sales to end users . . . indicate[s] that the products require different levels of support because [they] are different, not because the [levels of trade] differ." Appx1548.

Ditar then asserts—without any further elaboration, as if the proposition is self-evident—that "these facts" show "substantial differences in selling activities" and that "[i]t is hard to imagine a more constrained logical progression or one based less on substantial evidence." ECF 24, at 33. But the Department gave a reasonable explanation why it weighed the evidence differently. That the company "devote[d] the vast majority of its staff and resources to end users rather than distributors" merely reflected "an alignment of its resources with the requirements of making and servicing the vast majority of its sales." Appx1548. "Only where the intensity of sales functions and support reflect demonstrable differences out of proportion with their relative difference in volume . . . might they support a difference in the [level of trade]." *Id.* Ditar's "sales to end users" did not reflect "selling functions which are disproportionally higher than that of sales to distributors." *Id.*

The agency thus "examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. And where, as here, "two different, inconsistent conclusions may reasonably be drawn from the evidence in [the] record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013) (quoting *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002)).

Ditar next attacks Commerce's finding that the company failed to substantiate its claims that its warehousing and repacking expenses for home-market end users were more intensive than its expenses for distributors. ECF 24, at 33–36; *see also* Appx1548–1549 (finding these expenses unreported in the home-market sales database). The company argues that it did not report these as direct selling expenses in its home-market sales database because they were instead properly reported as indirect selling expenses. *See* ECF 24, at 34–36. The government does not dispute this point. *See* ECF 30, at 26. It instead argues that the exhibits Ditar cites for its indirect warehouse and repacking expenses offer no quantitative support for the company's intensity claim. *Id*.

It's the agency's job to make factual findings, not the court's. As the government does not contest that Commerce simply misunderstood its own data reporting requirements for repacking and warehousing expenses, remand is necessary. The Department must review Ditar's indirect selling expenses and reconsider

the company's claims that intensity differences in these two categories show a difference in levels of trade.[4]

Ditar also challenges the agency's finding that the company "faces the same design demands, whether it sells paper bags to end users or to distributors who supply those end users." Appx1549; *see* ECF 24, at 36–39. In so doing, the company catalogs the evidence that it asserts supports its claim that the design demands were different for these two categories of purchasers. ECF 24, at 36–39.

Commerce, however, based its finding on Ditar's own statements at verification. *See* Appx1549 & n.53. The company said that "its home market customers are extremely demanding about sizes and designs, so that, whether it sells merchandise to distributors or end-users, it must satisfy the size and design demands of each specific end-user." Appx5779. The Department's finding is supported by substantial evidence, even if it could have relied on the material cited by the company to conclude otherwise.

---

[4] The government also points to Commerce's finding that Ditar's home-market database shows that its "average per-unit packing expenses are higher for distributors than end-user customers." *See* ECF 30, at 27 & n.4 (citing Appx1548; Appx1472; Appx1474). That's non-responsive to the company's point, which is that its *re*packing expenses for end users—which were *not* included, after all, in the home-market database—were more intensive than those for distributors.

Finally, Ditar argues that the quantitative analysis it submitted to Commerce established that in making end-user sales, it functioned like a distributor. ECF 24, at 40–46. The company does not, however, identify which activities a distributor (or "reseller") would normally perform. Instead, it compares its distributor and end-user sales in terms of numbers of invoices and numbers of line items per staff member, *id.* at 40–41; salary costs for personnel who sold to each type of customer, *id.* at 42–43; credit expenses and inventory costs on per-kilogram and per-bag bases, *id.* at 43–44; and relative numbers of each type of customer coupled with the variety of product codes or control numbers sold to each, *id.* at 44. Ditar says the Department "did not address" those comparisons. *Id.*

But Commerce discussed how the company calculates per-invoice and per-line-item values for such metrics as number of staff, compensation, and sales volume. Appx1550. It then said that while the *raw figures* "differ dramatically" between the two types of customers, "the *percentage values* . . . are in alignment" and simply reflect that "Ditar makes the vast majority of sales to end users and, therefore, allocates company personnel to support the value of its sales." *Id.* (emphasis added).

The agency reasoned that when one type of customer represents a significantly larger part of the business, one would expect the company to devote more expense and effort to those customers, and it observed that what would be remarkable would be a business doing the opposite. Appx1548; *cf. Productos Laminados de Monterey S.A. de C.V. v. United States*,

581 F. Supp. 3d 1349, 1355 (CIT 2022) (sustaining grant of level-of-trade adjustment and noting Department's observation that while company's industrial sales were a small proportion overall, its employee assignments to that work represented a higher percentage of overall staff). As the Coalition notes, the record shows that the percentage of sales staff assigned to the two types of customers matched the percentage of sales made to each. ECF 32, at 10. Moreover, while Ditar disagrees with the Department's approach and insists that the number of invoices and line items are the correct metric, *see* ECF 24, at 41, it cites no authority requiring the agency to adopt that methodology. The agency's findings about the company's quantitative evidence are supported by substantial evidence.

