A-301-805
Remand: Slip Op. 25-128
Investigation
POI: 4/1/2022-3/41/2023
**Public Document**
E&C/OIII:  BCQ

*Ditar, S.A. v. United States*, **Court No. 24-00130, Slip Op. 25-128**
**(CIT October 1, 2025)**
**Certain Paper Shopping Bags from Colombia**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International

Trade (the Court) issued in *Ditar, S.A. v. United States*, Court No. 24-00130, Slip Op. 25-128.[1]

This action arises out of Commerce's final affirmative determination in the investigation of sales

at less than fair value (LTFV) of certain paper shopping bags from Colombia covering the period

of investigation (POI) April 1, 2022, through March 31, 2023.[2]

The Court remanded for reconsideration of certain aspects of Commerce's finding in the

*Final Determination* that the sole participating respondent in the underlying investigation, Ditar,

S.A. (Ditar), was not eligible for a level-of-trade (LOT) adjustment to the company's home-

market pricing.[3]  Specifically, though sustaining certain elements of Commerce's LOT analysis

challenged by Ditar, the Court held that Commerce failed to support its determination that

Ditar's claimed intensity difference for one selling function, warehousing and repacking

---

[1] *See Ditar, S.A. v. United States,* Court No. 24-00128, Slip Op. 25-128, (CIT October 1, 2025) (*Remand Opinion*);
*see also Ditar, S.A. v. United States, Court No. 24-00130-MMB* (CIT October 1, 2025) (*Remand Order*)
(collectively, *Remand Opinion and Order*).
[2] *See Certain Paper Shopping Bags from Colombia:  Final Affirmative Determination of Sales at Less Than Fair
Value*, 89 FR 45843 (May 24, 2024) (*Final Determination*), and accompanying Issues and Decision Memorandum
(IDM).
[3] *See Remand Opinion* at 2.

expenses, were not more intensive for home-market end users than its expenses for distributors.[4] Accordingly, the Court remanded for Commerce to review Ditar's indirect selling expenses and to determine whether the warehousing and repacking selling function was done at a higher intensity and what effect that would have on the LOT analysis.[5]  Further, while the Court sustained Commerce's price comparability analysis, it held that Commerce failed to explain why the differential in pricing was not significant and remanded on that narrow basis.[6]

## II.    BACKGROUND

Pursuant to section 773(a)(1)(B)(i) of the Tariff Act of 1930, as amended (the Act), to the extent practicable, Commerce will calculate normal value based on the same LOT as the U.S. sales.  To determine whether the home market sales are at different marketing stages than the U.S. sales, Commerce examines the distribution system in each market, including selling functions, customer categories, and the level of selling activities for each type of sale. When Commerce is unable to match a U.S. sale to sales in the home market at the same LOT as the export price (EP) or constructed export price (CEP), Commerce may compare the U.S. sale to sales at a different LOT in the home market.  In comparing EP or CEP sales at a different LOT in the home market, where available data make it possible, Commerce makes an LOT adjustment under section 773(a)(7)(A) of the Act.  According to 19 CFR 351.412(c)(2), sales are made at different LOTs if they are made at different marketing stages (or their equivalent), and substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing. [7]

---

[4] *See Remand Opinion* at 14-15.
[5] *Id.*
[6] *Id.* at 20-22.
[7] *See Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administration Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010), and accompanying IDM at Comment 7.

In the LTFV investigation, Ditar reported that it has one channel of distribution in the United States:  Channel 1, sales to distributors; and two channels of distribution in Colombia: Channel 1, sales to distributors, and Channel 2, sales to end users.[8]  Ditar made the majority of its home market sales to end users.[9]  Ditar claimed that it performs the same selling functions in Colombia for its EP sales to the United States as it does for Channel 1 sales in the home market. For Channel 2 sales to end users in Colombia, Ditar alleged that it performs the same selling functions as for Channel 1 sales to distributors (*i.e.*, employed sales personnel, conducted sales meeting, forecasting and market research, engaged in period fulfillment, inventory maintenance, packing and delivery arrangement, conducted customer contact/negotiation, order processing, billing adjustments, quality assurance/warranty services, commission payments, and payment collection), but to a greater level of intensity, for example, on a daily basis, compared to a monthly or quarterly basis.[10]  Thus, Ditar argued that the differences in selling activities that Ditar performed in selling to distributor and end user customers in Colombia are so substantial that they constitute different marketing stages.  According to Ditar, the record contained numerous quantitative analyses, mathematical metrics, and substantial source documentation demonstrating that the selling activities that Ditar performed in making sales to distributors and end users differed by customer type and that these differences were significant and meaningful.[11]

Commerce evaluated Ditar's LOT adjustment and determined that Ditar was not able to demonstrate that it made sales to distributors and end users at different LOTs.  Thus, Commerce continued to find a single LOT in the home market and made no LOT adjustment in the final

---

[8] *See* Ditar's Letter, "Ditar Case Brief - Sales," dated April 1, 2024 (Ditar's Sales Case Brief), at 8-9.
[9] *Id.*
[10] *Id.*
[11] *Id.* at -24.

determination.[12]  With regard to the specific aspects remanded by the Court for further

consideration, for warehousing and repacking selling functions, Commerce noted that – though

warehouse and repacking services were listed in Ditar's selling functions chart – Ditar did not

report warehousing or repacking expenses in the home market sales database or in the narrative

of its section B questionnaire response.  Commerce's further analysis relied on an analysis

focused on the warehousing and packaging information reported as a direct expense in the home

market sales database, or lack thereof, in concluding that "Ditar did not report any post-sale

warehousing expenses on its sales database."[13]  For the price comparison analysis, we rejected

Ditar's proposed price comparison analysis methodology (based on product control number) in

favor of an analysis based on reported product codes.  In defending the accuracy of the latter,

Commerce concluded that "we maintain that the overall price differences found at the

PRODCODH level (which can be accurately measured), do not demonstrate sufficient price

differences to justify an LOT adjustment."[14]

    In litigation, Ditar challenged Commerce's findings that the company failed to

demonstrate either a difference in the LOT in its home-market sales or any significant effect on

price comparability stemming from the asserted disparity.

