# UNITED STATES COURT OF INTERNATIONAL TRADE

# BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DITAR, S.A.,<br>　　　Plaintiff,<br>v.<br><br>UNITED STATES,<br>　　　Defendant,<br>and<br><br>COALITION FOR FAIR TRADE<br>IN SHOPPING BAGS,<br>　　　Defendant-Intervenor. | Court No. 24-00130 |

## COMMENTS OF DITAR, S.A. IN OPPOSITION TO THE U.S. DEPARTMENT OF COMMERCE'S REMAND

Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Ditar, S.A.

Dated:  May 1, 2026

## TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................i

TABLE OF AUTHORITIES..................................................................ii

GLOSSARY ............................................................................................iv

INTRODUCTION ....................................................................................1

I.  Background and Procedural History ..................................................2

    A. The *Final Determination* and the Court's Remand Order..........2

    B. Commerce's Proceedings on Remand............................................4

SUMMARY AND RELIEF SOUGHT......................................................6

STANDARD OF REVIEW.........................................................................8

ARGUMENT............................................................................................10

I.  The *Remand Results* Do Not Justify Commerce's Denial of a Level-of-Trade Adjustment for Ditar ..........................................................10

    A. Commerce Fails to Explain Why the Pricing Differential Between Ditar's Home Market Levels of Trade Is Not Significant    ..........................................................................10

    B. Commerce Fails to Explain Why Ditar's Warehousing Activities and Repacking Services for End User Customers Do Not Support a Difference in Levels of Trade....................................19

V.  CONCLUSION................................................................................26

CERTIFICATE OF COMPLIANCE

i

# TABLE OF AUTHORITIES

<u>Cases</u>                                                          <u>Page</u>

*Consol. Edison Corp. v. NLRB*, 305 U.S. 197 (1938) ............................... 9

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) . 9

*Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) ................................................................................................ 9

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ........ 9

*Prosperity Tieh Enterprise Co. v. United States*, 965 F.3d 1320 (Fed. Cir. 2020) ...................................................................................................... 9

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F. Supp. 3d 1263 (Ct. Int'l Trade 2015) .................................................................. 9

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014)) ...................................................................... 9

<u>Statutes and Regulations</u>

19 U.S.C. § 1516a ............................................................................... 8-9

19 U.S.C. § 1673b(b)(3) ......................................................................... 15

19 U.S.C. § 1673d(a)(4) ......................................................................... 15

19 U.S.C. § 1677f-1(d) ........................................................................... 16

19 C.F.R. § 351.224(e) ........................................................................... 13

19 C.F.R. § 351.224(g) ........................................................................... 13

19 C.F.R. § 351.403(c) ............................................................................ 13

Other Authorities

*Certain Frozen Warmwater Shrimp from Thailand:  Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8182 (February 20, 2026) ...................................................................... 16

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 84 Fed. Reg. 26,401 (Dep't Commerce June 6, 2019) .................................. 15

*Large Diameter Welded Pipe from the Republic of Turkey*, 84 Fed. Reg. 6,362 (Dep't Commerce Feb. 27, 2019) ..................................................... 14

# **GLOSSARY**

| Acronym | Meaning |
|---------|---------|
| CONNUM | Control number |
| LOT | Level of trade |
| POI | Period of investigation |

## INTRODUCTION

On behalf of Plaintiff, Ditar, S.A. ("Ditar"), a foreign producer and exporter of paper shopping bags from Colombia, we comment in opposition to the U.S. Department of Commerce's remand redetermination. *See* Final Results of Redetermination Pursuant to Court Remand (Mar. 13, 2026) ("*Remand Results*"), ECF 45, Appx8690-8717.  Commerce prepared the *Remand Results* following the Court's order remanding the final determination of Commerce's less-than-fair-value investigation of paper shopping bags from Colombia.  *See Ditar, S.A. v. United States*, Court No. 24-00130, Order (Ct. Int'l Trade Oct. 1, 2025) ("*Ditar I*").  On remand, Commerce examined certain aspects of the level of trade ("LOT") analysis that it previously had failed to consider, and maintained its position that only a single LOT existed in Ditar's home market and that Ditar was not eligible for an LOT adjustment to its home market pricing.  As explained below, the Court should issue a second remand in this case because the *Remand Results* do not comply with the Court's remand order, are unsupported by substantial evidence, and are otherwise contrary to law.

