# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER MAKER, JUDGE

| | | |
|---|---|---|
| ———————————————— | ) | |
| DITAR, S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 24-00130 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COALITION FOR FAIR TRADE | ) | |
| IN SHOPPING BAGS, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| ———————————————— | ) | |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S COMMENTS ON COMMERCE'S REMAND RESULTS

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
OF COUNSEL:                      Assistant Director

PAUL THORNTON                    REBECCA T. MITCHELL
Attorney                         Trial Attorney
Office of the Chief Counsel      Commercial Litigation Branch

for Trade Enforcement &
  Compliance
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230


July 10, 2026

Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-0467


Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ..... ii

BACKGROUND ...................................................................................... 2

I.    Legal Framework ........................................................................ 2

II.    Commerce's Final Determination .................................................. 4

III.   This Court's Remand Order .......................................................... 6

IV.   Commerce's Remand Redetermination ......................................... 8

ARGUMENT ......................................................................................... 17

I.    Standard of Review ..................................................................... 17

II.    Commerce's Denial of a Level-of-Trade Adjustment Is Supported
by Substantial Evidence and Is in Accordance with Law ............. 19

     A.    Substantial Evidence Supports Commerce's Finding that
Ditar's Warehousing Activities and Repacking Services for
End User Customers Do Not Support a Difference in Levels
of Trade .............................................................................. 20

     B.    Commerce's Remand Results Regarding the Pricing
Differential Issue Is Consistent with This Court's Remand
and Supported By Substantial Evidence ............................... 32

          1.    Commerce's Remand Results Are Consistent with this
Court's Opinion and Order .......................................... 33

          2.    Commerce Adequately Explained Why the Pricing
Differential Issue Is Not Significant ........................... 37

          3.    Any Error Regarding Commerce's Analysis of the
Pricing Differential Issue Is Harmless ........................ 41

CONCLUSION ...................................................................................... 44

## TABLE OF AUTHORITIES

CASES

*Atl. Sugar, Ltd. v. United States,*
  744 F.2d 1556 (Fed. Cir. 1984)..............................................................18

*Belton Indus., Inc. v. United States,*
  6 F.3d 756 (Fed. Cir. 1993)...................................................................41

*Bethlehem Steel Corp. v. United States,*
  223 F. Supp.2d 1372 (Ct. Int'l Trade 2002) .........................................17

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron*
  *Pipe Co.*, 5 F.4th 1367, (Fed. Cir. 2021).................................................19

*Changzhou Wujin Fine Chemical Factory Co. v. United States,*
  701 F.3d 1367 (Fed. Cir. 2012).............................................................43

*Cleo Inc. v. United States,*
  501 F.3d 1291 (Fed. Cir. 2007).............................................................19

*Compania Valenciana de Aluminio Baux, S.L.U. v. United States,*
  803 F. Supp. 3d 1265 (Ct. Int'l Trade 2025) ........................................32

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) ..............................................................................18

*Cornerstone Chem. Co. v. United States,*
  No. 25-00005, 2026 WL 1747087 (Ct. Int'l Trade June 17, 2026).......43

*Ditar, S.A. v. United States,*
  No. 24-00130, 2025 WL 2795057 (Ct. Int'l Trade Oct. 1, 2025).. passim

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996)...............................................................18

*INS v. Elias-Zacarias,*
  502 U.S. 478 (1992) ..............................................................................18

ii

*Intercargo Ins. Co. v. United States*,
  83 F.3d 391 (Fed. Cir. 1996)..................................................................41

*NEXTEEL Co. v. United States*,
  28 F.4th 1226 (Fed. Cir. 2022) ...........................................................43

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006)...........................................................19

*Productos Laminados de Monterrey S.A. de C.V. v. United States*,
  554 F. Supp. 3d 1355 (Ct. Int'l Trade 2021) ..........................................3

*SolarWorld Ams., Inc. v. United States*,
  910 F.3d 1216 (Fed. Cir. 2018)...........................................................32

*U.S. Steel Corp. v. United States*,
  621 F.3d 1351 (Fed. Cir. 2010)..............................................................3

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) ............................................................................18

*Win-Tex Prods., Inc. v. United States*,
  843 F. Supp. 709 (Ct. Int'l Trade 1994) .............................................39

STATUTES

19 U.S.C. § 1673 .......................................................................................2

19 U.S.C. § 1677(35)(A) ............................................................................3

19 U.S.C. § 1677b(a)(7)(A)........................................................................3

19 U.S.C. § 1677b(a)(7)(A)(i) ............................................................ 40, 41

19 U.S.C. § 1677b(a)(7)(A)(ii) .................................................................41

19 U.S.C. § 1677b(a)(7)(A)(i), (ii).......................................................3, 42

OTHER AUTHORITIES

Statement of Administrative Action Accompanying the Uruguay
   Rounds Agreement Act, H.R. Doc. 103-316, Vol. 1 (1994)....................23

REGULATIONS

19 C.F.R. § 351.412(a) .................................................................................4

19 C.F.R. § 351.412(b) .................................................................................4

19 C.F.R. § 351.412(c)(2) ........................................................................4, 31

19 C.F.R. § 351.412(d)(1).............................................................................4

*Antidumping Duties; Countervailing Duties*,
   62 Fed. Reg. 27296 (May. 19, 1997)...............................................29, 32

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____

|  |  |  |
|---|---|---|
| DITAR, S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 24-00130 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COALITION FOR FAIR TRADE IN SHOPPING BAGS, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

_____

### DEFENDANT'S RESPONSE TO PLAINTIFF'S COMMENTS ON COMMERCE'S REMAND RESULTS

Defendant, the United States, respectfully submits this response to comments submitted by plaintiff, Ditar, S.A. (Ditar), *see* Comments of Ditar, S.A. in Opposition to the U.S. Department of Commerce's Remand (May 1, 2026), ECF No. 50 (Ditar Comments), concerning the Department of Commerce's (Commerce) remand results, Appx8690-717, pursuant to this Court's opinion and remand order, *Ditar, S.A. v.*

*United States*, No. 24-00130, 2025 WL 2795057 (Ct. Int'l Trade Oct. 1, 2025). Because Commerce has fully complied with the Court's remand order and the remand redetermination is supported by substantial evidence and otherwise in accordance with law, we respectfully request that the Court sustain the remand redetermination and enter final judgment for the United States.