B

Recall that in its preliminary determination, Commerce found that even if there were different levels of trade as Ditar contended, its prices did not differ significantly between its home-market sales to end users and distributors. Appx1023. The agency stood by that conclusion in its final determination. It discussed a quantitative analysis Ditar submitted—based on control numbers—to show that its prices to Colombian end users were "considerably higher than to distributors." Appx1550. The Department noted that the company's comparison omitted two control numbers sold to both classes of customers but also included outlier sales that disproportionately affected the analysis. Appx1551. Commerce excluded the outlier sales. *Id.* It found that Ditar's "analysis, based on incomplete data," was inadequate. *Id.* It thus instead used a meth-

odology based on product codes, which did "not demonstrate sufficient price differences to justify" a level-of-trade adjustment. *Id.*

The agency's conclusion that the company failed to show any effect on price comparability thus was based on the latter's asserted provision of incomplete data and insignificant price differences. As to the former, Ditar argues that the Department did not place the data on which it relied for that finding on the record, rendering its conclusion of "incompleteness" unsupported. ECF 24, at 49. But the government and the Coalition both respond that the agency did indeed do so. *See* ECF 30, at 35 n.6 (government, citing Appx1023); ECF 32, at 13 (Coalition, citing Appx1474–1502).[5] Ditar's reply brief does not dispute that rebuttal, which the court finds persuasive.

The company next argues that the Department's pricing analysis—based on product codes—contradicts longstanding agency practice to use control numbers. ECF 24, at 51–55. The government responds that the company identifies no requirement that the agency limit its examination to a control-number basis. ECF 30, at 34. Instead, it says, the Department found that the product code information available here was more specific and allowed for a more accurate

---

[5] Appx1025 identifies the cited pages as an Excel spreadsheet containing "Ditar Home Market End Users/Distributors Analysis." The final determination, in turn, cites "Preliminary Analysis Memorandum at Attachment 5 ('Ditar Home Market End Users/Distributors Analysis (Excel Data File)')" four times to support its discussion of the company's submission. *See* Appx1551 nn.59–62.

calculation. *Id.* (citing *Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015)). It cites examples from the record where Commerce discovered that some control numbers included bags of differing sizes. *Id.* at 35–36 (citing Appx5781).

Ditar is correct that the Department constructs a control number scheme with input from the parties to reflect the goods' most significant physical characteristics. ECF 24, at 52–53 (citing agency decisions); *see also Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1312 n.3 (CIT 2020) ("In order to ensure an apples-to-apples comparison of sales in the U.S. and home markets, Commerce establishes a set of product criteria, from most to least important, to identify identical and similar products. Within each of these criteria, the distinct characteristics are given different numeric values which, when listed next to each other, constitute the 'control number' or 'CONNUM' for that 'model' or 'type.'"). It is also true that, generally, the agency considers products with identical control numbers to be "identical," or at least "similar," goods. *Manchester*, 483 F. Supp. 3d at 1312 n.3 ("[T]he CONNUM is a number designed to reflect the hierarchy of certain characteristics used to sort subject merchandise into groups and allow Commerce to match similar and identical products . . . .").

But the government is also right that the "control number" system is a matter of agency practice, not a statutory requirement. The Federal Circuit has rejected the argument that "Commerce's CONNUM-specific reporting requirement is a legislative rule because it effectively amends [the] existing regulation,

19 C.F.R. § 351.401(g)," finding instead that the use of such numbers is "a statement of policy rather than the agency's explicit invocation of general legislative authority." *Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*, 50 F.4th 98, 106, 107 (Fed. Cir. 2022) (cleaned up). And even if it were an agency rule, it is a "general principle" of administrative law that "[i]t is always within the discretion of . . . an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it." *PAM S.p.A. v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006) (brackets in original) (quoting *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538–39 (1970)). All that is required is a "reasonable justification." *Coal. of Am. Mfrs. of Mobile Access Equip. v. United States*, Slip Op. 24-66, at 26, 2024 WL 2796654, at *9 (CIT 2024).

Commerce found the control-number analysis inadequate here because Ditar's reporting was incomplete, and it found that switching to product codes posed no such problem and allowed for an accurate measurement. Appx1551. The agency's explanation that the record would not allow for its standard approach is reasonable. As the preliminary decision explained, using product codes was "more realistic." Appx1014. That assessment was the Department's prerogative to make and is supported by substantial evidence.

Finally, the company attacks Commerce's failure to explain why the differential in pricing between distributor and end-user pricing that it found here—which was greater than five percent—was not "significant."

ECF 24, at 55–56. Ditar points to several contexts where both the statute and the agency use that percentage as a test for significance. *See id.* at 56.

The government responds that the company "cites no authority that would limit Commerce's discretion" to determine that any given percentage is not significant. ECF 30, at 39. That's true insofar as Ditar's opening brief goes,[6] but the company's argument isn't that the Department has no such discretion. Instead, it contends the agency has abused that discretion by failing to explain why the pricing-differential percentage here—which exceeds five percent—is not significant, especially when in other contexts it would be. *See* ECF 24, at 55–56.

The court agrees. Commerce's pronouncement that the pricing differential that it found here was "insufficient" to warrant a level-of-trade adjustment was unadulterated *ipse dixit*. The Department failed to

---

[6] This filing asserts in passing that "nothing in the statute, regulations, or Commerce practice mandates that the difference in pricing between levels of trade reach a minimum threshold." ECF 24, at 55. The company belatedly develops this argument at length in its reply brief, contending "[t]he statute does not prescribe a particular percentage difference; it requires only that there be 'a pattern of consistent price differences,' which Commerce found." ECF 36, at 24. But "[p]assing references do not raise arguments." *I.D.I. Int'l Dev. & Inv. Corp. v. United States*, Slip Op. 21-82, at 32, 2021 WL 3082807, at *11 (CIT 2021) (citing *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1325 n.6 (Fed. Cir. 2012)). The court therefore declines to entertain this contention and instead reserves it for a case where a party properly raises it.

"articulate a satisfactory explanation . . . including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The court therefore remands to allow the agency to connect the dots.

Dated:  October 1, 2025          /s/ *M. Miller Baker*
          New York, NY            Judge