    In the *Remand Opinion*, the Court sustained the majority of Commerce's findings

challenged by Ditar.  Specifically, the Court agreed that Commerce's finding that the sales did

not involve different marketing stages is supported by substantial evidence.[15]  The Court then

found that Commerce thus "examine{d} the relevant data and articulate{d} . . . a rational

---

[12] *See Final Determination* IDM at Comment 3 (pages 15-19).
[13] *Id.* at 16-17 (citations omitted).
[14] *Id.* at 18-19 (citations omitted).
[15] *See Remand Opinion* at 12.

connection between the facts found and the choice made,"[16] in finding that Ditar did not sufficiently demonstrate that it took on a role comparable to that of a reseller by engaging in an additional layer of selling activities, amounting in the aggregate to a substantially different selling function.[17]  Thus, the Court sustained Commerce's finding that Ditar's sales to end users did not reflect selling functions which are disproportionally higher than that of sales to distributors.  The Court further held that Commerce's finding that Ditar faces the same design demands, whether it sells paper bags to end users or to distributors who supply those end users is supported by substantial evidence.[18]  Moreover, the Court sustained Commerce's findings about the company's quantitative evidence as supported by substantial evidence, specifically that the percentage of sales staff assigned to the two types of customers matched the percentage of sales made to each.[19]  Finally, the Court affirmed that the pricing analysis used by Commerce, based on product codes, was supported and did not contradict longstanding agency practice to use control numbers, as Commerce reasonably found the control-number analysis inadequate because Ditar's reporting was incomplete.[20]

However, regarding warehousing and repacking expenses, the Court reasoned that Commerce's analysis improperly relied on references to the absence of such expenses in Ditar's home-market database, and therefore the Court found that Commerce failed to substantiate its claims that Ditar's warehousing and repacking expenses for home-market end users were more intensive than its expenses for distributors.[21]  The Court further noted that Ditar argued that it did not report these as direct selling expenses in its home-market sales database because Ditar

---

[16] *Id.* at 13-14 (citations omitted).
[17] *Id.* at 14 (citation omitted).
[18] *Id.* at 15.
[19] *Id.* at 16-17.
[20] *Id.* at 17-20.
[21] *Id.* at 14 (citation omitted); *see also* Appx1548-1549 (finding these expenses unreported in the home market sales database).

claimed that these expenses were instead properly reported as indirect selling expenses.[22]
According to the Court, Commerce did not dispute this point.[23]  Rather, the Court stated that the
government argued that the exhibits Ditar cited for its indirect warehouse and repacking
expenses offered no quantitative support for the company's claim that its end-user expenses were
made at a higher intensity.[24]  Because the Court reasoned that Commerce did not contest that it
misunderstood its own data reporting requirements for repacking and warehousing expenses, the
Court remanded the issue and instructed Commerce to review Ditar's indirect selling expenses
and reconsider the company's claims that intensity differences in repacking and warehousing
expenses indicate a difference in LOTs between home-market distributors and end-users.[25]

Finally, though generally sustaining Commerce's pricing analysis, the Court agreed with
Ditar's argument that Commerce failed to adequately explain why it found the greater-than-five
percent differential in pricing between home-market distributor and end-user sales to be not
"significant," especially in consideration of other contexts where Commerce finds this threshold
to be significant.[26]  Though the Court agreed with Commerce's contention that Ditar cited no
authority that would limit Commerce's discretion to determine that any given percentage is not
significant, the Court held that this contention does not address Ditar's argument that
"Commerce failed to explain why it does not find the pricing-differential percentage significant
in this context."[27]  The Court contended that Commerce's conclusion that the pricing differential
"that it found here was 'insufficient' to warrant a level-of-trade adjustment was unadulterated

---

[22] *See Remand Opinion* at 14 (citations omitted).
[23] *Id.* at 14 (citations omitted).
[24] *Id.*
[25] *Id.* at 14-15 and fn. 4 ("The government also points to Commerce's finding that Ditar's home-market database shows that its "average per-unit packing expenses are higher for distributors than end user customers… That's non-responsive to the company's point, which is that its *re*packing expenses for end users - which were *not* included, after all, in the home-market database - were more intensive than those for distributors.") (emphasis in original).
[26] *Id.* at 20-21(citation omitted).
[27] *Id.* at 22.

*ipse dixit*."[28]  According to the Court, Commerce failed to "articulate a satisfactory

explanation…including a rational connection between the facts found and the choice made."[29]

The Court, therefore, remanded the matter to Commerce to allow it to "connect the dots." [30]

## III.    ANALYSIS

*Repacking and Warehousing Expenses*

The Court remanded for Commerce to examine whether the record information regarding

Ditar's home-market indirect selling expenses provides support for Ditar's claims that it

provided certain warehousing and repacking sales functions to end users that it did not provide to

distributors.[31]  The Court remanded for reconsideration of Ditar's claims that intensity

differences warrant an LOT adjustment.[32]  Upon reexamination, Commerce continues to

determine that the record information regarding indirect selling expenses does not provide

sufficient information to further evaluate or corroborate Ditar's claims regarding intensity

differences between end-users and distributors resulting from additional repacking and

warehousing expenses incurred with respect to sales to end-users.  While the supporting

information for indirect selling expenses identifies the sub-accounts included in the numerator of

the ratio, these account names only reflect the most-specific level of detail on the record to

determine the nature of the constituent expenses included in the indirect selling expenses ratio.[33]

None of these account names identify a specific account for warehousing services nor repacking

---

[28] *Id.*
[29] *Id.* (citation omitted).
[30] *Id*.
[31] *Id.*
[32] *Id.*
[33] *See* Sales Verification Report and Exhibit SVE-14; *see also* Ditar's Section B Questionnaire Response (BQR) at Exhibit B-16.  In its BQR at B-26, Ditar notes that the indirect selling expense (ISE) support in Exhibit B-16 contains worksheets showing that Ditar dedicated significantly different areas of its warehouse space for sales in the different distribution channels.  However, it is unclear how any aspect of the ISE worksheet demonstrates the difference in warehouse space allocated between channel, nor how warehouse space informs level of intensity claimed not accounted for by the difference in sales volume which the ISE allocation considers.

services, nor any greater category of expense accounts under which such expenses would be included.[34]  Even if, *arguendo*, such expenses are included in one of the subaccounts listed, the record does not contain transaction-specific line-item detail for such accounts for Commerce to evaluate the total amount of expenses incurred, nor does the record contain detail on specific transactions which could corroborate that these expenses are only incurred for sales to end-users and the level of intensity reported.[35]  This lack of specific detail is expected:  indirect selling expenses are indirect and not attributable to any specific sale.[36]  If Ditar were able to separate these expenses out to specific transactions, they would be reported as direct selling expenses and reported as distinct expenses as applicable to a channel of sale in the home market database.[37]  The indirect selling expense ratio allocates any indirect sales expenses which cannot be acutely distinguished or delineated, and Ditar did so here using an allocation based on the proportion of value sold between distributor and end users reported.[38]  That these claimed expenses cannot be identified does not undermine the indirect selling expenses reporting.  Rather, because these claimed expenses are included in indirect selling expenses allocated to all sales regardless of

---

[34] At best, accounts for "Building/Warehouse" identify where expenses for building leases and related payments are expenses and accounts related to various Services or Inventories *might* apply.  However, the issue is not whether or not these support operations exist and are, in fact, booked *somewhere* in an account allocated by the ISE ratio; it is whether the level of intensity reported is supported and that these support services are only applicable to end-user sales may be corroborated.  Those questions are not further informed by the ISE information directed for further consideration by the Court and not supported elsewhere on the record.