1

## I.     Background and Procedural History

### A.  The *Final Determination* and the Court's Remand Order

This appeal and the contested remand redetermination arise from Commerce's decision not to make a level-of-trade adjustment when comparing Ditar's selling prices to *distributor resellers* in the United States to the prices of merchandise under investigation sold in the home market to *end users*. Given that substantial information on the administrative record established (1) that Ditar made sales to its U.S. and Colombian distributor customers at the same level of trade; (2) that Ditar made its Colombian home market sales to *end users* at a more remote and significantly different level of trade than its sales to *distributor* customers; and (3) that the different levels of trade in Colombia were characterized by substantially different selling activities, which had an significant impact on price comparability, it was imperative that Commerce make a LOT adjustment to home market pricing in those instances when Commerce did not compare the prices of U.S. *distributor* sales to home market *distributor* sales, and instead compared the prices of U.S. *distributor* sales to the prices of sales to home market *end users* at a different level of trade.

2

In *Ditar, S.A. v. United States* ("*Ditar I*"), the Court remanded for Commerce to reconsider its determination that Plaintiff Ditar was not eligible for a LOT adjustment to its home market pricing when it compared Ditar's U.S. sales to distributor customers to Ditar's home market sales to end user customers. *See Ditar I* at 2. Although the Court sustained certain elements of Commerce's LOT analysis, the Court held that Commerce had abused its discretion by failing to explain why the differential in pricing between Ditar's home market distributor and end user levels of trade – which exceeded five percent – was not "significant," when in other contexts it would be. *See Ditar I* at 20-21. Accordingly, the Court remanded for Commerce to provide a reasoned explanation why the LOT pricing differential was not significant in the context of this case and why the differential was insufficient to warrant a LOT adjustment. *See id.* at 21-22.

The Court also found that Commerce failed to support its determinations that Ditar's claimed intensity differences for warehousing activities and repacking functions were not more intensive for home-market end users than those for home market distributor customers, in part because Commerce misunderstood its own reporting

requirements and assumed incorrectly that the costs for these activities should have been reported as direct selling expenses. *See Ditar I* at 14-15. The Court thus remanded for Commerce to review Ditar's *indirect* selling expenses and to determine whether Ditar's warehousing and repacking selling functions were performed at a higher intensity and what effect that would have on Commerce's LOT analysis. *Id.*

### B.   Commerce's Proceedings on Remand

As described above, on October 1, 2025, the Court ordered that this case be remanded for Commerce to provide a reasoned explanation why the LOT pricing differential between Ditar's Colombian sales to distributor and end user customers was not "significant" within the context of this case, and to determine whether Ditar's warehousing and repacking selling functions were performed for end user customers at a higher level of intensity. Initially, the Court stayed the remand in view of the then-ongoing lapse in government appropriations, but ordered that Commerce file its remand determination on or before 120 days after the government filed a notice with the Court that Commerce had resumed operations. On November 14, 2025, the government having reopened, the Court issued a paperless order instructing Commerce to

4

file the remand results within 120 days.

On February 17, 2026, almost five months after the Court's remand order, Commerce released its Draft Results of Redetermination Pursuant to Court Remand (Feb. 17, 2026) ("*Draft Remand Results*"), Appx8678-Appx8689, and afforded parties five business days until February 24, 2026, to comment on the draft results.  On the same day, Commerce issued its Draft Results of Redetermination Pursuant to Court Remand in the companion case, *Coalition for Fair Trade In Shopping Bags v. United States*, Court No. 24-00157, Slip Op. 25-129, and gave parties the same deadline to file comments in that case. Given the overlapping deadlines in the two remand proceedings, Ditar requested a 10-day extension of time to file comments on the *Draft Remand Results*, and also agreed in advance to an extension for Commerce to file the remand redetermination with the Court.  *See* Ditar Extension Request (Feb. 20, 2026), Appx8718-Appx8719. Commerce, however, agreed to allow interested parties) only three additional days to submit comments on the *Draft Remand Results*.  *See* Commerce Memorandum to the File (Feb. 23, 2026), Appx8721.