## BACKGROUND

In 2023, Commerce initiated a less-than-fair-value investigation covering paper bags from Colombia, Appx5984-990, and selected Ditar as a mandatory respondent. Appx3230. On May 24, 2024, Commerce published its final determination and calculated a weighted-average dumping margin of 11.06 percent for Ditar. Appx1533-58. In that final determination, Commerce declined to make a level-of-trade adjustment to Ditar's home-market pricing. Appx1547-51. This case stems from Ditar's challenge to Commerce's denial of a level-of-trade adjustment.

## I.   Legal Framework

Under 19 U.S.C. § 1673, antidumping duties are imposed "in an amount equal to the amount by which the normal value exceeds the export price . . . for the merchandise." Normal value is "the price a

2

producer charges in its home market," while export price is "the price of the product in the United States." *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)). When determining the amount by which the normal value exceeds the export price, Commerce will adjust the home-market sales price "to make due allowance for any difference" between export price and normal value that is due to "a difference in level of trade." 19 U.S.C. § 1677b(a)(7)(A). For Commerce to make an adjustment to the home-market sales price, the difference in level of trade must (1) involve the performance of "different selling activities" and (2) "affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade" in the producer's home market. *Id.* § 1677b(a)(7)(A)(i), (ii). Both conditions must be met for Commerce to make a level-of-trade adjustment. *Productos Laminados de Monterrey S.A. de C.V. v. United States*, 554 F. Supp. 3d 1355, 1359 (Ct. Int'l Trade 2021).

Commerce's regulation implementing this statutory scheme acknowledges the two-pronged nature of this test, providing that Commerce will "determine {(1)} that sales in the two markets were not

3

made at the same level of trade, and {(2)} that the difference has an effect on the comparability of the prices." 19 C.F.R. § 351.412(a); *see also id.* § 351.412(b) (explaining Commerce will make level-of-trade adjustment if there is different level of trade and difference in level of trade impacts price comparability). For the first part of this test, Commerce will find different levels of trade if the sales "are made at different marketing stages (or their equivalent)." *Id.* § 351.412(c)(2). "Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing." *Id.* Turning to the second part, Commerce will determine that a difference in level of trade has an effect on price comparability "only if . . . there is a pattern of consistent price differences between sales in the market in which normal value is determined" at the level of trade of the export price and the level of trade at which normal value is determined. *Id.* § 351.412(d)(1).

II.   Commerce's Final Determination

In its final determination, Commerce denied Ditar's request for a level-of-trade adjustment because Commerce found that Ditar failed to

4

demonstrate that it satisfied either condition for a level-of-trade adjustment. *Ditar*, 2025 WL 2795057, at *3 (citing Appx1547-1551).

Although Ditar made home-market sales to distributors and end users, Commerce determined that Ditar failed to demonstrate a substantial difference in selling activities between the two groups of home-market customers, therefore, Ditar's home-market sales were made at a single level of trade. Appx1547-51. Regarding qualitative analysis, Commerce found that the differences in Ditar's selling activities and intensities were better attributed to differences in the product rather than a different level of trade, and that on balance, Ditar's selling activities and intensity were proportionate to each channel of distribution. Appx1548. Further, Commerce found that Ditar did not support its qualitative analysis with an adequate quantitative analysis, because an analysis of prices by product code showed that there was an insignificant difference between the price to home-market distributor and end-user customers. Appx1550-51. Commerce also emphasized that Ditar's home-market sales did not pass through multiple levels of companies or affiliated parties; in other words, the sales did not change hands twice. Appx1550.

Commerce also found that the "overall price differences" between home-market sales to distributors and end users "do not demonstrate sufficient price differences to justify" a level-of-trade adjustment. Appx1551.  Commerce reached this conclusion in the context of discussing its price comparison using product codes.  Appx1551.

Thus, because "Ditar was not able to demonstrate that it made sales to distributors and end users at different" levels of trade, Commerce found that there was only one level of trade in Ditar's home market and accordingly declined to make a level-of-trade adjustment. Appx1551.

III.    This Court's Remand Order

In this Court, Ditar challenged Commerce's denial of a level-of-trade adjustment.  *Ditar*, 2025 WL 2795057, at *3.  The Court explained that Ditar attacked Commerce's findings on both whether there is "a difference in the level of trade" and whether there is "any significant effect on price comparability."  *Id.* at *4.

First, the Court addressed Commerce's finding that Ditar failed to demonstrate a difference in the level of trade and determined that Commerce's finding that Ditar's sales "did not involve different

6

marketing stages" was supported by substantial evidence, because it was undisputed that Ditar's home-market sales did not change hands twice. *Id.*

Next, the Court addressed whether Ditar established "'the equivalent' of different marketing stages," and it rejected the vast majority of Ditar's challenges to Commerce's findings. *Id.* at *4-6. However, as relevant here, the Court considered Ditar's attack on Commerce's finding that Ditar "failed to substantiate its claims that its warehousing and repacking expenses for home-market end users were more intensive than its expenses for distributors." *Id.* at *6. This Court determined that Commerce "misunderstood its own data reporting requirements for repacking and warehousing expenses" as Ditar "properly reported" its warehousing and repacking expenses as "indirect expenses." *Id.* The Court accordingly remanded this issue for Commerce to "review Ditar's indirect selling expenses and consider the company's claims that intensity differences in these two categories show a difference in levels of trade." *Id.*

Second, regarding Ditar's challenge to Commerce's finding that there was no significant effect on price comparability stemming from

7

the asserted difference in level of trade, the Court rejected Ditar's arguments that Commerce "did not place the data on which it relied for {its finding that Ditar failed to show any effect on price comparability} on the record," and that Commerce erred in relying on product codes rather than control numbers.  *Id.* at \*7-8.  The Court, however, agreed with Ditar that Commerce "fail{ed} to explain why the pricing-differential percentage here—which exceeds five percent—is not significant, especially when in other contexts it would be."  *Id.* at \*8. Accordingly, the Court remanded this issue for Commerce to "connect the dots" for its finding that the pricing differential in this case is insignificant.  *Id.*

IV.    Commerce's Remand Redetermination

On February 17, 2026, Commerce released the draft results of redetermination and invited the parties to comment.  Appx8678.  Ditar submitted comments in response to the draft results on February 27, 2026.  Appx8722.  After reviewing Ditar's comments, Commerce issued its remand redetermination on March 13, 2026, in which it continued its denial of a level-of-trade adjustment.  Appx8716-17.