[35] The verification of ISE did review detail for certain subaccounts, such as "Building/Warehouse" but – to illustrate this point – even presuming some of the warehousing expenses referenced were booked in this account (which none of the transaction specific descriptions suggest), there is nothing which confirms even this first order presumption, let alone which could be used to identify the amount of the expense or confirm that it applied to only end-user sales.  *See* Sales Verification Report at Exhibit SVE-14.

[36] *See* Commerce's Letter, "Request for Information," dated July 28, 2023 (Initial AD Questionnaire) at Appendix I (Glossary of Terms) at "Direct vs. Indirect Selling Expenses".

[37] The Court is correct in identifying that the discussion of this issue in Commerce's Final Determination IDM at Comment 3 was over-reliant on emphasizing that these expenses were not identified in the HM database as distinct expenses, such that it gave the impression Commerce concluded the expenses did not exist because they could not be identified in the database.  The intent, however, was to convey that – as the expenses were not able to be broken out as direct expenses, and necessarily allocated as an indirect expense applicable to all sales – the record could not independently verify the accuracy of the quantitative level of intensity and relative intensity claim absent information otherwise provided in support of Ditar's claims, which Ditar did not provide.

[38] *See* Sales Verification Report at Exhibit SVE-14 and BQR at Exhibit B-16.

channel, their inclusion detracts from Ditar's ability to substantiate the claims regarding the applicability of these sales functions to only one channel and the intensity level claimed.

Accordingly, we have reviewed Ditar's indirect selling expenses and find that the information on the record does not further inform consideration of the company's claims that intensity differences in repacking and warehousing expenses indicate a difference in LOTs between distributors and end-users, as directed by the Court.[39]  We note that, even if, *arguendo*, the difference in intensity of these two functions is accurately reported, evidentiary support aside, the low absolute levels of intensity for two logistics-related support functions described to be applied on an *ad hoc* basis for certain end-users would serve as insufficient basis to compel reconsideration of the decision to deny the LOT adjustment based on the totality of circumstances in the *Final Determination*.[40]  Therefore, we have made no changes to our final results of redetermination.

*Significance of Pricing Differential Between Distributor and End-User Sales*

The Court sustained the price difference analysis used by Commerce in the *Final Determination* but remanded for further explanation Commerce's failure to explain why it does not find the pricing-differential percentage significant in this context.[41]

Under section 773(a)(1)(B)(i) of the Act, Commerce will calculate normal value based on the same LOT as U.S. sales.  Under section 773(a)(7)(A) of the Act, Commerce will make an LOT adjustment when sales made to the U.S. are made at a different LOT than in the home market, *i.e.*, the difference in LOTs involves the performance of different selling activities *and* affects price comparability.  Commerce's practice is to require both qualitative and quantitative

---

[39] *See Remand Opinion* at 14-15.
[40] *See Final Determination* IDM at Comment 3 (pages 15-19).
[41] *See Remand Opinion* at 21-22.

evidence that the difference in LOTs involves the performance of different selling activities.[42]

As to the sufficiency of Ditar's qualitative analysis, the Court sustained Commerce's finding that

Ditar had not demonstrated that its sales to home market end-user customers and home market

distributor customers were made at different marketing stages or their equivalent.[43]  As to the

sufficiency of Ditar's quantitative analysis, the Court also sustained Commerce's finding that

Ditar's quantitative evidence also did not demonstrate that sales made to home market end-user

customers and home market distributor customers were made at different market stages or their

equivalent.[44]  The Court also sustained Commerce's finding that sales did not involve different

market stages or their equivalent.[45]  Thus, where Ditar has failed to meet one of the two required

prerequisites to entitlement to an LOT adjustment, Commerce cannot lawfully grant Ditar the

requested LOT adjustment.[46]

Still, the LOT adjustment analysis is inherently a factually intensive analysis.[47]  As the

SAA cautions, "{LOT} adjustments may be susceptible to manipulation," such that "Commerce

will closely scrutinize claims for such adjustments."[48]  Thus, "Commerce will not make an

adjustment based on the fact that expenses or costs differ between the two levels of trade."[49]

Indeed, "an effect on price comparability must be identified and measured by observed

---

[42] *See* Initial AD Questionnaire at A-6 and A-7, and Appendix I (Glossary of Terms) at "Level of Trade"; *see also* Statement of Administrative Action Accompanying the Uruguay Rounds Agreement Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 829 ("Commerce will require evidence from the foreign producers that the functions performed by the sellers at the same level of trade in the U.S. and foreign markets are similar, and that different selling activities are actually performed at the allegedly different levels of trade.").
[43] *See Remand Opinion* at 12-14
[44] *Id.* at 16-17.
[45] *Id.* at 12-14.
[46] *See* SAA at 829 ("However, if a respondent claims an adjustment to decrease normal value, as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment."); *cf. Saha Thai Steel Pipe Public Company Ltd. v. United States*, 605 F.Supp.3d 1348, 1371 (CIT 2022) (holding Commerce's application of AFA unlawful when pre-requisites to AFA had not been met).
[47] *See* SAA at 829.
[48] *Id.*
[49] *Id.* at 830.

differences between prices at different levels of trade."[50]  Given the factually intensive analysis

required to determine whether there are different LOTs, Commerce does not find it appropriate

to establish bright line rules for such a determination.  Here, we clarify that, given the balance of

the findings, the record does not reflect that Ditar's sales are made at different marketing stages

nor are there substantial differences in selling activities.