On February 27, 2026, Ditar was the only party to comments on the

*Draft Remand Results*, arguing *inter alia* that Commerce's *Draft Remand Results* did not follow the Court's specific instructions, that Commerce had failed to explain why Ditar's warehousing activities and repacking services for end user customers did not support a difference in levels of trade, and that Commerce had failed to explain why the pricing differential between Ditar's different home market levels of trade was not significant.  In its *Remand Results*, however, Commerce made no changes to the *Draft Remand Results*, and continued to find that only a single LOT existed in Ditar's home market and that Ditar was not eligible for an LOT adjustment to its home market pricing.  *See Remand Results*, Appx8690-8717.  In doing so, however, and as described in detail below, Commerce both mischaracterized the Court's findings and ignored the Court's instructions, and a second remand therefore is necessary.

## SUMMARY AND RELIEF SOUGHT

In *Ditar I*, the Court remanded for Commerce to explain why it found a greater-than-five percent differential in Ditar's pricing between home-market end user and home-market distributor sales not to be significant, especially when Commerce has found this threshold to be

significant in other contexts. *See Ditar I*, at 21-22. On remand, however, Commerce ignored the Court's instructions and failed to answer why the pricing-differential percentage between Ditar's sales to home market end user and distributor customers was not significant. Rather than provide a satisfactory explanation for why the pricing differential was "insufficient" to warrant a level-of-trade adjustment, Commerce simply decided on its own authority that the issue was not "germane" to whether Ditar was entitled to a LOT adjustment, and that Commerce need not provide the Court with the explanation required.

The Court also remanded for Commerce (1) to review Ditar's *indirect* selling expenses and (2) to determine whether Ditar's warehousing and repacking selling functions were performed at a higher intensity for its end user customers and what effect that would have on Commerce's LOT analysis. Despite reconsidering the factual record and concluding in the *Remand Results* that Ditar performed these selling activities only for its end user customers and not at all for its distributor customers, Commerce refused to draw the inescapable conclusion that this finding established that Ditar thus performed these activities for its end user customers at a higher level of intensity.

**Plaintiff's Comments in Opposition to *Remand Results***       Ct. No. 24-00130

Because Commerce failed to respond to the Court's inquiries, failed to acknowledge the importance and relevance of its own factual findings, and failed to determine that Ditar's home market sales to distributor and end user customers were made at different levels of trade, Commerce's *Remand Results* are unsupported by substantial evidence. The Court should remand to Commerce with instructions to consider further that the pricing differential between sales by Ditar to its home market end user and distributor customers was significant, and that Ditar's additional selling activities and selling expenses (including those for warehousing and repacking services) for end user customers amounted in the aggregate to a substantially different selling function. Given that sales to distributors and sales to end users constituted different levels of trade, Commerce should recalculate Ditar's dumping margin and allow for level-of-trade adjustments when comparing Ditar's sales to distributors in the United States to sales to end user customers in Colombia.

## STANDARD OF REVIEW

A remand redetermination will be set aside if it is found to be "unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F. Supp. 3d 1263, 1268 (Ct. Int'l Trade 2015) (discussing the substantial evidence standard of review). Commerce's remand redeterminations also are reviewed for compliance with the Court's remand order. *See, e.g.*, *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014) (citation omitted).

The substantial evidence standard requires Commerce to base its determination upon such evidence that "a reasonable mind might accept as adequate to support a conclusion." *Prosperity Tieh Enterprise Co. v. United States*, 965 F.3d 1320, 1326 (Fed. Cir. 2020) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is defined as "more than a mere scintilla," *Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015) (citation omitted), and requires that the agency take into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)).