Commerce continued to find that the record evidence regarding indirect selling expenses is insufficient to support Ditar's argument that there is a difference in intensity between home-market sales to distributors and end-users. Appx8696. First, Commerce noted that the supporting information for Ditar's indirect selling expenses identifies sub-accounts but review of those sub-accounts does not show sufficient information to determine the nature of the expenses that went into the indirect selling expenses ratio. Appx8696 (citing Appx5773-98, Appx5150-53, Appx3936-39). For example, while Ditar provided a worksheet showing that it divided warehouse space between distributor and end-user sales, the worksheet did not show precisely how any warehouse space was allocated. Appx8696. Without that additional information, any difference in allocation could be explained by differences in sale volumes, rather than differences in intensity. Appx8696.

Further, the account information provided did not include specific accounts for warehousing or repacking services nor did the account information delineate an account under which warehousing and repacking services would be included. Appx8696-97. Commerce

9

explained that the absence of such account information is significant because, while the accounts could support a finding that warehousing and repackaging services exist, that existence alone cannot substantiate a claim that the level of intensity for warehousing and repacking services is greater for end users or is exclusively applicable to end users. Appx8697.  Commerce also explained that the issue with Ditar's chosen method of proof, indirect sales expenses, is that they generally are "not attributable to any specific sale" and "cannot be acutely distinguished or delineated," therefore, they are "allocated to all sales regardless of channel."  Appx8697-98.

Even assuming the accounts were sufficient to demonstrate some difference in the level of intensity between sales to distributors and sales to end users, Commerce concluded that the "low absolute levels of intensity for two logistics-related support function described to be applied on an *ad hoc* basis for certain end users" would be insufficient to compel Commerce to find a difference in level of trade considering all of Commerce's other findings on this prong, which this Court had previously sustained.  Appx8698.

Commerce then turned to clarifying its statement that the pricing differential in this case is not significant.  Appx8698.  Commerce explained that, because a level-of-trade adjustment is contingent on Ditar establishing both a difference in marketing stages or their equivalent and an effect on price comparability and Ditar failed to meet the first prerequisite in that two-part test, Ditar was not entitled to a level-of-trade adjustment.  Appx8698-99.  In other words, because Ditar failed on part one, its arguments regarding part two were insignificant.  Thus, Commerce clarified that "given the balance of the findings, the record does not reflect that Ditar's sales are made at different marketing stages nor are there substantial differences in selling activities."  Appx8700.

Although Commerce determined that the pricing differential was not significant because Ditar had already failed to establish a difference in marketing stages or the equivalent, Commerce nevertheless observed that Ditar's focus on a specific differential percentage misses the fact that level-of-trade adjustment analysis is "inherently . . . factually intensive," and requires more than just a difference in expenses or costs.  Appx8699.  Accordingly, within the context of level-of-trade

11

adjustments, a bright-line rule on pricing differentials would be inappropriate.  Appx8700.

Commerce also considered and rejected Ditar's three arguments raised in its comments on the draft remand results:  (1) that Commerce failed to follow this Court's remand order; (2) that Commerce failed to properly consider documentation supporting Ditar's claim that its warehousing and repackaging services demonstrates a difference in intensity amounting to the equivalent to a different level of trade between distributors and end users; and (3) that Commerce did not adequately explain the insignificance of the pricing differential. Appx8700-8701; *see also* Ditar Comments at 6.

First, Commerce determined that it followed the Court's remand order.  In doing so, Commerce explained that its objective was to address "only" the issues specified for reconsideration because "Commerce is not permitted to reopen and re-review settled issues." Appx8702.  Commerce noted that this Court did not make a "general finding" about whether Commerce's denial of a level-of-trade adjustment was supported by substantial evidence but instead reviewed specific factual findings, sustaining many and sending two back for

Commerce's review.  Appx8703.  For example, Commerce observed that this Court sustained Commerce's pricing analysis, based on product codes, but remanded Commerce's finding that the pricing differential is not significant.  Appx8702-03.  As Commerce stated, these are "separate and distinct" issues.  Appx8703.  Commerce noted that there appeared to be no dispute over the two issues on remand:  "(1) Commerce's treatment of warehousing and repacking selling functions; and (2) Commerce's analysis of whether the price-differential between Ditar's claimed {levels of trade} is significant."  Appx8704.

Second, Commerce determined that it considered and properly analyzed relevant information when evaluating Ditar's warehousing and repacking services.  Appx8706-12.  Commerce explained that both quantitative and qualitative information is relevant to whether Ditar engaged in a substantially different selling function with its warehousing and repacking services.  Appx8708.  Although qualitative information like "{e}mail correspondence summarizing internal sales meetings, projections, plans, and negotiations with customers which reference post-sale warehousing and repacking services" supports a finding that "such services, in fact, exist (and may provide some

13

corroborative support for the level of intensity claimed),” quantitative information “substantiates the amount of expenses incurred on an absolute and/or relative basis” for purposes of assessing Ditar’s claimed level of intensity for these activities.  Appx8708.

Commerce also engaged with the qualitative information on which Ditar relied.  Assessing Ditar’s claim that it provided post-sale warehousing at a level “3” of intensity for end users, Commerce noted that “the hundreds of pages of correspondence” that Ditar provided “did not contain a single instance where warehousing services of any type (post-sale or pre-sale) for any customer channel is discussed or further defined.”  Appx8708-09.  Commerce searched the correspondence for Spanish and English terms in an attempt to locate information on warehousing services.  Appx8709.  Moreover, although Ditar’s correspondence contained information “regarding sales planning generally,” Commerce determined there was a lack of information on whether post-sale warehousing services or inventory control were exclusively provided to end users.  Appx8709.  Commerce found that this information “generally supports” Ditar’s claim that it sells excess inventory to end users but does not provide sufficient detail regarding

14

the level of intensity claimed for warehousing services.  Appx8709.