## IV.    INTERESTED PARTY COMMENTS

Commerce released its draft results of redetermination on February 17, 2026, in which it

provided interested parties the opportunity to submit comments for consideration in these final

results of redetermination.[51]  Ditar submitted timely comments on the Draft Redetermination on

February 27, 2026.[52]  No other party submitted comments on the Draft Redetermination.  In

providing substantive comments in opposition to the findings in the Draft Redetermination, Ditar

asserts that:  (1) the Draft Redetermination mischaracterized the Court's findings and failed to

address the proper scope of the *Remand Opinion*, which found Commerce's LOT analysis to lack

a well-reasoned and factually supported basis and broadly remanded for reconsideration of its

denial of a level-of-trade adjustment *writ large*; (2) the Draft Redetermination's analysis of

record information regarding warehousing or repacking services provided to end users focused

too narrowly on Ditar's accounting system and failed to consider source documentation that

supports Ditar's claims that intensity differences in selling functions indicate a difference in

LOTs between distributors and end users; and (3) the Draft Redetermination failed to provide an

---

[50] *Id.*

[51] *See* Draft Results of Redetermination Pursuant to Court Remand, *Ditar, S.A. v. United States*, Court No. 24-00130, Slip Op. 25-128 (CIT October 1, 2025), issued February 17, 2026 (Draft Redetermination).  The "Analysis" section above is unchanged from the Draft Redetermination.

[52] In citing Ditar's comments on the draft remand redetermination, Commerce references the pdf pages on which information appears because Ditar's pagination simply refers to every page following page 2 as "Page 2."  *See* Ditar's Letter, "Comments on Draft Results of Redetermination," dated February 27, 2026 (Ditar's Comments).

adequate explanation for Commerce's assertion that the pricing differential percentage between Ditar's sales to distributor and end-user customers is not significant.[53]

After considering these comments, we disagree with Ditar that the Draft Redetermination misinterpreted the scope of the Court's directive, failed to consider relevant information in support of Ditar's claims regarding intensity differences in selling functions, nor failed to adequately address the Court's directive regarding the significance of the pricing differential percentage (though we have provided further discussion regarding the pricing differential conclusion below). Accordingly, we have made no changes to the Draft Redetermination. We summarize and address Ditar's comments below.

**Issue 1:** **Whether Commerce Properly Interpreted the Court's *Opinion and Order***

The following reflects the verbatim executive summary of arguments submitted by Ditar. *See* Ditar's Comments at 1-2. For further details, *see* Ditar's Comments at 4-6.

> In the final remand redetermination, Commerce should consider carefully the language of the Court's October 1, 2025, Remand Order, and not mischaracterize the Court's instructions and findings. For example, Commerce claims that the Court found that Ditar did not take on "the role comparable to that of a reseller by engaging in an additional layer of selling activities." But the Court did not make this specific "reseller" finding. Commerce also claims that the Court "sustained Commerce's price comparability analysis" and remanded simply so Commerce could "explain why the differential in pricing {for home market and distributor customers} was not significant." But the Court's finding was not so facile. Rather, the Court found that a proper examination of the degree of pricing differences at the two levels of trade was critical to whether Commerce's price comparability analysis was appropriate. If the Court actually had sustained Commerce's price comparability analysis, then the Court would not have remanded the case for Commerce to justify its conclusions. But Commerce provided no such justification in its original determination, and the Court therefore found that Commerce's level of trade analysis was lacking a well reasoned and factually supported basis. Far from remanding this case to Commerce on a "narrow basis," the Court affirmatively explained on the first page of its opinion that it was remanding more broadly for Commerce to "reconsider its denial of a level-of-trade adjustment."

---

[53] *See*, generally, Ditar's Comments.

**Commerce's Position:**  Commerce does not presume to speak for the Court; however, Commerce does not see a basis for Ditar's claim that the "draft remand does not follow the Court's specific instructions" or that Commerce is misinterpreting the Court's *Remand Order*.[54]

In remand proceedings, the Court will sustain Commerce's determination if it is "in accordance with the remand order," and is "supported by substantial evidence and otherwise in accordance with law."[55]  It is well-established that Commerce may only address issues specified in the *Remand Order*.[56]  Similarly, Commerce is not permitted to reopen and re-review settled issues.[57]  Thus, Commerce's purpose in parsing Ditar's arguments about the proper interpretation of the Court's *Remand Order* is not to show Ditar's nonsensical reading of the Court's *Remand Order*, but to ensure compliance with the Court's *Remand Order* and settled law on what Commerce is permitted (or not) to do on remand.

The general problem with Ditar's reading of the Court's *Remand Order* is that Ditar again conflates distinct analyses and principles.[58]  For example, Ditar discusses Commerce's interpretation of the Court's *Remand Order* with respect to Commerce's price comparability analysis.[59]  Without any reference to the language of the Court's *Remand Order*, Ditar claims that the Court found that "Commerce's level of trade analysis was lacking a well-reasoned and factually supported basis."[60]  However, the Court instead explained:

> Commerce found the control-number analysis inadequate here because Ditar's reporting was incomplete, and it found that switching to product codes posed no

---

[54] *See* Ditar's Comments at 4.

[55] *See MacLean-Fogg Co. v. United States*, 100 F.Supp.3d 1349, 1355 (CIT 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

[56] *See Hussey Copper, Ltd. v. United States*, 960 F.Supp. 315, 317 (CIT 1997).

[57] *See Zhaoqing Tifo New Fibre Co. v. United States*, 256 F.Supp.3d 1314, 1334 (CIT 2017).

[58] *See Remand Order* at 11 ("Ditar conflates the regulation's terms 'different marketing stages' and 'the equivalent' rather than considering them separately.  Contrary to the company's assertion, the foundation for the agency's statement is clear and correct: It comes from the *Federal Register* notice, which declares precisely what the agency said here.") (internal citations omitted).

[59] *See* Ditar's Comments at 4.