**Plaintiff's Comments in Opposition to *Remand Results*** Ct. No. 24-00130

## ARGUMENT

## I. The *Remand Results* Do Not Justify Commerce's Denial of a Level-of-Trade Adjustment to Ditar

### A. Commerce Fails to Explain Why the Pricing Differential Between Ditar's Home Market Levels of Trade Is Not Significant

In *Ditar I*, the Court found that Commerce had abused its discretion by failing to explain why the differential in pricing between Ditar's home market distributor and home market end-user pricing – which Commerce conceded was above seven percent – was not "significant." *Ditar I*, at 21-22; *see also* Ditar Preliminary Analysis Memorandum, at 3, Appx1023. In particular, the Court found that Commerce's "pronouncement that the pricing differential that it found {} was 'insufficient' to warrant a level-of-trade adjustment was unadulterated *ipse dixit*" (*i.e.*, that Commerce's assertion was based solely on its own authority, without any supporting evidence). The Court therefore remanded for Commerce to "connect the dots," *i.e.*, to "articulate a satisfactory explanation" for its unsupported assertion, and to answer "why the pricing-differential percentage here – which exceeds five percent – is not significant, especially when in other contexts it would be." *Ditar I*, at 21-22.

10

**Plaintiff's Comments in Opposition to *Remand Results***          **Ct. No. 24-00130**

As an initial matter, Commerce incorrectly claims that "the Court

did sustain Commerce's analysis of price comparability as supported by

substantial evidence." *Remand Results*, Appx8703.  While the Court

sustained Commerce's use of product code pricing comparisons instead

of control-number pricing comparisons, *see Ditar I*, at 20, the Court did

not sustain Commerce's overall price comparability analysis.

Otherwise, contrary to Commerce's assertion, the Court would not have

remanded the issue to Commerce for further consideration and

explanation.  And with respect to the Court's specific issue of why

Ditar's pricing-differential percentage was not significant, Commerce

failed to provide a meaningful or satisfactory answer to the Court's

question and instructions.  Initially, in the *Draft Remand Results*, after

introducing the issue and explaining some of the background,

Commerce's sole response to the specific question of why the pricing

differential that exceeds five percent in this case is not significant was a

non-answer:

> Given the factually intensive analysis required to make an
> LOT adjustment, Commerce does not find it appropriate to
> establish bright line rules for determining whether a given
> percentage difference in price would be significant enough to
> merit an LOT adjustment. Insofar as five percent may be

11

> significant in some contexts, a higher threshold is significant in other contexts.

*Draft Remand Results*, Appx8688.  Essentially, Commerce answered the Court's question with the same "I know it when I see it" argumentation that the Court rejected in the first place.  Commerce provided no supporting evidence or explanation to justify its conclusion that a pricing differential that exceeded five percent in this particular case was not significant.  Commerce thus failed to "connect the dots," and provided no rational connection between the substantial pricing differences for Ditar's sales to distributor and end-user customers and Commerce's conclusion that such differences were "insufficient" in the context of warranting a level-of-trade adjustment.

Commerce's only explanation in the *Draft Remand Results* for why a pricing differential above five percent was not significant was that in another context, Commerce defines a *significant* ministerial error as one in which a correction would result in a change of "not less than 25 percent of, the weighted-average dumping margin." Appx8688.  But this particular and limited identification of regulatory support for its "significance" determination is cherry picking at its worst.  The ministerial error threshold is wholly unrelated to sales price

12

comparisons and is largely a matter of administrative convenience to determine whether an error requires immediate remedy or whether the error should be addressed in the course of briefing.  19 C.F.R. § 351.224(e).  Notably, under this regulation, significance also may depend on the "absolute" impact of the error.  *Id.* § 351.224(g).  Beyond citing to this single example of a 25 percent threshold in its regulations, Commerce did not provide any other examples or explanations relevant to the significance of price differences in general or relevant to the significance of prices differences across different levels of trade in this case in particular.