Commerce also noted that the information provided did not identify

which end-user sales relied on post-sale warehousing services provided

for excess inventory sales.  Appx8710.  Thus, while Commerce found

that some end-user sales were sold from inventory, it could not make a

finding regarding the quantity or proportion of end-user sales from

inventory.  Appx8710.

Turning to Ditar's claim that its repacking services support a

finding of a substantially different selling function for end users,

Commerce determined that the information Ditar provided did not

support Ditar's claim.  Appx8710.  In Exhibit A-4, Ditar claimed it

provided repacking services at a level "4" intensity; however, Commerce

noted that the underlying information provided in Exhibit A-6 "merely

reflects a customer complaint regarding the quality of packaging

materials."  Appx8710 (citing Appx3562-66).  Commerce found that this

information supported that "the sale in question reflected an end-user

sale from inventory" but did not otherwise demonstrate the extent of

Ditar's repacking services.  Appx8711.  Commerce also noted that the

resolution of a single customer complaint regarding packing could

simply be customer-specific rather than reflective of Ditar's general practice regarding repackaging for end users. Appx8711. Commerce further explained that Ditar did not submit information to support a quantitative analysis of its claims regarding its repacking services, such as the amount of expense incurred for repacking services or the proportion of end-user sales that involved repacking services. Appx8711-12.

Thus, Commerce concluded that the qualitative information provided did not support Ditar's reported intensity levels, the record did not contain quantitative information substantiating Ditar's reported intensity levels, and Ditar's claimed intensity levels did not account for the proportion of end user sales not from inventory. Appx8712; *see also* Appx3798, Appx3836.

Third, Commerce rejected Ditar's argument that Commerce failed to explain why the pricing differential here is not significant. Appx8714. Commerce explained that, to obtain a level-of-trade adjustment, Ditar must show both that the purported different levels of trade involve the performance of different selling activities and that they affected price comparability. Appx8714. Because Commerce found

that Ditar failed to show a difference in selling activities, even after

Commerce considered Ditar's arguments regarding warehousing and

repacking services, Commerce concluded that Ditar failed the first

prerequisite for a level-of-trade adjustment.  Appx 8715.  That failure

rendered Ditar's hypothetical success on the second prerequisite

immaterial and therefore insignificant.  Appx8715-16.

Having reconsidered the two issues this Court remanded,

Commerce continued to conclude that Ditar failed to establish its

entitlement to a level-of-trade adjustment and accordingly made no

change to the estimated weighted-average dumping margin for Ditar.

Appx8716.

## ARGUMENT

### I.    Standard of Review

"The same standard of review applies to the review of a remand

determination as to the review of the original determination."

*Bethlehem Steel Corp. v. United States*, 223 F. Supp.2d 1372, 1375 (Ct.

Int'l Trade 2002).  Accordingly, the Court will uphold Commerce's

determination, finding, or conclusion if it is supported by "substantial

evidence on the record" and is otherwise "in accordance with law."

17

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."). Substantial evidence is "'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotation omitted). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Further, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *see also Borusan Mannesmann*

18

*Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374 (Fed. Cir. 2021) (explaining that this "highly deferential review standard recognizes Commerce's special expertise in antidumping duty investigations," and that Federal Circuit affords "tremendous deference" to Commerce's administration of antidumping laws (quotation omitted)).  It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007).  A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quotation omitted).

II.    Commerce's Denial of a Level-of-Trade Adjustment Is Supported by Substantial Evidence and Is in Accordance with Law

In compliance with the Court's remand order, Commerce reconsidered its findings regarding indirect sales expenses for warehousing and repacking and the significance of the price differential between sales to end users and sales to distributors.  In doing so, Commerce still found that Ditar failed to establish that its home-market sales to end users and distributors were made at different

19

marketing stages or reflected substantial differences in selling activities. That finding is supported by substantial evidence and otherwise in accordance with the law. As explained below, Ditar's arguments to the contrary are unpersuasive.

A.    Substantial Evidence Supports Commerce's Finding that Ditar's Warehousing Activities and Repacking Services for End User Customers Do Not Support a Difference in Levels of Trade

On remand, Commerce reviewed Ditar's indirect selling expenses and found that the record does not support Ditar's claims that intensity differences in repacking and warehousing expenses indicate a difference in levels of trade between distributors and end users. Appx8696. For example, Commerce observed that, while some record information for indirect selling expenses identifies the sub-accounts included in the numerator of the ratio, those account names are only sufficiently detailed to determine the nature of the constituent expenses included in the indirect-selling-expenses ratio and none of the account names identified a specific account for warehousing services nor repacking services. Appx8696-97; Appx5150-53. Commerce pointed to accounts for "Building/Warehouse" and explained that it could identify from those accounts "where expenses for building leases and related

20

payments" are housed but not "whether the level of intensity reported is supported" or whether "these support services are only applicable to end-user sales." Appx8697. The mere existence of warehousing and repackaging expenses alone is insufficient to prove the nature of those services and for which sales those expenses were incurred.

Moreover, Commerce explained that these sub-accounts do not "contain transaction-specific line-item detail" on the expenses occurred nor does the record otherwise provide detail on specific transactions to corroborate that the information in the sub-accounts pertains to expenses that were (1) only incurred for sales to end users and (2) at a level of intensity matching Ditar's claims. Appx8696. In essence, although Ditar claims that its warehousing and repacking services were only provided to end users and were at a level of intensity demonstrating substantially different selling functions, Commerce reviewed the record to see if that claim was supported and, based on the account information, determined that it was not.

In addition to identifying the information lacking from the account information provided for indirect selling expenses, Commerce explained why indirect selling expenses generally lack the type of information

21

needed to support Ditar's claim that its warehousing and repacking services provided to end users were more intense such that Ditar performed a substantially different selling function for end users compared to distributors. Appx8697. By their nature, indirect selling expenses are those that cannot be attributed to specific sales. Appx8697. Because they cannot be attributed to specific sales, that inhibits Ditar from substantiating its claim that these indirect expenses were incurred specifically for sales to end users and at a level of intensity demonstrating a substantially different selling function. Appx8697. In sum, Commerce acknowledged its previous overreliance on whether these indirect selling expenses were reported as distinct expenses and provided an explanation of why the indirect selling expenses, when reviewed, did not substantiate Ditar's claims. Appx8697.