[60] *Id.*

such problem and allowed for an accurate measurement. The agency's explanation that the record would not allow for its standard approach is reasonable. As the preliminary decision explained, using product codes was "more realistic." That assessment was the Department's prerogative to make and is supported by substantial evidence.[61]

Thus, contrary to Ditar's reading of the *Remand Order*, the Court did sustain Commerce's analysis of price comparability as supported by substantial evidence. The Court, however, separately examined Commerce's separate conclusion that the "differential in pricing…was not 'significant.'"[62] That issue is separate and distinct from Commerce's price comparability analysis as evidenced by the Court's separate discussion of the issue as well as the Court's application of a different standard of review to the issue.[63]

Similarly, Ditar also claims that the Court did not make a specific finding as to whether Ditar took on a role comparable to a reseller (again without reference to any language in the Court's *Remand Order*). Again, Commerce does not presume to speak for the Court but would simply submit that Commerce's interpretation of the Court's *Remand Order* is consistent with the language used by the Court. As the Court explained, Commerce's LOT regulations provide that Commerce will determine that sales are made at different LOTs if they are made at "'the equivalent' of different marketing stages. Under that option, the company may show it took on a role comparable to that of a reseller *by engaging in an additional layer of selling activities, amounting in the aggregate to a substantially different selling function*."[64] After examining Ditar's arguments, the Court turned to Commerce's argument that Ditar had failed to show that it made its sales at the equivalent of different marketing stages.[65] The Court held that:

---

[61] *See Remand Order* at 20 (internal citations omitted).
[62] *Id.*
[63] *Id.* at 20-21.
[64] *Id.* at 12.
[65] *Id.* at 13-14.

{Commerce} thus examined the relevant data and articulated a rational connection between the facts found and the choice made. And where, as here, two different, inconsistent conclusions may reasonably be drawn from the evidence in the record, an agency's decision to favor one conclusion over the other is the epitome of a decision that *must be sustained upon review for substantial evidence*.[66]

That is Commerce's entire point: "the Court sustained Commerce's finding that Ditar's sales to end users did not reflect selling functions which are disproportionally higher than that of sales to distributors."[67]

Again the importance of pinpointing the exact issues that Commerce must address on remand, is that Commerce is not permitted to re-open and re-review settled issues.[68] Thus it does to not follow that "in order to respond to the Court's remand instructions – and unless Commerce revising its position 'under protest' – Commerce must first accept the Court's general finding that Commerce's original determination . . . was not supported by substantial evidence"[69] especially when the Court did not make such a general finding, and instead found that several aspects of Commerce's original determination *were supported by substantial evidence*.

Setting aside that the Court did not make a "general finding," Ditar and Commerce are seemingly in agreement as to what issues the Court remanded to Commerce:  (1) Commerce's treatment of warehousing and repacking selling functions; and (2) Commerce's analysis of whether the price-differential between Ditar's claimed LOTs is significant.[70]  Thus, where there is agreement on which issues are subject to remand, Ditar's disagreement with Commerce's

---

[66] *Id.* at 14 (emphasis added).
[67] *See* Draft Redetermination at 5.
[68] *See Zhaoqing Tifo*, 256 F.Supp.3d at 1334.
[69] *See* Ditar's Comments at 5.
[70] *Compare* Draft Redetermination at 7-10 ("Repacking and Warehousing Expenses) and 9-11 ("Significance of Pricing Differential Between Distributor and End-User Sales), *with* Ditar's Comments at 6-9 ("Commerce Fails to Explain Why Ditar's Warehousing Activities and Repacking Services for End User Customers Do Not Support a Difference in Levels of Trade"), and 9-13 ("Commerce Fails to Explain Why the Pricing Differential Between Ditar's Home Market Levels of Trade Is Not Significant").

interpretation of the *Remand Order* is simply a matter of opinion and not a basis to find Commerce's remand redetermination in error.[71]

Still Commerce also disagrees with Ditar that Commerce is attempting "to make light of its errors by condensing two of Ditar's selling functions that it ignored into one" and thus "minimize{ing} the Court's findings."  It is true that Commerce stated that "the Court held that Commerce failed to support its determination that Ditar's claimed intensity difference for one selling function, warehousing and repacking."[72]  Commerce's analysis, however, properly analyzed warehousing and repacking as different selling functions.[73]  Thus, Commerce did not fail to "identify and analyze each of these functions independently."[74]

**Issue 2:**     **Whether Commerce Considered All Relevant Record Information Regarding Ditar's Warehousing Activities and Repacking Services for End User Customers**

The following reflects the verbatim executive summary of arguments submitted by Ditar.  *See* Ditar's Comments at 2-3.  For further details, *see* Ditar's Comments at 6-9.

> In the Draft Remand, Commerce explains that it examined the sub-accounts included in the numerator of Ditar's indirect selling expense ratios to identify if there were specific accounts for warehousing or repacking services, and whether the subaccounts contained details to corroborate whether such expenses were incurred only for sales to end user customers.  In doing so, Commerce illustrates its limited focus on Ditar's accounting system to identify differences in the selling activities performed.  Instead, Commerce should take into consideration record source documentation that supports Ditar's claims that intensity differences in selling functions indicate a difference in LOTs between distributors and endusers.  For example, substantial record information illustrates the type, intensity, and frequency of Ditar's warehousing or repacking activities, including emails and internal sales meetings held by Ditar sales personnel to discuss with warehousing control and end users how to manage inventory, emails discussing delivery schedules, and other correspondence related to product loading quality guarantees, all of which Ditar included in its descriptions of its post-sale warehousing and repacking services.  None of this information related to distributor sales, and instead

---

[71] *See Gov't of Argentina v. United States*, 542 F.Supp.3d 1380, 1395 (CIT 2021) (holding that resolving mere disagreement with Commerce's weighing of the evidence is not the function of the Court).
[72] *See* Draft Redetermination at 2.
[73] *Id.* at 7 ("certain warehousing and repacking sales functions") and 9 ("applicability of these sales functions").
[74] *See* Ditar's Comments at 6.

related to end user customer selling activities. Record information thus illustrates that Ditar engaged in substantially higher intensities of repacking and warehousing activities for its end user customers than for its distributor customers.

Commerce claims that even taking into consideration Ditar's warehousing and repacking services for end user customers, they would not serve to "compel reconsideration" of Commerce's decision to deny Ditar a{n} LOT adjustment because of their "low absolute levels of intensity." By focusing solely on the "intensity" of these services, however, Commerce fails to recognize that these services were not performed for the different channels of trade at slightly different levels. Rather, Ditar performed these selling activities only for its end user customers, and did not perform these services for its distributor customers whatsoever. Commerce also fails to address that Ditar performed these services frequently on a weekly or monthly basis.

The evidence thus demonstrates that while Ditar performed minimal selling functions for its distributor customers in only some of the five selling function categories that Commerce typically considers in its LOT analysis, Ditar performed substantial selling activities in all five of Commerce's selling function categories for its end user customers. That Ditar performed these services for end user customers frequently and at a relatively high degree of intensity and did not perform post-sales warehousing or repacking services for its distributor customers at all supports a difference in LOTs between distributors and end-users and compels Commerce to reconsider its decision to deny Ditar a{n} LOT adjustment.