In contrast, there are numerous other *relevant* examples where Commerce's regulations and practices identify differences as little as *two percent as significant*, which Commerce did not address at all.  For example, in the arm's-length test conducted pursuant to 19 C.F.R. § 351.403(c), Commerce finds that sales between affiliated parties in the comparison market are not at arm's length and fall outside of the ordinary course of trade when the CONNUM-specific market prices to an affiliated customer are not within a range of 98 percent to 102 percent of the average CONNUM-specific comparison market prices to

**Plaintiff's Comments in Opposition to *Remand Results***      **Ct. No. 24-00130**

unaffiliated customers (*i.e.*, a plus or minus *two-percent difference* from the weighted-average price to unaffiliated customers).  In fact, Commerce has found that average prices to an affiliated customer that differ by at least two percent, and therefore fail the arm's-length test, "differ significantly" from market prices.[1]  The distinction between being within or outside of the ordinary course of trade is a significant difference, because sales that are found to be outside the ordinary course of trade are excluded from Commerce margin calculations, *e.g.*, excluded from the calculation of normal value.  The definition of "significant" under the arm's-length test is a relevant and analogous comparison to the selling prices differences at different levels of trade at issue in this case because the arm's-length test compares affiliate sales prices to market prices to measure whether an affiliate's prices are

---

[1]  *See, e.g.*, Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe from the Republic of Turkey*, 84 Fed. Reg. 6,362 (Dep't Commerce Feb. 27, 2019) (final deter. of sales at less-than-fair-value) at Comment 4 ("In this case, *the prices at issue differ significantly* from the prices charged to an unaffiliated company (*i.e.*, they are not within 98 to 102 percent of the price charged for or by an unaffiliated party), which leads us to conclude that these prices are affected by the relationship between Borusan and Borusan Logistik.") (emphasis added) (ACCESS Barcode: 3795774-02).

distorted by the relationship between the respondent and its affiliate. Similarly, a *comparison of selling prices* at different levels of trade examines whether prices are impacted by the selling activities performed and the selling prices determined at the different LOTs.

Another example, pursuant to sections 733(b)(3) and 735(a) of the Tariff Act, is Commerce's *de minimis* two-percent threshold for an estimated weighted-average dumping margin in an investigation. *See* 19 U.S.C. § 1673d(a)(4); 19 U.S.C. § 1673b(b)(3). In such context, Commerce considers an estimated weighted-average dumping margin of at least two percent to be significant; *i.e.*, Commerce has synonymously referred to non-*de minimis* levels of dumping as a "significant" amount of dumping. *See, e.g.*, *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 84 Fed. Reg. 26,401 (Dep't Commerce June 6, 2019) (final results of antidumping duty admin. rev.; 2016-2017), Issues and Decision Memorandum at Comment 2 ("Under scenario (4), *there is a significant (i.e., non-de minimis) amount of dumping ….*") (emphasis added) (ACCESS Barcode: 3842193-02). If a weighted-average difference of two percent between U.S. prices and normal value is significant enough to warrant an affirmative determination of sales at

15

less-than-fair-value, then it is not reasonable for Commerce to conclude that a five-percent difference of selling prices at different levels of trade is not significant.

Furthermore, in *hundreds* of less-than-fair-value investigation and administrative review decisions since mid-2025, Commerce has determined under its new differential pricing analysis that a difference in pricing of merely two percentage points is sufficient to establish that prices differ significantly. *See, e.g., Certain Frozen Warmwater Shrimp from Thailand: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8182 (February 20, 2026), Issues and Decision Memorandum, at Comment 2 ("A two-percent threshold is a reasonable measure of significance and is consistent with other aspects of Commerce's practice in antidumping proceedings."). If a pricing difference of two percentage points is sufficient for Commerce to conclude that prices differ significantly under 19 U.S.C. § 1677f-1(d)(1), then Commerce acts arbitrarily when it does not consider pricing differences several times greater to be significant.