Rather than engaging with Commerce's determination that the account information does not support Ditar's claims regarding warehousing and repacking expenses, Ditar points to its Section A questionnaire response, in which Ditar claimed that warehousing and repacking services were provided only to end users, and argues that

22

Commerce's focus on sub-accounts is unwarranted.  Ditar Comments at 19-23.

First, Commerce's consideration of Ditar's sub-accounts was in accordance with the Court's opinion, which instructed Commerce to "review Ditar's indirect selling expenses and reconsider the company's claims that intensity differences in {warehousing and repacking services} show a difference in levels of trade."  *Ditar*, 2025 WL 2795057, at *6; *see also* Appx8708.  Evaluating Ditar's indirect selling expenses under Commerce's practice required both a qualitative and quantitative analysis.  Appx8698-99.[1]  Thus, in addition to its analysis of the qualitative information provided by Ditar (like that in Ditar's Section A response) Commerce also properly reviewed the quantitative information provided by Ditar (like that in Ditar's account information).  Based on that review, Commerce found that the supporting information

---

[1] *See also* Appx3259 (explaining level-of-trade analysis involves qualitative and quantitative analysis); Statement of Administrative Action Accompanying the Uruguay Rounds Agreement Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 829 ("Commerce will require evidence from the foreign producers that the functions performed by the sellers at the same level of trade in the U.S. and foreign markets are similar, and that different selling activities are actually performed at the allegedly different levels of trade.")).

for the indirect selling expenses that identified the sub-accounts did "not provide sufficient information to further evaluate or corroborate Ditar's claims regarding intensity differences between end-users and distributors resulting from additional repacking and warehousing expenses incurred with respect to sales to end-users." Appx8696 (citing Appx5773-94, Appx5150-53, Appx3936-39).

Second, contrary to Ditar's arguments, Ditar Comments at 21-23, Commerce considered the qualitative information Ditar provided, which included over 300 pages of internal emails, and determined that the information "serve{d} as insufficient support for the level of support (*i.e.*, intensity) reported in the Selling Functions chart at Exhibit A-4 absent quantitative information which substantiates the amount of expenses incurred on an absolute and/or relative basis." Appx8707-08. Additionally, Commerce found that "the hundreds of pages of correspondence supporting the selling activities provided in Exhibit A-6 (including the specific pages referenced in Ditar's comments brief) do not contain a single instance where warehousing service of any type (post-sale or pre-sale) for any customer channel is discussed or further defined." Appx8708 (citing Appx3296-303, Appx3308-567). Ditar points

24

to several pieces of correspondence in Exhibit A-6, which it claims supports its assertions regarding warehousing services. Ditar Comments at 22. However, the correspondence actually supports Commerce's determination that these emails discuss sales planning and forecasting, delivery schedules, and sales from inventory generally but do not describe the warehousing services provided nor do they illuminate to which customers those services were provided on a grand scale or at what level of intensity. *Compare* Appx8709 *with* Appx3444-47, Appx3521, Appx3523, Appx3526, Appx3528, Appx3532, Appx3552.

In addition to reviewing the correspondence Ditar cited, Commerce searched through all of Exhibit A-6 for additional information on Ditar's warehousing services. For example, Commerce searched for "almacén," "desposito," and "warehouse" within the correspondence provided, yet that search yielded only one correspondence, which did not provide insight on the warehousing services Ditar claims to have provided. Appx8709; *see also* Appx3563-64. The dearth of discussion of warehousing services in the documents on which Ditar relied contrasted with Ditar's claim that it performed "post-sale warehousing" services at a level "3" of intensity. Appx8708-

25

09.  Likewise, although Commerce found pages referencing inventories in the context of sales planning generally, it looked to the entire context of that correspondence and determined that it supported only a finding that Ditar stores some excess product, but absent further detail, merely storing products was insufficient to substantiate the level of intensity Ditar claimed.  Appx8709-10.  Thus, while Ditar pointed to documentation to support claims that it performed warehousing services, it did not point to documentation substantiating its claim that said work was performed at a level of intensity indicating a different selling activity was performed for end users.

Substantial evidence also supports Commerce's finding that Ditar failed to show that its repacking services were performed at such an intensity so as to constitute a different selling activity for end users compared to distributors.  Exhibit A-4 is a selling activities chart that Ditar created which contains Ditar's claims regarding the services provided to customers and their level of intensity.  Appx3297-303.  However, the supporting "sample documentation" Ditar provided to "illustrate the types, intensities, and frequencies of the selling activities" is provided in other exhibits, like Exhibit A-6.  Appx3266.  In

Exhibit A-6, the sample document regarding repacking services is correspondence regarding a customer complaint regarding the quality of packaging materials.  Appx3563-66.

In weighing that information, Commerce noted that, although Ditar claims that it frequently and exclusively provided repacking services to end users, a single customer complaint could just represent an isolated incident involving a warranty for how items are packaged. Appx8711.  Ditar does not cite to any other supporting documentation for its claims regarding repacking services and instead concedes that this "correspondence related to product quality guarantees."  Ditar Comments at 22; *see also* Ditar Comments at 20 (citing Appx3273 for assertions regarding repacking, which relies on correspondence provided in Exhibit A-6).

Moreover, in addition to weighing the qualitative information provided, Commerce noted the absence of quantitative information, as Ditar's reliance on indirect costs meant that Commerce could not decipher which expenses were allocable to warehousing and repacking, let alone which expenses were exclusively allocable to end users. Appx8711-12.  In Ditar's comments, we cannot discern any dispute as to

27

the absence of quantitative information to support Ditar's claims regarding repacking services. Ditar Comments at 21. Commerce reasonably concluded that this one example of an end-user customer complaint regarding the quality of packaging was insufficient to meet Ditar's burden of showing that its repacking services provided to end users constituted a substantially different selling function. Appx8710-11.