**Commerce's Position:** Ditar asserts that the Draft Redetermination analysis placed too narrow of an emphasis on the record information with respect to Ditar's accounting system and whether individual subaccounts under which indirect selling expenses are booked could be used to substantiate the level of intensity reported for end-user warehousing and repackaging activities, but instead should place greater consideration on whether the source documentation that Ditar included in its responses that inform consideration of Ditar's claims that intensity differences in selling functions indicate a difference in LOTs between distributors and end-users.[75] According to Ditar, the Section A response contains over 300 pages of internal documentation illustrating the type, intensity, and frequency of its different home market selling activities, including: (1) emails and internal sales meetings held by Ditar sales personnel to discuss with warehousing

---

[75] *Id.* at 7.

control and end users how to manage inventory (*e.g.*, pages 136, 137, 213, 218, 220, and 244 of the AQR at Exhibit A-6); (2) emails discussing delivery schedules (*e.g.*, pages 136, 137, 139, 213. 215, and 224 of the AQR at Exhibit A-6); and (3) correspondence related to product loading quality guarantees (e.g., pages 252-256 of the AQR at Exhibit A-6).[76]  Ditar notes that none of the dozens of emails provided in Exhibit A-6 related to sales to distributors; all of the correspondence related to end user customer selling activities; thus, this information illustrates that Ditar engaged in substantially higher intensities of repacking and warehousing activities for its end user customers than for its distributor customers.[77]

Furthermore, according to Ditar, Commerce's focus solely on the "intensity" of these services fails to recognize that these services were not performed for the different channels of trade at slightly different levels, but were performed for its end user customers frequently (on a weekly or monthly basis) and not performed at all for its distributor customers.[78]  Ditar concludes that because it "performed these services for end user customers frequently and at a relatively high degree of intensity and did not perform post-sales warehousing or repacking services for its distributor customers at all supports a difference in LOTs between distributors and end-users and should compel Commerce to reconsider its decision to deny Ditar an LOT adjustment based on the totality of circumstances."[79]

As an initial matter, we disagree with Ditar that the Draft Redetermination placed improper emphasis on Ditar's indirect selling expense accounts and ignored relevant information otherwise not previously considered.  The information referenced by Ditar from the AQR at Exhibit 6, and discussed further below, was considered and directly referenced in the *Final*

---

[76] *Id.* at 7-8.
[77] *Id.*
[78] *Id.* at 8-9.
[79] *Id.* at 9.

*Determination*.[80]  The Court did not direct Commerce to reexamine this information in the specific context of its conclusions regarding post-sale warehousing and repackaging sales support services provided to end user customers, but instead instructed Commerce to review Ditar's indirect selling expenses and reconsider the company's claims that intensity differences in repacking and warehousing expenses indicate a difference in LOTs between home-market distributors and end-users.[81]  Thus, Commerce's focus on this information is not "limited," but precisely the analysis requested by the Court.  Further, we disagree with Ditar's inference that such quantitative information (or lack thereof) is not critical to the conclusion reached or should be de-emphasized in favor of qualitative information on the record which references these selling activities.  Email correspondence summarizing internal sales meetings, projections, plans, and negotiations with customers which reference post-sale warehousing and repacking services support only that such services, in fact, exist (and may provide some corroborative support for the level of intensity claimed), but serve as insufficient support for the level of support (*i.e.*, intensity) reported in the Selling Functions chart at Exhibit A-4 absent quantitative information which substantiates the amount of expenses incurred on an absolute and/or relative basis.

Nevertheless, Commerce further reviews the record information referenced by Ditar in support of its claims that this correspondence represents "substantial record information {which} illustrates the type, intensity, and frequency of Ditar's warehousing or repacking activities."[82]  With respect to the "post-sale warehousing" selling activity reported to be provided at intensity level "3" for end user customers in the selling functions chart in the AQR at Exhibit A-4 (and as an empty set, denoting it was not provided at all in support of sales to distributors), the

---

[80] *See Final Determination* IDM at Comment 3 (pages 17-18).
[81] *See Remand Opinion* at 14-15 and fn. 4.
[82] *See* Ditar's Comments at 2.

information does not in fact provide any further support for the nature of the post-sale warehousing services provided. Indeed, the hundreds of pages of correspondence supporting the selling activities provided in Exhibit A-6 (including the specific pages referenced in Ditar's Comments) do not contain a single instance where warehousing service of any type (post-sale or pre-sale) for any customer channel is discussed or further defined.[83]

The pages identified by Ditar contain a few references to "inventarios" or inventories in the context of sales planning and forecasting internally, and for the purposes of delivery schedules regarding sales pursuant to long term frameworks with end user customers.[84] The context of the correspondence generally supports that Ditar keeps and monitors some level of excess inventory of generic bag products to fulfill long-term multi-shipment sales agreements with certain end user customers for certain sales. However, this information provides no further insight or detail regarding the nature of the warehousing support service other than the basic summary described in the selling functions chart at Exhibit A-4, much less further substantiate the appropriateness of the level 3 intensity claimed from a qualitative standpoint.[85]

---

[83] Commerce is unable to identify a single instance where either the Spanish words "almacén" or "deposito" are used in any of the hundred pages of correspondence provided in Exhibit A-6, and only a single instance where the word warehouse is referenced in the English translation, where it is used in the context of correspondence generally discussing facility maintenance plans and provides no further insight into the sales support service reported (or intensity thereof). That single instance is a translation of the Spanish word "bodega" in the original document, but all instances of the word "bodega" otherwise found in Exhibit A-6 reference the customer's warehouse at the point of delivery, not warehouses or warehousing services provided by Ditar.

[84] That information provided regarding sales planning generally, which references certain line items referencing inventories and delivery schedules in the context of long term sales schedules to end user customers, does not definitively establish that post-sale warehousing services and inventory control is exclusively provided in support of sales operations for only end user customers and cannot be utilized for the purpose of sales to distribution customers. Nevertheless, there is nothing on the record to suggest that any of Ditar's sales to distributor customers were made from inventory. As such, Commerce accepts the veracity of Ditar's statements that this support was provided for only end user sales from inventory. Nevertheless, the correspondence cited by Ditar in the AQR at Exhibit A-6 does not provide further detail on the nature or intensity of the service provided for relevant sales.