In the final *Remand Results*, perhaps recognizing the weakness of its *Draft Remand Results* response to the Court's instructions regarding

price comparability, Commerce discarded its solitary reference to the "significance" level for ministerial errors, abandoned providing an explanation why Ditar's differential in pricing across LOTs was not significant, and adopted the position that it was not required to answer the Court's inquiry. Specifically, after positing that it had satisfactorily addressed the Court's separate concerns with respect to Ditar's warehousing and repacking selling functions that the Court had remanded for further consideration and explanation, Commerce advanced the notion that "resolution of the price comparability issue is no longer germane to Commerce's determination not to grant Ditar the requested LOT adjustment," and that Ditar's arguments on price comparability – and presumably, the Court's remand instructions – "are not relevant." *Remand Results*, Appx8716. But Commerce cannot punt on the "price comparability" issue simply because Commerce itself believes it has sufficiently addressed the packing and warehousing selling activity issues that the Court remanded. As described further below, Ditar disputes Commerce's conclusion with respect to these selling functions. But, in any event, Commerce's evaluation of its own explanation is not a conclusion that Commerce unilaterally may make;

17

**Plaintiff's Comments in Opposition to *Remand Results*          Ct. No. 24-00130**

that is a decision for the Court.[2]  In this regard, Commerce's strategy seems to be: (1) we do not have (or do not want to provide) an answer to the Court's inquiry; (2) let's not provide one; and (3) let's hope that the Court will allow us to ignore its instructions.  But Commerce does not control the judicial proceeding, and on this basis alone, a remand is necessary for Commerce to provide the price comparability explanation that the Court required.

In sum, the *Remand Results* fail to articulate any explanation for Commerce's unsupported assertion that the pricing differential percentage between Ditar's home market sales to distributor and end-user customers was not significant, especially when in other contexts it would be.  The Court thus should remand this case to Commerce again with instructions (1) to provide the explanation that the Court requested originally, or (2) to determine that the pricing differences across Ditar's different LOTs in the home market were significant, and to find – given the record as a whole – that Ditar's home market sales to distributor and end user customers were made at different marketing

---

[2]  Commerce also was required to answer the Court's inquiry in case of additional appellate review.

stags, and thus recalculate Ditar's dumping margin by making a LOT adjustment when comparing Ditar's U.S. sales to home market end user sales made at a different level of trade.

### B. Commerce Fails to Explain Why Ditar's Warehousing Activities and Repacking Services for End User Customers Do Not Support a Difference in Levels of Trade

In its original Section A response, Ditar reported that it performed numerous additional selling functions for end user customers in Colombia that it did not perform *at all* for sales to distributor customers. For example, and in particular for purposes of Commerce's remand, Ditar provided post-sale warehousing services for end user customers that it *did not provide* for distributor customers. Ditar described these services as (1) establishing schedules for the delivery of merchandise that is being shipped to customers; (2) segregating physically in the warehouse merchandise that is sold and awaiting customer delivery or pickup; and (3) reviewing the physical locations of merchandise in inventory to be shipped to customers based on upcoming forecasted sales. *See* Ditar Section A Response, at Exhibit A-4, Appx3297-Appx3303.

19

While Ditar performed these services only for its end user customers, the expenses related to these activities were indirect selling expenses because they were – in accordance with Commerce's original antidumping questionnaire Appendix I Glossary of Terms – not both (1) variable and (2) traceable in Ditar's financial records to sales of the merchandise under investigation.  *See* Antidumping Questionnaire, Appx7381-7382.  Ditar also provided repacking logistical services for sales to end users that it *did not provide* to distributor customers. Ditar described these services as (1) repacking the foreign like product from certain carton sizes into other carton sizes for end user customers and (2) loading merchandise in accordance with certain end-user instructions.  *See* Ditar Section A Response, at Exhibit A-4, Appx3297-Appx3303; *see also* Ditar Section A response, at A-24, Appx3273 (discussing the repacking of certain merchandise for quality reasons). As with post-sale warehousing services, Ditar correctly reported the expenses associated with these services as indirect selling expenses because the expenses were not variable (*i.e.*, they were fixed expenses that would be incurred whether or not a sale was made).