Substantial evidence further supports Commerce's conclusion that, even if the record supported Ditar's claims regarding differences between warehousing and repacking services provided to end users compared to distributors—which the record does not, these differences are insufficient to establish Ditar performed substantially different selling activities for end users. Appx8698. Under Commerce's regulations, to establish different levels of trade, sales must be "made at different marketing stages (or their equivalent)." 19 C.F.R. § 351.412(c). Because Ditar cannot show different marketing stages, it must attempt to demonstrate the equivalent. *Ditar*, 2025 WL 2795057, at *4-5. To do so, Ditar must show either "an additional layer of selling activities, amounting *in the aggregate* to a substantially different

28

selling function," or "substantial differences in the *amount of selling expenses* associated with two groups of sales."[2]  *Id.* at *2 n.2 (emphasis added) (quotation omitted).

This Court already upheld several findings Commerce made regarding Ditar's claim that it engaged in an "additional layer of selling activities, amounting in the aggregate to a substantially different selling function." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27371 (May. 19, 1997).  This Court sustained Commerce's finding that "Ditar's sales to end users did not reflect selling functions which are disproportionately higher than that of sales to distributors." *Ditar*, 2025 WL 2795057, at *5 (quotation omitted).  Additionally, this Court upheld Commerce's finding that Ditar "faces the same design demands, whether it sells paper bags to end users or to distributors who supply those end users." *Id.* at *6 (quotation omitted).  Finally, this

---

[2] It appears that Ditar seeks to establish its entitlement to a level-of-trade adjustment using the former path only but taking the latter path would prove no better.  In its brief, Ditar does not compare the overall selling expenses associated with end users to the overall selling expenses associated with distributors, let alone demonstrate that any differences are not due to sales volume or pricing choices.  Indeed, Ditar's position is predicated on an avoidance of any sort of quantitative analysis.  Ditar Comments at 19-23.

Court upheld Commerce's findings regarding Ditar's quantitative evidence submitted, which Commerce determined was insufficient to support Ditar's claims. *Id.*

In addition to the findings the Court already upheld, the warehousing and repacking services that Ditar reported, even if exclusive to end users, involved "logistics-related support functions" provided "on an ad hoc basis" for only some end users. Appx8698. These support functions, which amount to "keep{ing} and monitor{ing} some level of excess inventory of generic bag products" to be sold on a longer schedule to some end users, Appx8709, and to repacking products packaged in defective or damaged packaging, Appx8711, did not involve a unique and intense service. In the face of these findings, Commerce reasonably determined that a few "dozen{}" emails relating to sales to end users, Ditar Comments at 22, performed at a self-reported low level of intensity, Appx3297, was not enough to show "an additional layer of selling activities, amounting *in the aggregate* to a substantially different selling function." *Ditar*, 2025 WL 2795057, at *2 n.2 (emphasis added) (quotation omitted).

30

Under Ditar's argument, any service provided to an end user but not to a distributor, no matter how minor or how infrequent, would be sufficient to demonstrate substantially different selling activities. *See* Ditar Comments at 23 (arguing "relative degrees of intensities and frequencies of activities for the different types of customers is not material"); Ditar Comments at 26 (requesting "instructions to find two distinct levels of trade"). However, the regulation expressly provides that different selling activities is "necessary, but not sufficient," to show a substantially different selling function. 19 C.F.R. § 351.412(c)(2). As this Court observed, under the regulation, "the producer must show those activities' *cumulative effect*." *Ditar*, 2025 WL 2795057, at *2 n.2 (emphasis added). Commerce accordingly applied the correct standard when evaluating Ditar's warehousing and repacking claims within the context of all of Ditar's activities.

As explained above, Commerce's findings regarding Ditar's warehousing and repacking services are supported by substantial evidence and otherwise in accordance with the law. It was Ditar's burden to establish that its services provided to end users involved an "additional layer of selling functions" that "in the aggregate" shows "a

31

substantially different selling function." 62 Fed. Reg. at 27371; *see also*

*Compania Valenciana de Aluminio Baux, S.L.U. v. United States*, 803

F. Supp. 3d 1265, 1276 (Ct. Int'l Trade 2025) ("The burden of supporting

a claim for a level of trade adjustment falls on the party, not the

agency."). For indirect expenses for warehousing and repacking

services, the qualitative information Ditar provided did not support its

claims, and Ditar did not provide sufficient quantitative information.

Ditar's arguments before this Court amount to a request for this Court

to reweigh the evidence before Commerce, which it cannot do. *See*

*SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir.

2018) (explaining Court may not "reweigh the evidence already

considered by Commerce").

B.   Commerce's Remand Results Regarding the Pricing
     Differential Issue Is Consistent with This Court's Remand
     and Supported By Substantial Evidence

Ditar brings a two-fold challenge to Commerce's explanation

regarding its finding that the pricing differential in this case is not

significant. First, Ditar claims that Commerce "ignored the Court's

instructions." Ditar Comments at 7. Second, Ditar contends that

Commerce "failed to answer" why the pricing differential is not

significant.  Ditar Comments at 7.  Neither argument is persuasive.
Commerce's remand results are consistent with this Court's
instructions and are supported by substantial evidence.  Moreover, any
error regarding Commerce's analysis of this issue is harmless because
Commerce's finding that Ditar has not established that it engaged in
different levels of trade in its home-market sales is supported by
substantial evidence and that issue is dispositive in this case.

> 1.    Commerce's Remand Results Are Consistent with this
>        Court's Opinion and Order

This Court addressed Ditar's challenge to "Commerce's failure to
explain why the differential in pricing between distributor and end-user
pricing that it found here—which was greater than five percent—was
not 'significant.'"  *Ditar*, 2025 WL 2795057, at *8.  Then, this Court
concluded that "Commerce's pronouncement that the pricing
differential that it found here was 'insufficient' to warrant a level-of-
trade adjustment was unadultered *ipse dixit*."  *Id.*  The Court therefore
"remand{ed} to allow the agency to connect the dots."  *Id.*  Commerce
did that here.

Commerce explained that Ditar's home-market sales to end users
were not performed at different market stages or their equivalent

33

compared to Ditar's home-market sales to end users.  Appx8698-99.