[85] Ditar's AQR at Exhibit A-4 describes this activity as "Establish schedule for delivery of merchandise that is being shipped to customers; segregate physically in warehouse merchandise that is sold and awaiting customer delivery or pickup; review physical location of merchandise in inventory to be shipped to customers based on upcoming forecasted sales." While the level of intensity was reported as a level 3 (out of 10), thus indicating a somewhat low level of intensity, it is unclear how the activities described (creating delivery schedules, locating, picking and

As discussed in the Draft Redetermination and in the "Analysis" section above, the record does not contain information that further supports the intensity level reported from a quantitative standpoint.  Furthermore, Ditar fails to identify the proportion of end-user sales which require this service and which do not (*i.e.*, though the level of intensity is reported as applicable for all end user sales, the post-sale warehousing service is, by definition, not relevant to end user sales not sold from inventory).

Thus, in contrast to Ditar's assertions, the information identified does not provide any further detail standing in support of the level of intensity reported for post-sale warehousing in either an absolute or relative sense.  Rather, it merely confirms that some end-user sales were sold from inventory and, at best, that fulfillment of such sales requires the sales team to frequently track inventory levels, but without any quantification of the proportion of the total end user sales represented by sales from inventory.

With respect to the "Repacking Services" selling activity, Ditar argues that correspondence related to product loading quality guarantees (pages 252-256 of the AQR at Exhibit A-6), sufficiently supports the type, intensity, and frequency (reported as a low-to-moderate level 4 intensity for end users in Exhibit A-4) irrespective of the lack of quantitative record support otherwise available for this figure.  However, the underlying information contained in Ditar's reporting merely reflects a customer complaint regarding the quality of packaging materials which caused issues with a transaction covered by Ditar's general warranty and return policy applicable to all products regardless of customer channel.[86]  The correspondence reflects actions taken to remedy the issues identified by the customer, which

---

segregating merchandise for shipping) warrant even that level of intensity, as this fails to describe logistics stages/processes which meaningfully differ from those required to ready any sale to any customer for shipment, regardless of whether picked from inventory or produced to order.

[86] *See* AQR at Exhibit A-6 (pages 252-256).

included a commitment to utilizing sturdier materials and processes in the future.[87]  Whereas the sale in question reflected an end-user sale from inventory (a post-sale warehousing service sale), the documentation does not reflect the extension of a channel-specific selling function, but the mere resolution of a customer quality claim related to packaging.

The proprietary details of the customer complaint suggest that the issue prompting the quality claim appeared to be compounded by the amount of time the merchandise spent sitting in warehouse in inventory.  However, there is no information which otherwise suggests that the resolution to this claim (generally committing to use higher quality materials) reflected anything greater than what was necessary to address the issue presented by the specific customer and ameliorate further occurrences.  Further, there is no support for the contention that this information reflected a change in practice to repackage all inventoried materials of warehoused goods sold but not shipped and utilize superior packaging products in practices for all such similar warehoused sales (but not sales not sold from inventory) moving forward, nor does Ditar claim this to be the case.  Simply put, this single example of a resolution of a customer claim involving repacking fails to substantiate the "4" level of intensity reported as applicable to repacking services provided for all end user sales (inclusive of sales not made from inventory and sales from warehouse which did not receive customer quality complaints regarding packaging issues).[88]  Moreover, as with the post-sale warehousing service sales, the record does not contain information that allows for any quantification of the amount of expense incurred in providing this repackaging service, nor identify the proportion of end-user sales which utilized

---

[87] *Id.*

[88] The description of this sales support service in the selling functions chart in the AQR at Exhibit A-4 otherwise identifies that repacking services involve repacking bags from one carton size into another carton size for customer-specific and quantity-specific sales needs, but no supporting information is provided to evaluate other claimed examples of repacking services provided.

this "sales support" service.  Thus, in contrast to Ditar's assertions, the information identified

does not provide any further detail to support of the level of intensity reported for post-sale

repackaging service for end user customers.

Ditar asserts that Commerce's focus on intensity fails to recognize that these services

were not performed for the different channels of trade at slightly different levels, but were

performed for its end user customers frequently (on a weekly or monthly basis) and not

performed at all for its distributor customers at all.[89]  Based on the above analysis, Commerce

responds that, on the contrary, the record instead lays bare that it is Ditar who fails to

acknowledge that the services were not performed for all end-user sales and misrepresents the

level of record support for the claimed levels of intensity.  In consideration of all information

identified regarding post-sale warehousing and repacking sales support services claimed,

Commerce continues to conclude that:  (1) the intensity level reported by Ditar is overstated (as

the small amount of qualitative information on the record fails to meaningfully distinguish the

intensity of the logistics services provided to sales from inventory from those not receiving post-

sale warehousing services regardless of customer channel, and entirely lacks support (aside from

a single dubious example) substantiating that repacking services exist as a measurable selling

activity distinguishable between sales channels); (2) claimed levels of intensity cannot be

substantiated by any quantitative information on the record; and (3) claimed levels of intensity

are misrepresented, as reported (as Ditar fails to account for the proportion of end user sales

which are not sold from inventory).

---

[89] *Id.* at 9.

**Issue 3:**        **Whether Commerce Provided Sufficient Explanation in Support of the Conclusion that the Pricing Differential Between Ditar's Home Market Levels of Trade Is Not Significant**

The following reflects the verbatim executive summary of arguments submitted by Ditar.  *See* Ditar's Comments at 3-4.  For further details, *see* Ditar's Comments at 9-13.

In *Ditar v. U.S.*, the Court found that Commerce abused its discretion by not explaining why the differential in pricing between Ditar's home market distributor and end-user pricing was not "significant," concluding that Commerce's assertion that the pricing differential it found was insufficient to warrant an LOT adjustment was based solely on Commerce's own authority, without any supporting evidence. The Court therefore remanded for Commerce to explain why the pricing-differential percentage of at least five percent in this case was not significant, especially when it is in other contexts.

The Draft Remand does not answer the Court's question.  Commerce's sole explanation for why a minimum five percent pricing differential in this case was not significant was that Commerce did not find it appropriate to establish bright line rules for determining whether a given percentage difference in price would be significant to merit an LOT adjustment, and that while five percent might be significant in some contexts, a higher threshold is significant in other contexts. Commerce therefore provides no rational connection between the substantial pricing differences between Ditar's sales to distributor and end-user customers and Commerce's conclusion that such differences were "insufficient" in the context of warranting a level-of-trade adjustment.