On remand, Commerce describes its examination of (1) whether any of the sub-accounts included in the numerator of Ditar's indirect selling expense ratios identify a specific account for warehousing services or repacking services, and (2) whether the subaccounts contain transaction-specific line item details to corroborate whether such expenses were incurred only for sales to end user customers. *See Remand Results*, at 7-8, Appx8696-Appx8697, and thus erroneously ignores the "indirect" nature of these expenses. Although Commerce concedes that "{t}his lack of detail is expected: indirect selling expenses are indirect and not attributable to any specific sale," *Remand Results*, at 8, Appx8697, Commerce's emphasis in both the main text and footnotes of the *Remand Results* on whether Ditar's subaccounts identify specific accounts for warehousing services or repacking services demonstrates Commerce's limited and erroneous focus on Ditar's accounting system to identify the differences in the selling activities performed. Instead, as consistently advocated by Ditar, Commerce should have taken into consideration on remand the source documentation that Ditar included in its responses that inform consideration of Ditar's claims that intensity differences in selling

21

functions indicate a difference in LOTs between distributors and end-users, as directed by the Court. *Ditar I*, at 14-15. Exhibit A-6 of Ditar's Section A response, for example, contains 300+ pages of internal documentation illustrating the type, intensity, and frequency of its different home market selling activities, including (1) emails and internal sales meetings held by Ditar sales personnel to discuss with warehousing control and end users how to manage inventory (*e.g.*, pages 136, 137, 213, 218, 220, and 244 of Exhibit A-6), (2) emails discussing delivery schedules (*e.g.*, pages 136, 137, 139, 213. 215, and 224 of Exhibit A-6), and (3) correspondence related to product loading quality guarantees (*e.g.*, pages 252-256 of Exhibit A-6), *see* Ditar Section A Response, at Exhibit A-6, Appx3309–3567, all of which Ditar included in its Exhibit A-4 descriptions of its post-sale warehousing and repacking services. *See* Ditar Section A Response, at Exhibit A-4, Appx3297-Appx3303. Importantly, none of the dozens of emails provided in Exhibit A-6 related to sales to distributors; all of the correspondence related to end user customer selling activities. On remand, Commerce claims that:

> Email correspondence summarizing internal sales meetings, projections, plans, and negotiations with customers which

> reference post-sale warehousing and repacking services support only that such services, in fact, exist (and may provide some corroborative support for the level of intensity claimed), but serve as insufficient support for the level of support (*i.e.*, intensity) reported in the Selling Functions chart at Exhibit A-4 absent quantitative information which substantiates the amount of expenses incurred on an absolute and/or relative basis.

*Remand Results*, at 19, Appx8708.  But when Ditar conducted selling functions for end user customers and did not perform these same functions *at all* for distributor customers (as Commerce concedes), the question of relative degrees of intensities and frequencies of activities for the different type of customers is not material; it is a black and white issue – there are no shades of gray.  As such, it is axiomatic that Ditar thus engaged in these activities more significantly for its end user customers.  Thus, contrary to Commerce's assertions in the *Remand Results*, information on the record demonstrates that Ditar engaged in substantially higher intensities of warehousing and repacking activities for its end user customers than for its distributor customers.[3]

---

[3]   As established above, Ditar described its warehousing activities as including (1) establishing schedules for the delivery of merchandise that is being shipped to customers; (2) segregating physically in the warehouse merchandise that is sold and awaiting customer delivery or pickup; and (3) reviewing the physical locations of merchandise in inventory to be shipped to customers based on upcoming forecasted sales.  *See* Ditar Section A Response, at Exhibit A-4, Appx3297-

In the *Remand Results*, Commerce claims that even taking into consideration the "difference in intensity" of Ditar's warehousing services and repacking logistical services that Ditar performed for end user customers, they would not serve to "compel reconsideration" of Commerce's decision to deny Ditar a LOT adjustment because of their "low absolute levels of intensity." *Remand Results*, at 9.  But by focusing solely on the "intensity" of these services, Commerce again fails to recognize that – as described above – these services were not performed for the different channels of trade at slightly different levels. Rather, while Ditar performed these selling activities for its end user customers, Ditar did not perform these services for its distributor

---

Appx3303.  On remand, Commerce discounts the record evidence of such warehousing activities, claiming that the source documentation addresses "inventories in the context of sales planning and forecasting internally, and for the purposes of delivery schedules regarding sales pursuant to long term frameworks with end user customers" and for fulfilling long-term multi-shipment sales agreements with certain end user customers." *Remand Results*, at 20, Appx8709.  But where the documentation Ditar provided reflects – as Commerce concedes – exactly the scope of the warehousing activities that Ditar described, it is impossible to accept Commerce's assertion that the documentation provides no "insight or detail regarding the nature of {Ditar's} warehousing support service," *Remand Results*, at 20, Appx8709.  This error further illustrates that the *Remand Results* are not based on substantial evidence.

**Plaintiff's Comments in Opposition to *Remand Results*** Ct. No. 24-00130

customers whatsoever. Commerce's *Remand Results* also fail to address that these were not services that Ditar performed quarterly or annually, but were selling activities that Ditar performed with far greater frequency on a weekly or monthly basis.

The importance of the record evidence that Ditar performed warehousing services and repacking activities for end user customers only is that while Ditar performed minimal selling functions for its distributor customers in *only three of the five* selling function categories that Commerce typically considers in its LOT analysis, Ditar performed *substantial* selling functions for its end user customers, including significant selling activities in *all five* of Commerce's selling function categories (*i.e.*, sales support, training services, technical support, logistical services, and sales-related administration). That Ditar performed these services for end user customers frequently and at a relatively high degree of intensity *and did not perform post-sales warehousing or repacking services for its distributor customers at all* supports a difference in LOTs between distributors and end-users and should have compelled Commerce to reconsider its decision that there was only a single LOT in the home market. Because Commerce's

25

**Plaintiff's Comments in Opposition to *Remand Results*          Ct. No. 24-00130**

*Remand Results* do not account for these significant differences in selling activities across Ditar's different home market levels of trade, the *Remand Results* are not based on substantial evidence, and the Court must remand to Commerce again with instructions to find two distinct levels of trade in Ditar's home market.

## CONCLUSION

For the reasons stated above, it was unlawful for Commerce to compare Ditar's U.S. sales to distributor customers to home market sales to end user customers without making a level of trade adjustment to the home market selling prices. As established in the administrative record, the selling activities and the intensity and frequency of such activities that Ditar performed for its distributor and end user customers, including that Ditar did not provide any warehousing or repacking services to its distributor customers, established that there was a significant difference between Ditar's distributor and end user marketing stages in Colombia.  Moreover, the record firmly established that the pricing differential between sales to Ditar's home market end user and distributor customers was significant, and Commerce has provided no explanation for why the this differential was "insufficient"

26

**Plaintiff's Comments in Opposition to *Remand Results***    **Ct. No. 24-00130**

to warrant a level-of-trade adjustment.  Viewed as a whole, Commerce's

*Remand Results* level of trade analysis was unreasonable and

unsupported by substantial evidence, and the Court should remand to

Commerce for further consideration.

Respectfully submitted,

<u>/s/ Robert G. Gosselink</u>
Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated:  May 1, 2026              Counsel to Ditar, S.A.

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| DITAR, S.A.,<br>     Plaintiff,<br>v.<br><br>UNITED STATES,<br>     Defendant,<br>and<br><br>COALITION FOR FAIR TRADE IN SHOPPING BAGS,<br>     Defendant-Intervenor. | Court No. 24-00130 |

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC certifies that the Comments of Ditar, S.A. in Opposition to the U.S. Department of Commerce's Remand Redetermination, dated May 1, 2026, complies with the word-count limitation described in Court's April 13, 2026, Order. These comments in opposition to the remand redetermination contain 5060 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink

**TRADE PACIFIC PLLC**
700 Pennsylvania Ave., SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Plaintiff Ditar, S.A.

Dated:  May 1, 2026