Accordingly "Ditar has failed to meet one of the two required

prerequisites to entitlement to a {level-of-trade} adjustment."

Appx8699.  Because Commerce concluded that there was only one level

of trade in Ditar's home market, Commerce explained that the second

part of the test—whether the difference in levels of trade affects price

comparability—was not in play.  Appx8714.  By identifying the basis of

its determination, which is the first prong of the level-of-trade

adjustment test, Commerce explained why Ditar's arguments

pertaining to pricing differential, which are brought under the second

prong of the level-of-trade adjustment test, were not sufficient to show

Ditar's entitlement to a level-of-trade adjustment.  Appx8715-16.

Ditar contends that "Commerce incorrectly claims that 'the Court

did sustain Commerce's analysis of price comparability as supported by

substantial evidence.'"  Ditar Comments at 11.  Instead, Ditar posits

that "[w]hile the Court sustained Commerce's use of product code

pricing comparisons instead of control-number pricing comparisons, the

Court did not sustain Commerce's overall price comparability analysis."

*Id.* (citation omitted).  However, Ditar's argument both takes the quoted

34

language from Commerce out of the context of Commerce's entire remand decision and is irrelevant to the outcome in this case.

First, although Ditar accurately observes that Commerce, in its introduction of the remand results, states "while the Court sustained Commerce's price comparability analysis, it held that Commerce failed to explain why the differential pricing was not significant and remanded on that narrow basis," Appx8691, Ditar misinterprets Commerce's use of "price comparability analysis" as a general reference to the entire second prong of the level-of-trade analysis. Ditar Comments at 11. In contrast, Commerce's remand results demonstrate that, when Commerce mentions "price comparability" at that point in the remand results, it is discussing Ditar's argument raised before this Court that Commerce's "pricing analysis—based on product codes— contradicts longstanding agency practice to use control numbers." *Ditar*, 2025 WL 2795057, at *7. Commerce quoted a portion of this Court's discussion of the pricing analysis and conclusion that Commerce's finding is supported by substantial evidence. Appx8702-03. Commerce distinguished the issue of pricing analysis from the issue

that this Court remanded—Commerce's conclusion that the pricing differential was not significant. Appx8703.

Commerce further observed that it appeared that Ditar agreed on the issue remanded, "Commerce's analysis of whether the price-differential between Ditar's claimed [levels of trade] is significant." Appx8704. Because Commerce and Ditar agree that this Court remanded for Commerce to "connect the dots" for its finding that the differential between distributor and end-user pricing is not "significant," *Ditar*, 2025 WL 2795057, at *8 (quotation omitted), there is no controversy for this Court to review. In sum, Commerce used the term "price comparability" in that section of the remand results to discuss an issue that this Court already addressed and decided in the United States' favor, and Ditar's first argument is therefore merely a disagreement about the phrase Commerce used as shorthand for one of this Court's conclusions.

Second, to the extent Ditar contends Commerce was required to proffer an analysis of whether other contexts are comparable to this context when it comes to pricing differential, Commerce is not so constrained. This Court concluded that Commerce failed to "articulate

36

a satisfactory explanation" for its finding. *Ditar*, 2025 WL 2795057, at *8 (quotation omitted). Commerce endeavored to explain why the pricing differential is not significant, or "germane," in this case. Appx8716. Ditar's mere disagreement with Commerce's explanation does not mean that Commerce failed to comply with this Court's instructions for it to explain.

2.    Commerce Adequately Explained Why the Pricing Differential Issue Is Not Significant

It is undisputed that Ditar must satisfy both statutory prerequisites for a level of trade adjustment. *Ditar*, 2025 WL 2795057, at *1. Accordingly, Commerce correctly observed that a conclusion that Ditar failed to establish one prerequisite would prohibit Commerce from granting Ditar a level-of-trade adjustment. Appx8698-99. Commerce made a finding that "the record does not reflect that Ditar's sales are made at different marketing stages nor are there substantial differences in selling activities," Appx8700; therefore, Commerce reasonably concluded that the pricing differential issue is not significant. Appx8698.

Commerce also explained why it chose not to proffer an alternative basis for its decision based on the second statutory

37

prerequisite.  Commerce determined that level-of-trade-adjustment analysis is "factually intensive" and requires Commerce to "closely scrutinize claims for such adjustments."  Appx699 (quotation mark omitted) (citing SAA at 829).  Within that context, Commerce concluded that a bright-line rule for pricing differentials would be inappropriate. Appx6899-700.  Given that Commerce had already made a finding that would, alone, prevent Ditar from obtaining a level-of-trade adjustment, Commerce reasonably decided not to engage in that fact-intensive next step in the analysis.

Ditar dedicates over five pages of its brief to challenging statements in Commerce's draft remand results that are not included in Commerce's final remand results.  Ditar Comments at 11-16; *compare* Appx8688 *with* Appx8699-700.  Such arguments are unavailing because the draft remand results, while part of the record, are not the final remand redetermination under review in this Court.  Accordingly, Ditar's challenge to findings or reasoning included in the draft remand results but not included in the final remand results do not support Ditar's challenge to the findings and reasoning in the final remand results. *Cf. Win-Tex Prods., Inc. v. United States*, 843 F. Supp. 709, 712

38

(Ct. Int'l Trade 1994) ("Commerce's proposed analysis as expressed in the contents of Draft Results are not subject to judicial review except in the form of, and to the extent incorporated in, the official final results of the remand proceedings reported to the court by the agency.").

As such this Court need not reach Ditar's arguments regarding examples from other contexts in which differences as little as two percent may be significant. Ditar's Comments at 13-16. Although Commerce observed that "bright line rules" regarding a percent difference in pricing between distributors and end users would not be appropriate in the level-of-trade context because level-of-trade analysis is fact specific, Appx8699-700, the remand results do not rest on a decision regarding the second prong of the level-of-trade analysis. *See* Appx8699-700 (explaining Ditar "failed to meet one of the two required prerequisites" for level-of-trade adjustment and "the record does not reflect that Ditar's sales are made at different marketing stages nor are there substantial differences in selling activities"); Appx8715-16 (emphasizing that, even if Commerce agreed with Ditar regarding price differential issue, Ditar was not entitled to level-of-trade adjustment because it failed to demonstrate different selling activities). Any

analysis of whether other specific contexts are comparable to the level-of-trade context for purposes of assessing whether a pricing differential is significant is an issue for Commerce in the first instance.[3]  *Cf. Ditar*, 2025 WL 2795057, at *6 ("It is the agency's job to make factual findings, not the court's.").

Once reaching Commerce's final remand results, Ditar contends that Commerce "abandoned providing an explanation of why Ditar's differential in pricing across {levels of trade} was not significant" and "punt{ed}" the issue.  Ditar Comments at 17.  Ditar, however, ignores that Commerce did explain why the differential in pricing between distributors and end users is not significant—because Ditar has not met "its burden to demonstrate that its sales involved different selling activities such that they were made at different {levels of trade}." Appx8715.  Indeed, Commerce clarified that its statement regarding the insignificance of the pricing differential was made in the context of Commerce reaching a conclusion under 19 U.S.C. § 1677b(a)(7)(A)(i), involving "whether there is a difference in selling activities," not 19

---

[3]  To be clear, we do not concede that any of the contexts to which Ditar cites are comparable.  Ditar's Comments at 13-16.

U.S.C. § 1677b(a)(7)(A)(ii), involving whether there is an effect on price comparability. Appx8715 (citing 19 U.S.C. § 1677b(a)(7)(A)(i)). Commerce "connected the dots," *Ditar*, 2025 WL 2795057, at *8, when it clarified under which prong of the test it was discussing the significance of the pricing differential argument.

### 3. Any Error Regarding Commerce's Analysis of the Pricing Differential Issue Is Harmless

If this Court sustains Commerce's finding that Ditar failed to meet its burden to demonstrate that its sales to end users involved different selling activities such that they were made at a different level of trade compared to sales to distributors, then any error in Commerce's remand results pertaining the pricing differential issue is harmless.

"It is well settled that principles of harmless error apply to the review of agency proceedings." *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996). An error that is not prejudicial is harmless. *See Belton Indus., Inc. v. United States*, 6 F.3d 756, 761 (Fed. Cir. 1993) ("Commerce's violation did not prejudice appellees. Accordingly, Commerce's violation was harmless error.").

Here, to establish entitlement to a level-of-trade adjustment, Ditar must show the purported difference in level of trade "both involve{s} the

41

performance of 'different selling activities' *and* 'affect{s} price comparability, based on a pattern of consistent price differences between sales at different levels of trade' in the producer's home market." *Ditar*, 2025 WL 2795057, at *1 (quoting 19 U.S.C. § 1677b(a)(7)(A)(i), (ii)). Therefore, notwithstanding any purported error in Commerce's handling of Ditar's pricing differential arguments pertaining to the effect on price comparability, a remand is unnecessary so long as this Court concludes that Commerce's findings regarding the first prong of the level-of-trade analysis, different selling activities, are supported by substantial evidence. For the reasons explained above, this Court should sustain Commerce's findings on the first prong, thus any error with regard to the second prong is harmless.

To the extent Ditar requests this Court instruct Commerce to make a level-of-trade adjustment, Ditar Comments at 18-19, 26, this Court should not limit Commerce's ability to administer antidumping law by directing a particular outcome. The United States Court of Appeals for the Federal Circuit has stated that the type of limiting instruction Ditar seeks is generally disfavored and not within this Court's authority. *See NEXTEEL Co. v. United States*, 28 F.4th 1226,

1238 (Fed. Cir. 2022) ("[T]he Court of International Trade is precluded by statute from ever outright reversing a decision by Commerce . . . when reviewing countervailing duty and antidumping duty proceedings. Rather, at most it can simply remand for further consideration consistent with its decision." (quotation omitted)); *see also Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1374-75 (Fed. Cir. 2012) ("We generally disfavor limited remands that restrict Commerce's ability to collect and fully analyze data on a contested issue.").

Moreover, Ditar has not shown that the record "supports only one outcome," *id.*, as this case challenges Commerce's weighing of the evidence and whether Commerce addressed particular issues or arguments. Thus, even if the Court were to remand the case, the Court should only remand for further consideration and allow Commerce, the agency charged with administering the antidumping law, to fulfill its statutory duty by determining for itself the most suitable way to proceed. *See Cornerstone Chem. Co. v. United States*, No. 25-00005, 2026 WL 1747087, at *6 n.12 (Ct. Int'l Trade June 17, 2026) ("The court's job, however, is to review—not preempt—agency action.").

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

                         Respectfully submitted,

                         BRETT A. SHUMATE
                         Assistant Attorney General

                         PATRICIA M. McCARTHY
                         Director

                         FRANKLIN E. WHITE, JR.
                         Assistant Director

| | |
|---|---|
| | s/ Rebecca T. Mitchell |
| OF COUNSEL: | REBECCA T. MITCHELL |
| | Commercial Litigation Branch |
| PAUL THORNTON | U.S. Department of Justice |
| Attorney | Civil Division |
| Department of Commerce | P.O. Box 480 |
| Office of Chief Counsel for Trade | Ben Franklin Station |
| Enforcement & Compliance | Washington, D.C., 20044 |
| 1401 Constitution Avenue, NW | Tel: (202) 616-0467 |
| Washington, DC 20230 | Email: Rebecca.Mitchell@usdoj.gov |
| | |
| July 10, 2026 | Attorneys for Defendant |

44

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(b)(1) of the Standard Chambers Procedures of this Court, that this brief contains 7,673 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Rebecca T. Mitchell
REBECCA T. MITCHELL

Case 1:24-cv-00130-MMB   Document 57   Filed 07/10/26   Page 52 of 52

## CERTIFICATE OF
## <u>NO GENERATIVE ARTIFICIAL INTELLIGENCE ASSISTANCE</u>

I hereby certify, pursuant to requirement 6 of Judge Baker's

Document Formatting Instructions and this Court's order, ECF 18, that

this filing was not prepared with the assistance of generative artificial

intelligence programs.

<u>/s/ Rebecca T. Mitchell</u>

REBECCA T. MITCHELL