Commerce's only explanation for why a pricing differential above five percent is not significant is that in the ministerial error context, Commerce defines a significant ministerial error as one where a correction would change the dumping margin by not less than 25 percent.  But the ministerial error threshold is irrelevant to sales price comparisons in general and unrelated to the significance of prices differences across different levels of trade in particular.  In contrast, there are numerous other relevant examples where Commerce's regulations and practices identify differences as little as two percent as significant, which Commerce fails to address.  For example, in the arm's-length test, Commerce finds that average prices to an affiliated customer that differ by at least two percent "differ significantly" from market prices.  Similarly, the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent, and Commerce has referred to non-*de minimis* levels of dumping as a "significant" amount of dumping. If a difference of two percent between U.S. prices and normal value is significant enough to warrant an affirmative determination of dumping, then it is not reasonable for Commerce to conclude that a five-percent difference in selling prices at different levels of trade is not significant.  The Draft Remand thus does not provide an explanation for Commerce's assertion that the pricing differential

percentage between Ditar's sales to distributor and end-user customers is not significant, especially when it is in other contexts.

**Commerce's Position:**  Commerce disagrees with Ditar that we failed "to provide a meaningful or satisfactory answer to the Court's question and instructions."[90]

The Court's *Remand Order* remanded "to allow {Commerce} to connect the dots," because Commerce had maintained that the pricing differential also was "'insufficient' to warrant a level-of-trade adjustment."[91]  Specifically the Court held that Commerce had "abused its discretion by failing to explain why the pricing-differential percentage here—which exceeds five percent—is not significant, especially when in other contexts it would be."[92]  Upon reconsideration, we find that Commerce's discretion to determine whether a "pricing differential" warrants an LOT adjustment is not implicated based on the record before us and the Court's *Remand Order* because of Commerce's determination that there is only a single LOT in Ditar's home market.

Under the Act, Ditar is entitled to an LOT adjustment:

if the difference in level of trade---
(i) involves the performance of different selling activities; and
(ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.[93]

The LOT adjustment is one of multiple "explicit statutory adjustments" to "help make a fair, apples-to-apples comparison between normal value and {export price} or {constructed export price}."[94]  If an LOT adjustment is warranted, Commerce increases or decreases the normal

---

[90] *See* Ditar's Comments at 10.
[91] *See Remand Order* at 21-22.
[92] *Id.* at 21.
[93] *See* section 773(a)(7)(A) of the Act.
[94] *See Timken Co. v. United States*, 354 F.3d 1334, 1344 (Fed. Cir. 2004) (quoting *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1313 (Fed. Cir. 2001); and *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995)) (emphasis added).

value.[95]  Thus, the LOT adjustment seeks to ensure that the comparison of normal value based on home market price and U.S. price are based on sufficiently similar circumstances of sale by making an adjustment where there are differences in LOTs.

In its LOT analysis, pursuant to section 773(a)(7)(A)(i) of the Act, Commerce examined Ditar's reported qualitative and quantitative factors to determine whether there is a difference in selling activities.[96]  In its analysis, Commerce found that "Ditar was not able to demonstrate that it made sales to distributors and end users at different LOTs."[97]  The Court held that Commerce's findings that Ditar sales "did not involve different marketing stages" or "the equivalent" were supported by substantial evidence both in terms of Ditar's proffered qualitative and quantitative analysis.[98]  Ditar does not "provide a meaningful or satisfactory" rebuttal to the Court's holding, and instead simply engages in unadulterated *ipse dixit* that the Court made certain statements without actually citing the relevant language.[99]  In these final results of redetermination, we have addressed the warehousing and repacking selling functions and continue to find that our analysis of those selling functions does not warrant a different outcome.  Thus, Ditar has failed to meet its burden to demonstrate that its sales involved different selling activities such that they were made at different LOTs.

Accordingly, Commerce cannot lawfully grant Ditar an LOT adjustment on that basis alone.[100]  Because Ditar failed to establish one of two statutorily required criteria for an LOT adjustment, even if Commerce were to agree with Ditar on the issue of price comparability, we

---

[95] *See* section 773(a)(7) of the Act.
[96] *See Preliminary Determination* PDM at 12-15.
[97] *See Final Determination* IDM at 19.
[98] *See Remand Order* at 12-14.
[99] *See* Ditar's Comments at 4-6.
[100] *See* SAA at 829 ("However, if a respondent claims an adjustment to decrease normal value, as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment."); *cf. Saha Thai Steel Pipe Public Company Ltd. v. United States*, 605 F.Supp.3d 1348, 1371 (CIT 2022) (holding Commerce's application of AFA unlawful when pre-requisites to AFA had not been met).

could not lawfully grant Ditar its requested LOT adjustment.[101]  In recognizing that resolution of the price comparability issue is no longer germane to Commerce's determination not to grant Ditar the requested LOT adjustment, Commerce has "connect{ed} the dots" as required by the *Remand Order*.  Ditar's arguments on price comparability, therefore, are not relevant.

## V.     FINAL RESULTS OF REDETERMINATION

For the reasons explained above, in accordance with the Court's instruction, we have reconsidered the record with respect to Ditar's indirect selling expenses to determine whether the warehousing and repacking selling functions were made at a higher intensity for home-market sales to end users than for home market sales to distributors.  Upon reexamination of the record, we find no information which materially impacts our finding in the *Final Determination* regarding these selling functions and, thus, nothing which compels reconsideration of our overall determination to find that a single LOT exists in Ditar's home market, and to deny an LOT adjustment for Ditar.  In addition, we have reconsidered our determination as to the effect on price comparability and "connect{ed} the dots" as requested by the Court, by finding that Commerce cannot lawfully grant Ditar's requested LOT adjustment where Ditar has failed to demonstrate that there are two different LOTs in its home market.[102]  Accordingly, we make no change to the estimated weighted-average dumping margin calculated for Ditar in the *Final Determination* as a result of this redetermination, which remains unchanged at 11.06 percent.[103]

---

[101] *See* section 773(a)(7) of the Act.
[102] *See Remand Opinion* at 21-22.
[103] While no change is made to the final results margin calculated as a result of the instant redetermination, we note that a that a change to the margin results from the redetermination pursuant to Court remand of the concurrent unconsolidated litigation of *Coalition for Fair Trade in Shopping Bags v. United States*, Court No. 24-00157, Slip Op. 25-129 (CIT October 1, 2025).

3/13/2026



X

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance